1  Jeffrey S. Bolender (Bar No. 174423)
2  Thomas H. Schelly (Bar No. 217285)
   Bolender & Associates,
3  A Professional Law Corporation
   2601 Airport Drive, Suite 360
4  Torrance, CA 90505
   Telephone: (310) 784-2443
5  Facsimile: (310) 784-2444

6  Attorney for Plaintiff,
7  EVANSTON INSURANCE COMPANY

8

9                UNITED STATES DISTRICT COURT

10      NORTHERN DISTRICT OF CALIFORNIA - SAN JOSE DIVISION

11

12 EVANSTON INSURANCE COMPANY,          Case No. C08 02099 JF
   an Illinois corporation,
13                                       **AMENDED NOTICE OF MOTION AND
14                Plaintiff,             MOTION FOR PARTIAL SUMMARY
                                         JUDGMENT; MEMORANDUM OF
15 vs.                                   POINTS AND AUTHORITIES;
                                         DECLARATION OF ROGER
16 GHILLIE SUITS.COM, INC, a             DEKRAKER; DECLARATION OF
   Georgia corporation; TODD            TRACEY ROVINELLI;
17 MUIRHEARD, a Georgia                  DECLARATION OF JEFFREY S.
   resident; JEREMY JAMES EHART,         BOLENDER**
18 a Kansas resident; KRISTY             **[Request for Judicial Notice
   EHART, a Kansas resident; and         Filed Concurrently]**
19 STEVEN RYAN McCLANAHAN, a
   West Virginia Resident, and           Date  : Sept. 19, 2008
20 DOES 1 - 10,                          Time  : 9:00 a.m.
21                                       Place : Courtroom 3
                  Defendants.            Judge : Hon. Jeremy Fogel
22
23
24                                       Complaint Filed : 4/22/2008
                                         Trial Date: None Set
25

26

27

28

BOLENDER & ASSOCIATES
A Professional Law Corporation
2601 Airport Dr., Suite 360
Torrance, CA 90505

TO ALL PARTIES AND THEIR ATTORNEYS:

PLEASE TAKE NOTICE that on September 19, 2008, at 9:00 a.m., or as soon thereafter as the matter may be heard, in Courtroom 3 of the United States District Court, Northern Division of California, located at 280 South First Street, San Jose, California, plaintiff Evanston Insurance Company ("Evanston"), will and hereby does move this Court as follows:

1.  For partial summary judgment on the complaint in its favor and against defendants Ghillie Suits.com, Inc., d/b/a and a/k/a Ghillie Suits.com Inc. ("Ghillie"), Todd Muirhead, Jeremy James Ehart, Kristy Ehart, and Steven Ryan McClanahan, and Does 1 - 100, on the ground that there is no genuine issue as to any material fact, that moving parties are entitled to summary judgment as a matter of law with respect to Evanston's First Cause of Action [Declaratory Relief - Duty to Indemnify], and that the final judgment in this action shall, in addition to any matters determined at trial, award judgment as established by such adjudication.

This Motion is brought pursuant to *Federal Rules of Civil Procedure* Rule 56, and on the grounds that:

1.  As a matter of law, the events set forth in Jeremy James Ehart, Kristy Ehart and Steven Ryan McClanahan v. Ghillie Suits.com Inc., et al., United States District

Court, Northern District of California, San Jose Division Case No. 06 06507 RS(the "Underlying Action"), constitute a single "occurrence," as that term is defined in the Evanston insurance policy No. CL041400001 issued to Ghillie (the "Evanston Policy"), and as defined by California law; and

2. As a matter of law, Evanston's duty to indemnify any qualifying insured, if any, is limited to $1,000,000 under the Evanston Policy with respect to the claims set forth in the Underlying Action, because the Underlying Action alleges once occurrence.

This motion is based on this notice of motion, the attached memorandum of points and authorities, the Declaration of Tracy Rovinelli, the Declaration of Roger Dekraker, the Declaration of Jeffrey S. Bolender, and on all pleadings and papers on file in this action, and upon such other matters as may be presented to the Court at the time of hearing.

BOLENDER & ASSOCIATES,
A Professional Law Corporation

Dated: August 12, 2008    By: _____

Jeffrey S. Bolender
Thomas H. Schelly,
Attorney for Plaintiff,
Evanston Insurance Company

**MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. C08 02099 JF**

# TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

I.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

   A. The Insurance Policies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

   B. The Ghillie Suits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

   C. The Underlying Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

III. THE UNDERLYING COMPLAINT ALLEGES ONE "OCCURRENCE" . . . . 7

   A. The Definition of "Occurrence" Is Determined
      As A Matter of Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

   B. The Defective Ghillie Suits Constitute A Single
      Occurrence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

   C. The Underlying Events Constitute A Single Occurrence
      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

IV.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

1

### TABLE OF AUTHORITIES

2

3

### CASE LAW

4

5    *American States Insurance Company v. Kearns*

6         (9th Cir. 1994) 15 F.3d 142...................15

7    *American Casualty Company of Reading, Pa. v. Krieger*

8         (9th Cir. 1999) 181 F.3d 1113.................10

9

10   *Certain Underwriters at Lloyd's London v. A&D Interests, Inc.*

11        (S.D.Tex 2002) 197 F. Supp. 2d 741...........16

12   *Comunale v. Traders & General Ins. Co.*

13        (1958) 50 Cal.2d 654.........................11

14

15   *Finkelstein v. 20th Century Ins. Co.*

16        (1993) 11 Cal.App.4th 926...................12

17   *Foley v. Interactive Data Corporation*

18        (1988) 47 Cal.3d 654........................9

19

20   *Griffin v. Allstate Insurance Company*

21        (C.D.Cal. 1996) 920 F.Supp. 127.............10

22

23   *Hamilton v. Maryland Casualty Company*

24        (2002) 27 Cal.4[th] 718....................10,11

25   *Kenney v Kenney*

26        (SDNY 2007) 494 F.Supp.2d 252...............16

27

28

*Love v. Fire Insurance Exchange*
     (1990) 221 Cal.App.3d 1136...................10

*New Orleans Public Service, Inc. v. Council of New Orleans*
     (5th Cir. 1987) 833 F.2d 583...................16

*Societe de Conditionnement v. Hunter Engineering Company*, Inc.
     (9th Cir. 1981) 655 F2d 938...................15

*Travelers Insurance Company v. Davis*
     (3rd Cir. 1974) 490 F.2d 536...................14

*Waller v. Truck Insurance Exchange, Inc.*
     (1995) 11 Cal.4th 1 10........................10

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### MEMORANDUM OF POINTS AND AUTOHRITIES

## I.    INTRODUCTION

This action arises out of an underlying lawsuit for personal injury and product defect resulting from burn injuries suffered during a military training exercise on October 28, 2004 ("Underlying Event").  At the time of the Underlying Event, defendants Jeremy James Ehart and Steven Ryan McClanahan were wearing specialized clothing called "ghillie suits," which were manufactured and distributed by defendant Ghillie Suits.com, Inc., d/b/a and a/k/a Ghillie Suits.com Inc. ("GSC"). During the training exercise, Jeremy's ghillie suit caught fire.  McClanahan attempted to extinguish the flames, but his ghillie suit caught fire in the process.  Both men were badly burned.

At the time of the Underlying Event, GSC was insured under a Commercial General Liability ("CGL") policy that had been issued by Evanston Insurance Company ("Evanston"), effective from May 19, 2004 to May 19, 2005.  The policy provided indemnity of up to one million dollars ($1,000,000) *per occurrence* for "bodily injury" and/or "property damage."

Jeremy Ehart, Steven McClanahan, and Jeremy's wife Kristy Ehart brought an action against, *inter alia*, GSC and its president and owner Todd Muirhead ("Muirhead") for strict product liability (design defect and failure to warn), negligence, breach of implied warranty, and loss of consortium

(the "Underlying lawsuit"). GSC then tendered the Underlying lawsuit to Evanston.

The undisputed evidence shows that Evanston is only obligated to provide GSC up to one million dollars ($1,000,000) in indemnity regarding events that occurred on October 28, 2004.  Under California law, the number of occurrences is determined by the cause of the injury, not the number of injuries. As a matter of law, Evanston is entitled to a judgment that it is not obligated to provide more than $1,000,000 in indemnity coverage to GSC.

II.    **FACTUAL BACKGROUND**

　　**A.    The Insurance Policies**

Evanston issued a commercial general liability insurance policy to GSC, Evanston Policy No. CL041400001 (May 19, 2004 to Mary 19, 2005, hereinafter "Evanston Policy").  [Declaration of Tracey Rovinelli ("Rovinelli Declaration"), paragraph 3, and Exhibit 1 attached thereto].

Subject to various terms, conditions and other limiting provisions, the Evanston policy afford liability coverage via the above-noted Commercial General Liability Coverage Form (hereinafter, "CGL form").  [Rovinelli Declaration, paragraphs 3 and 4(a) through (f), and Exhibits 1 through 7, attached thereto].  In particular, the Evanston Policies contained the following sections:

The Insuring Agreement portion of the Evanston
Policies stated, in pertinent part:

SECTION I COVERAGES

COVERAGE A BODILY INJURY AND PROPERTY DAMAGE
LIABILITY

    1.    Insuring Agreement

\*\*\*

    b.    This insurance applies to "bodily in-
jury" and "property damage" only if:

    (1)    The "bodily injury" or "property dam-
age" is caused by an "occurrence" that takes place
in the "coverage territory"; and

    (2)    The "bodily injury" or "property dam-
age" occurs during the policy period. [Rovinelli
Declaration, paragraphs 4(c) and (d), and Exhibits
4 and 5 attached thereto].

The Evanston Policies defined "occurrence" as "an
accident, including continuous or repeated exposure to
substantially the same general harmful conditions." [Rovinelli
Declaration, paragraph 4(f), and Exhibit 7 attached thereto].

In the event of an "occurrence," Evanston would indemnify
Ghillie Suits for up to one million dollars ($1,000,000), as
provided in the Evanston Policies - COMMERCIAL GENERAL
LIABILITY COVERAGE PART SUPPLEMENTAL DECLARATIONS - LIMITS OF

INSURANCE.  [Rovinelli Declaration, paragraphs 4(a) and (b), and Exhibits 2 and 3 attached thereto].

**B.  The Ghillie Suits**

GSC manufactures and/or distributes ghillie suits.  [See, paragraphs 15, 22, 23, and 29 of the Complaint in *Jeremy James Ehart, et al. v. Ghillie Suits.Com, Inc., et al.* United States District Court, Northern District of California, Case No. C06-06507 (the "Underlying Complaint"), attached as Exhibit 1 to Evanston's Request for Judicial Notice, filed concurrently herewith].  Muirhead is the registered patent owner of the ghillie suits at issue [See, Underlying Complaint, paragraph 5].  Prior to the Underlying Event, GSC sold approximately fifteen (15) ghillie suits to the United States Department of Energy ("USDOE").  [See, Underlying Complaint, paragraph 15]. The ghillie suits were "Desert Storm" era suits, which consisted of a blouse and trousers with jute fabric sewn onto them.  [Id.]. GSC and Muirhead also sold the USDOE a fire retardant spray that was to be applied to the ghillie suits. [See, Underlying Complaint, paragraphs 17 and 19]. However, the ghillie suits were allegedly highly flammable, despite the application of the fire retardant.  [See, Underlying Complaint, paragraphs 31, 40, 56, 63, and 77].

### C.  The Underlying Action

Defendants Jeremy Ehart ("Jeremy"), a lance corporal with the United States Marine Corps, and Steven Ryan McClanahan ("McClanahan") a corporal with the United States Marine Corps, were assigned to a training exercise at Fort Hunter Liggett, located in Monterrey County, California.  [See, Underlying Complaint, paragraph 15]. The exercise, titled "Exercise Pacific Patriot," was sponsored by the USDOE.  [Id.]. The USDOE would provide the soldiers with all of their equipment, including the ghillie suits it had purchased from GSC, and worn by Jeremy and McClanahan.  [Id.].

On or about the morning of October 28, 2004, Jeremy and McClanahan arrived at their fighting positions.  [See, Underlying Complaint, paragraph 22]. There was approximately 40 meters distance between Jeremy's fighting position and McClanahan's fighting position.  [Id.]. From his fighting position, Jeremy engaged a convoy of USDOE agents using an M60 machine gun (which was loaded with "blank" ammunition).  [See, Underlying Complaint, paragraph 23]. Suddenly, Jeremy's ghillie suit caught on fire. [Id.]. Jeremy rose from his fighting position and ran towards McClanahan while calling for help. [Id.]. McClanahan, after removing the blouse portion of his ghillie suit, attempted to smother the flames on Jeremy, and attempted to get Jeremy to roll on the ground.  [See, Underlying Complaint, paragraphs 23 and 24].  In the process of attempting to extinguish the flames, McClanahan's ghillie suit

also caught on fire.  [Id.].  A paramedic arrived at the scene, and extinguished Jeremy's flames with a fire extinguisher, while an unidentified individual extinguished McClanahan's flames.  [See, Underlying Complaint, paragraph 24].

Both Jeremy and McClanahan suffered serious burns.  [See, Underlying Complaint, paragraphs 25, 26, and 27].  On or about October 18, 2006, Jeremy, McClanahan, and Jeremy's wife Kristy Ehart ("Kristy") filed the Underlying lawsuit against, *inter alia*, GSC and Muirhead (collectively, Jeremy, McClanahan, Kristy, GSC, and Muirhead are referred to as "Defendants"). [See, Generally, Underlying Complaint]. GSC tendered the Underlying lawsuit to Evanston.  [Declaration of Roger DeKraker ("DeKraker Declaration"), paragraph 4].  Evanston agreed to defend Ghillie and Muirhead in the Underlying lawsuit under a reservation of rights, including the right to seek reimbursement of any amounts paid in indemnification of GSC and Muirhead.  [DeKraker Declaration, paragraphs 5 and 6].

Defendants contend that Evanston is obligated to provide indemnity coverage up to two million dollars ($2,000,000) for two "occurrences."  However, the undisputed facts clearly show that the underlying events constitute one "occurrence," as that term is defined under the Evanston Policy and pursuant to California law.  As a matter of law, this motion should be granted and judgment entered against Defendants and in favor of Evanston.

**MOTION FOR PARTIAL SUMMARY JUDGMENT**
**CASE NO. C08 02099 JF**

III.  THE UNDERLYING COMPLAINT ALLEGES ONE "OCCURRENCE"

A.    The Definition of "Occurrence" Is Determined As A
      Matter Of Law

As a matter of law, defining the term "occurrence" is a question of insurance policy interpretation, which follows the general rules of contract interpretation.  Essentially, any interpretation of an insurance policy's terms "must give effect to the 'mutual intention' of the parties . . . [s]uch intent is to be inferred, if possible, solely from the written provisions" of the policy.  *MacKinnon v. Truck Insurance Exchange* (2003) 31 Cal.4th 635, 647.  California courts have consistently held that "[i]n determining the number of occurrences for purposes of determining the number of policy limits available, "'occurrence' has been . . . held to mean the underlying cause of the injury rather than the injury or claim itself; otherwise the insurer's effort to limit its liability per occurrence would be substantially weakened." *Safeco Insurance Company of America v. Fireman's Fund Insurance Company* (2007) 148 Cal.App.4th 620, 633 (citing *Whittaker Corporation v. Allianz Underwriters, Inc.* (1992) 11 Cal.App.4th 1236, 1242); *See, Eott Energy Corp. v. Storebrand International Insurance Company* (1996) 45 Cal.App.4th 565, 575-578 (citing and discussing California and Federal case law). Indeed, "[w]hen there is a *single cause of multiple injuries* . . . courts often look to the cause rather than the injuries in determining the amount of insurance coverage." *Bay Cities Paving & Grading v.*

*Lawyers' Mutual Insurance Company* (1993) 5 Cal.4th 854, 863 (emphasis added). "In such a case, the result is a finding of only one claim, i.e., the court looks to the single cause rather than to the multiple injuries. *Id.*

Indeed, with respect to actions involving injury to more than one individual, courts nationally have held for the past several decades to look to the cause, rather than the injuries, in determining whether there was a single "occurrence," thereby subjecting the insurer to only one policy limit. *See, Denham v. La Salle-Madison Hotel Co.* (7th Cir. 1948) 168 F.2d 576 (applying Illinois law, holding that multiple injuries resulting from a fire was a single "occurrence"); *See, Barett v. Iowa National Mutual Insurance Company* (9th Cir. 1959) 264 F.2d 224 (applying Montana law, holding that multiple injuries resulting from a fire was a single "occurrence"); *See, Tri-State Roofing Company v. New Amsterdam Casualty Company* (D.C. Pa. 1955) 139 F.Supp. 193 (applying Pennsylvania law, holding that multiple injuries resulting from a fire was a single "occurrence"); *See, Greaves v. State Farm Insurance Company* (D.D.C. 1997) 984 F.Supp. 12, 16 (Noting that the vast majority of jurisdictions "have construed the term "occurrence," as used in insurance policies, to refer to "the cause or causes of the damage [or injury] and not to the number of injuries.").[1]

---

[1] In the two courts that had held that an occurrence is calculated by reference to the number of injuries, Texas and Louisiana, subsequent decisions from these same courts either repudiate their earlier holdings, or modify them to such an extent as to render their persuasive value de minimis. *See,*

The Evanston Policy provides for $1,000,000 in indemnity coverage *per occurrence*.  In the instant case, although there were two injuries alleged in the Underlying lawsuit, the injuries resulted from a single occurrence.  Consequently, as a matter of law, Evanston is only obligated to provide up to $1,000,000 in indemnity coverage to GSC with respect to the damages alleged in the Underlying lawsuit.

**B.    The Defective Ghillie Suits Constitute A Single Occurrence**

In *Chemstar, Inc. v. Liberty Mutual Insurance Company* (9th Cir. 1994) 41 F.3d 429, the plaintiff supplied lime plaster to numerous housing contractors for use in home construction. However, the plaintiff failed to advise the contractors that if the lime plaster was exposed to sufficient moisture, unsightly "pitting" would result, and therefore should not be use in home interiors.  The contractors ultimately used the lime plaster in 28 home interiors.  Pitting resulted, and the homeowners each brought claims against the plaintiff.

The plaintiff tendered the claims to its insurer, defendant Liberty Mutual Insurance Company ("Defendant").  The plaintiff's insurance policy stated, in pertinent part, that Defendant "will pay on behalf of [the plaintiff] all sums which

*Greaves v. State Farm Insurance Company*, 974, F.Supp. at 16 (citing *Saint Paul– Mercury Indemnity Company v. Rutland* (5th Cir. 1955) 225 F.2d 689, 693 (Texas), and *Whetstone v. Dixon* (La.Ct.App. 1993) 616 So.2d 764, 773-74 (Louisiana)).

[the plaintiff] shall become obligated to pay by reason of the liability imposed on [the plaintiff] . . . for damages because of . . . destruction of tangible property during the policy period . . . caused by an occurrence."

The plaintiff filed a declaratory relief action in the District Court against Defendant, seeking, *inter alia*, a declaration as to coverage.  The trial court ruled that all 28 pitting claims arose from one occurrence, and the plaintiff appealed.

The Ninth Circuit Court of Appeals upheld the District Court's ruling, holding that the pitting resulting from a single occurrence – the plaintiff's defective warning regarding the lime plaster.  *Id.* at 432.  The Appellate Court held that the defect was a continuing, uninterrupted cause of the pitting, stating that "if [the plaintiff] had employed an adequate quality control system and warned of the proper uses of its product, the other causes . . . would not have resulted in damage." *Id.* The Appellate Court further held that "the fact that the 28 incidents of pitting involved different homes, claimants, sources of lime, and times does not preclude a finding that the incidents arose from the same underlying cause." *Id.* at 433.

The undisputed evidence clearly shows that the Underlying Incident constitutes a single occurrence.  Similar to *Chemstar*, the Underlying Incident arose from the same underlying cause – the defective ghillie suits. Merely because the resulting

injuries involved different claimants, and the injuries occurred at (slightly) different times, does not preclude a finding that the injuries were the result of a single cause, i.e., one "occurrence." *See, Bay Cities Paving & Grading v. Lawyers' Mutual Insurance Company*, 5 Cal.4th at 863 (holding that Courts will look to the single cause, rather than the multiple injuries).   As a matter of law, this motion should be granted, and the maximum amount of coverage for the Underlying lawsuit should be set at $1,000,000 as provided by the Evanston Policy.

**C.    The Underlying Events Constitute A Single Occurrence**

Assuming *arguendo* that the fire, and not the ghillie suits themselves, constitute the "occurrence," the result is the same - only one occurrence took place, not two, and the amount of indemnity Evanston should be obligated to provide on behalf of GSC is no more than $1,000,000. In *Safeco Insurance Company of America*, 148 Cal.App.4th 620, an insured homeowner (the "Insured") owned a hilltop home in Encino, California.   In 1998, a portion of the Insured's property failed, sliding downhill into his neighbors' yards with dirt and debris, causing a variety of injuries to the neighbors' property.   The neighbors' filed a lawsuit, which resulted in a jury verdict in their favor for over $2,000,000 against the Insured.

Prior to the landslide, the Insured had obtained a one-year homeowners policy from Fireman's Fund Insurance Company

("Fireman's Fund"), effective starting in June 1997, which provided coverage for an "occurrence" of property damage and/or personal injury. Fireman's Fund renewed the Insured's policy in three subsequent years, each for a one-year period, with the last policy expiring in June 2001. The policies covered claims up to $500,000 per occurrence for property damage and/or bodily injury caused by each occurrence. In addition, during the same period as the Fireman's Fund policies, the Insured obtained excess coverage from Safeco Insurance Company of America ("Safeco").

Safeco filed a declaratory relief action against Fireman's Fund, asserting that Fireman's Fund was obligated to indemnify its Insured for four separate occurrences, thus totaling $4,000,000 in indemnity, with Fireman's Fund filing its own cross-action for declaratory relief regarding the same issue, asserting that there was only one occurrence, and was only obligated to provide up to $500,000 in indemnity for the Insured. Both parties filed cross-motions for summary judgment. The trial court ruled in favor of Fireman's Fund, concluding that there was a single occurrence during a single policy period, resulting in $500,000 in coverage for the underlying incident. Safeco appealed.

The Appellate Court upheld that trial court's ruling, holding that "[l]iability policies invariably contain limits on the insurer's liability for covered events. *Safeco Ins. Co. of America v. Fireman's Fund Ins. Co.*, 148 Cal.App.4th at 633. Such

limits are usually stated in terms of a certain amount for each 'occurrence,' 'accident' or 'claim' during the policy period." *Id.* "For this purpose, the number of occurrences . . . depends on the cause of injury rather than the number of injurious effects . . . ." *Id.* (internal quotations omitted). "Where one proximate, uninterrupted, and continuing cause results in injuries . . . there is a single accident or occurrence within the meaning of the 'per accident' clause in the liability insurance policy limiting the insurer's liability to a certain amount for each accident or each occurrence." *Id.*

The Appellate Court further held that "[w]hen all injuries emanate from a common source . . . there is only a single occurrence for purposes of policy coverage." *Id.* at 633-634. "It is irrelevant that there are multiple injuries or injuries of different magnitudes . . . ." *Id.*

Moreover, the Appellate Court held that in the instance of "personal injury," the analysis was essentially the same, holding that an "occurrence meant an act or series of acts of the same or similar nature that occurs during the policy period and which results in 'personal injury." *Id.* at 636-637 (internal quotations omitted). "In the world of liability insurance, personal injury coverage applies to injury which arises out of the commission of certain enumerated acts or offenses[;] . . . coverage thus is triggered by the offense, not the injury or damage which a plaintiff suffers." *Id.* (internal quotations omitted).

The fire that erupted on October 28, 2004 constitutes the single occurrence that resulted in Jeremy and McClanahan's burns. Similar to the landslide in *Safeco*, the fire was a single, uninterrupted cause of multiple damages. Merely because the fire spread from one ghillie suit to two ghillie suits does not create two distinct occurrences, but is instead, one continuous event, starting with the ignition of Jeremy's ghillie suit, and ending with McClanahan's ghillie suit. The flames that burned Jeremy and McClanahan all originated from the same event. As a matter of law, Evanston's motion should be granted.

## IV.    CONCLUSION

Evanston does not dispute that the allegations in the Underlying Action represent a horrible tragedy that befell two people. However, that horrible tragedy was the result of a single occurrence, either as the defective ghillie suits manufactured and distributed by GSC, or the fire that ignited Jeremy's ghillie suit. For the foregoing reasons, Evanston's motion for summary judgment as to its First Cause of Action [Declaratory Relief – Duty to Indemnify] should be granted, and the amount of indemnity Evanston is obligated to provide on behalf of GSC is limited to $1,000,000.

1

2          BOLENDER & ASSOCIATES,

3          A Professional Law Corporation

4    Dated: 8/12/08      By: _____

5          Jeffrey S. Bolender

6          Thomas H. Schelly,
           Attorney for Plaintiff,
7          Evanston Insurance Company

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   Jeffrey S. Bolender (Bar No. 174423)
    Bolender & Associates,
2   A Professional Law Corporation
    2601 Airport Drive, Suite 360
3   Torrance, CA 90505
    Telephone: (310) 784-2443
4   Facsimile: (310) 784-2444

5
    Attorney for Plaintiff,
6   EVANSTON INSURANCE COMPANY

7

8
                    UNITED STATES DISTRICT COURT
9
10       NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION

11
    EVANSTON INSURANCE COMPANY,      Case No. C08 02099 JF
12  an Illinois corporation,
                                     DECLARATION OF ROGER
13                 Plaintiff,        DEKRAKER IN SUPPORT OF
                                     PLAINTIFF EVANSTON INSURANCE
14  vs.                             COMPANY'S MOTION FOR PARTIAL
                                     SUMMARY JUDGMENT; EXHIBIT 1
15  GHILLIE SUITS.COM, INC., a
16  Georgia corporation; TODD
    MUIRHEARD, a Georgia             Date  : Sept. 19, 2008
17  resident; JEREMY JAMES EHART,    Time  : 9:00 a.m.
    a Kansas resident; KRISTY        Place : Courtroom 3
18  EHART, a Kansas resident; and    Judge : Hon. Jeremy Fogel
    STEVEN RYAN McCLANAHAN, a
19  West Virginia Resident, and
20  DOES 1 - 100,                    Complaint Filed : 4/22/2008
                                     Trial Date: None Set
21                 Defendants.

22

23

24

25

26

27

28

BOLENDER & ASSOCIATES
A Professional Law Corporation
2601 Airport Dr., Suite 360
Torrance, CA 90505

U:\Jeffrey\Ghillie Suits\MSJ\Partial.MSJ.DeKraker.Dec.v1.doc

## DECLARATION OF ROGER DEKRAKER

I, Roger DeKraker, declare:

1.   I submit this declaration in support of Plaintiff Evanston Insurance Company's Motion for Partial Summary Judgment.  The statements in this declaration are based upon my personal knowledge, and if called upon to testify to the truth of said matters, I can and will do so under oath based upon my personal knowledge.

2.   I am and have been employed by Markel Southwest Underwriters ("Markel") for approximately two (2) years.  I hold the position of Claims Specialist in the Claims Department and have been so employed for two (2) years.  I am familiar with the practices and procedures in the Markel Claims Department.

3.   Markel performs claims handling services for insurance companies, including Evanston Insurance Company ("Evanston").

4.   On or about November 6, 2006, I received tender from Defendant Ghillie Suits.Com, Inc. ("GSC")requesting that Evanston provide it and its owner Todd Muirhead with a defense and indemnification regarding the underlying action, titled Jeremy James Ehart, Kristy Ehart and Steven Ryan McClanahan v. Ghillie Suits.com Inc., et al., United States District Court,

U:\Jeffrey\Ghillie Suits\MSJ\Partial.MSJ.DeKraker.Dec.v1.doc

1    Northern District of California, San Jose Division Case No. 06

2    06507 RS (the "Underlying Action"), pursuant to commercial

3    general liability insurance policy, No. CL041400001 (the

4    "Evanston Policy").

5

6         5.    Pending its investigation into the claims against GSC

7    and Mr. Muirhead raised in the Underlying Action, Evanston

8    elected to extend a defense to GSC and Mr. Muirhead under the

9    Evanston Policy, pursuant to reservations of rights as set

10   forth in letters from Evanston's coverage counsel in this

11   matter dated January 3, 2008, true and correct copies of which

12   are attached hereto as Exhibit 1.

13

14        6.    Evanston is currently providing GSC and Mr. Muirhead

15   with a defense in the Underlying Action under the Evanston

16   Policy, pursuant to the reservation of rights in Exhibit 1.

17

18        I declare under penalty of perjury under the laws of the

19   State of Arizona, the State of California, and the United

20   States of America that the foregoing is true and correct.

21   Executed on June 5, 2008 in Scottsdale, Arizona.

22

23

24                              Roger DeKraker, Declarant

25

26

27

28

**DECLARATION OF ROGER DEKRAKER IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

3

CASE NO. C08 02099 HRL

# BOLENDER & ASSOCIATES
### A PROFESSIONAL LAW CORPORATION

2601 AIRPORT DRIVE, SUITE 360
TORRANCE, CALIFORNIA 90505

JEFFREY S. BOLENDER†
LAUREN M. CHUN
E. SUSIE WENDORFF

TELEPHONE 310 784 2443
FACSIMILE 310 784 2444

— OF COUNSEL —
MIKEL A. GLAVINOVICH
TALI MONROF

†ADMITTED IN CALIFORNIA AND HAWAII

January 3, 2008

**GHILLIE SUITS.COM, INC.**
1743 Rhonda Lane
Stone Mountain, GA 30087

*Via Certified Mail*

Attn: Todd Muirhead

Re: ***Ehart, et al.  vs. Ghillie Suits.com, Inc., et al.***
    Case No.    : C06-06507
    Claim No.   : 00126843
    Policyholder : Ghillie Suits.com, Inc., et al.
    Policy No.   : CL 041400001 (05/19/2004 – 05/19/2005)
               : CL 041400008 (05/19/2005 – 05/19/2007)
    Our File No. : 07-80185

Dear Mr. Muirhead:

As you may recall from earlier correspondence, our office has been retained as insurance coverage counsel by Markel Southwest Underwriters, Inc., an affiliated underwriter manager for Evanston Insurance Company ("Evanston"), the general liability carrier for Ghillie Suits.com, Inc. ("Ghillie"). We understand that you are the president and owner of Ghillie. Please let us know if there is anyone else to whom we should direct this letter.

Evanston has been providing a defense to you and Ghillie in the above-captioned lawsuit (the "Ehart lawsuit") under Policy No. CL 041400001 via Paul Stephan, Esq. of the law firm Selman & Breitman. Attached hereto as Exhibit 1 is a copy of our firm's letter dated April 24, 2007, the terms of which are incorporated herein. Evanston will continue providing a defense to the complaint and cross-claim under a reservation of rights as supplemented by this letter. Please contact Mr. Stephan directly if you have any questions concerning the status of the lawsuit, including the status of any pending settlement discussions.

**EXHIBIT** \_\_1\_\_ .

Mr. Todd Muirhead
January 3, 2008
Page 2

As you may be aware, plaintiffs recently demanded $2 million to settle the claims in the complaint against Ghillie. Plaintiffs claim that the Evanston insurance affords indemnity benefits in the amount of $2 million. As explained below, it is the position of Evanston that only one policy applies to this loss, i.e., Policy No. CL 041400001, and that under the policy's Each Occurrence Limit, only $1 million in indemnity benefits applies to this claim. Attached hereto as Exhibit 2 is a copy of our firm's letter dated October 11, 2007, in which Evanston again offered to settle the complaint against Ghillie in the amount of $1 million.

We are informed that plaintiffs decline to accept Evanston's settlement offer in the amount of the policy's Each Occurrence Limit. Thus, plaintiffs seek damages against Ghillie in amounts in excess of the Limits of Insurance available under Policy No. CL 041400001. It is the position of Evanston that it is not responsible for the amount of any judgment or settlement in excess of the policy's Each Occurrence Limit of $1 million. As explained below, Evanston reserves its rights under Policy No. CL 041400001, including its right to limit coverage pursuant to the policy provisions relating to Limits of Insurance. We urge Ghillie to immediately notify any other insurance carrier who issued insurance that applies, or that may apply, to the claims in the Ehart lawsuit.

## FACTUAL BACKGROUND

In order to explain the coverage issues, we must discuss the allegations in the complaint. Evanston understands that these allegations are unproven and may be untrue, incomplete, or embellished. In discussing the allegations, Evanston has not and does not conclude that any such allegations are true, and no statement in this letter should be construed otherwise.

On October 18, 2006, plaintiffs Jeremy Ehart, Kristy Ehart, and Steven McClanahan filed a lawsuit against you, Ghillie, and others (New York Fire-Shield, Inc., Wackenhut Services, Inc., and the Wackenhut Corporation) in the United States District Court for the Northern District of California, Case No. C06-06507. The complaint alleges that Jeremy Ehart and Steven McClanahan, both United States Marines, were severely burned on October 28, 2004 while participating in a military exercise in Jolon, California. They had each been wearing "ghillie suits" purchased from Ghillie by the U.S. Department of Defense which provided the suits to plaintiffs and other Marines for the exercise. Ehart's ghillie suit apparently ignited while he was firing an M60 machine gun during the exercise. McClanahan came to Ehart's aid and attempted to extinguish the fire. As a result, McClanahan's suit also ignited. Ehart and McClanahan sue Ghillie for

Mr. Todd Muirhead
January 3, 2008
Page 3

strict products liability, including design and manufacturing defects and failure to warn, as well as for negligence and seek to recover general damages, medical and incidental expenses, loss of earnings and earning capacity, interest, and costs. In addition, Plaintiff Kristy Ehart alleges a separate claim for loss of consortium arising from the injury to her husband.

## POLICY INFORMATION

### 1.    The Policies

Evanston issued a commercial general liability policy, No. CL 041400001, to Ghillie for the period May 19, 2004 through May 19, 2005. Evanston issued a second insurance policy, No. CL 041400008, effective May 19, 2005 to May 19, 2006. Evanston renewed the second policy as No. CL 041400008RC1, effective May 19, 2006 to May 19, 2007. Liability coverage under each policy is afforded by a Commercial General Liability Occurrence Form, Form No. CG 00 01 (07/98), hereinafter "CGL form."

### 2.    Coverage A – Bodily Injury and Property Damage

Please refer to the CGL form, specifically the Insuring Agreement under Section I – Coverages, Coverage A – Bodily Injury and Property Damage Liability, which provides in pertinent part as follows:

### SECTION I – COVERAGES

### COVERAGE A.  BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1. **Insuring Agreement**

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. ...

   b. This insurance applies to "bodily injury" and "property damage" only if:

Mr. Todd Muirhead
January 3, 2008
Page 4

---

    (1)    The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and

    (2)    The "bodily injury" or "property damage" occurs during the policy period.

\* \* \*

Please refer to the CGL form, specifically Section V – Definitions, which defines the following policy terms:

## SECTION V – DEFINITIONS

...

**3.**    "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

...

**13.**    "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

\* \* \*

As you will note, the liability insurance under Coverage A applies only to "bodily injury" sustained during the policy period as a result of an "occurrence." Plaintiffs sustained injuries on October 28, 2004, and therefore those injuries occurred during the effective dates of Policy No. CL 041400001. The injuries sustained by plaintiffs did not occur during the effective dates of the subsequent policies, Nos. CL 041400008 and CL 041400008RC1, and therefore, those two policies do not potentially apply to the claims in the complaint. Accordingly, Evanston must respectfully decline to defend or indemnify Ghillie under those two subsequent policies with respect to the bodily injury claims.

## 3.    <u>Coverage B – Personal and Advertising Injury</u>

It is the position of Evanston that Coverage B does not apply to the claims in the complaint or the cross-claim. Please refer to the enclosed letter dated April 24, 2007. That letter, which relates to the cross-claim by New York Fire-Shield, Inc., sets forth the pertinent provisions of the Insuring Agreement for Coverage B. The claims by plaintiffs do not meet the definition of "personal and advertising injury" and, therefore, do not fall within the scope of Coverage B as to any of the policies issued by Evanston to Ghillie. Accordingly, Evanston must respectfully decline to defend or indemnify Ghillie under Coverage B with respect to the claims in the cross-claim.

Mr. Todd Muirhead
January 3, 2008
Page 5

4.    **Limits of Insurance**

The liability declarations of Policy No. CL 041400001 schedule the policy's Limits of Insurance as follows:

**LIMITS OF INSURANCE**

| | |
|---|---|
| General Aggregate Limit (Other Than Products /Completed Operations) | $2,000,000 |
| Products-Completed Operations Aggregate Limit | $2,000,000 |
| Personal and Advertising Injury Limit | $1,000,000 |
| Each Occurrence Limit | $1,000,000 |
| Fire Damage Limit | $50,000 |
| Medical Expenses | $1,000 |

\* \* \*

Please refer to the CGL form, specifically Section III – Limits of Insurance, which provides as follows:

**SECTION III – LIMITS**

1.  The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

    a.  Insureds;

    b.  Claims made or "suits" brought; or

    c.  Persons or organizations making claims or bringing "suits".

2.  The General Aggregate Limit is the most we will pay for the sum of:

    a.  Medical expenses under Coverage **C**;

    b.  Damages under Coverage **A**, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

    c.  Damages under Coverage **B**.

3.  The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage **A** for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

...

Mr. Todd Muirhead
January 3, 2008
Page 6

> 5. Subject to **2.** or **3.** above, whichever applies, the Each Occurrence Limits is the most we will pay for the sum of:
>
>> **a.** Damages under Coverage **A**; and
>>
>> **b.** Medical expenses under Coverage **C**
>> because of all "bodily injury" and "property damage" arising out of any one "occurrence".
>
> ...
>
> 7. Subject to **5.** above, the Medical Expense Limit is the most we will pay under Coverage **C** for the sum of all medical expenses damages because of "bodily injury" sustained by any one person.

* * *

As reflected above, the Limits of Insurance in the declarations apply regardless of the number persons making claims or bringing "suits." The General Aggregate Limit and Products-Completed Operations Aggregate Limit, whichever applies, are subject to the Each Occurrence Limit. The claims in the complaint fall within the "products-completed operations hazard," and therefore are subject to the rules pertaining to the Products-Completed Operations Aggregate Limit. Please refer to the CGL form, specifically, Section V – Definitions, which sets forth the following definition:

> 16. "Products-completed operations hazard":
>
>> **a.** Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:
>>
>>> **(1)** Products that are still in your physical possession[.]...

* * *

The Each Occurrence Limit provides that $1 million is the most that Evanston will pay for damages under Coverage A and medical expenses under Coverage C because of all "bodily injury" and "property damage" arising out of any one "occurrence." The term "occurrence is defined at Paragraph 13. of the CGL form to mean "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

Mr. Todd Muirhead
January 3, 2008
Page 7

In determining policy limits, occurrence means the underlying cause of the injury, rather than the injury or claim itself.[1] When there is a single cause of multiple injuries, courts look to the cause rather than the injuries in determining the amount of insurance coverage.[2] "In such a case, the result is a finding of only one claim, i.e., the court looks to the single cause rather than to the multiple injuries."[3] In applying the cause test, courts in California consistently hold that "a series of related acts, attributable to a single cause, may be treated as having been caused by one occurrence."[4]

The subject incident and claims by Ehart and McClanahan fall squarely within this framework. It is therefore necessary to advise you that Evanston will not be responsible for any damages awarded against Ghillie or for any amounts paid in settlement, to the extent any such damage award or settlement amount exceeds the Each Occurrence Limit of $1 million. We urge you to immediately notify any other insurance carrier whose insurance may cover some or all of the damages alleged in the complaint or cross-claim.

## 5.    **Punitive Damages**

Policy No. CL 041400001 is subject to the Combination General Endorsement, Form M/E-001(04/00), which states in pertinent part as follows:

---

[1] *Whittaker Corp. v. Allianz Underwriters, Inc.* (1992) 11 Cal.App.4th 1236, 1242; *accord Safeco Ins. Co. of America v. Fireman's Fund Ins. Co.* (2007) 148 Cal.App.4th 620, 633.

[2] *Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Ins. Co.* (1993) 5 Cal.4th 854, 863.

[3] *Id.*

[4] *EOTT Energy Corp. v. Storebrand Internat. Ins. Co.* (1996) 45 Cal.App.4th 565, 576; *see also Haerens v. Commercial Cas. Ins. Co.* (1955) 130 Cal.App.2d Supp. 892, 893-894 (279 P.2d 211); *State Farm Fire & Casualty Co. v. Elizabeth N.* (1992) 9 Cal.App.4th 1232, 1237-1238; *Chemstar, Inc. v. Liberty Mut. Ins. Co.* (9th Cir. 1994) 41 F.3d 429, 433 (twenty-eight incidents of pitting involving twenty-eight different homes and multiple claimants, but caused by the failure of a lime plaster manufacturer to warn of limited application requirement, thus triggering only one deductible); *Mead Reinsurance v. Granite State Ins. Co.* (9th Cir. 1988) 873 F.2d 1185, 1188.

Mr. Todd Muirhead
January 3, 2008
Page 8

6. Punitive or Exemplary Damages is not covered under this policy nor are any expenses nor any obligation to share damages with or repay anyone else who must pay damages from same. ...

\* \* \*

Evanston specifically reserves its rights under the above-quoted policy exclusion relating to punitive and exemplary damages.

## CONCLUSION

In addition to the specific reservation of rights set forth in this letter, any duties owed by Evanston to the insured are subject, but not limited, to the following additional reservations:

1. The Evanston policies do not provide coverage for equitable claims, such as claims for injunctive relief. In California, "damages" are limited to compensation for harm suffered and do not include injunctive relief and other equitable relief. *Bank of the West v. Superior Court* (1992) 2 Cal. 4th 1254.

2. Evanston reserves the right not to indemnify the insured for pure economic loss, as such damages are not covered by the Evanston policies.

3. Evanston specifically reserves the right to seek reimbursement of defense fees paid toward defending causes of action which raise no potential for coverage, as authorized by California law, including the California Supreme Court's decisions in *Buss v. Superior Court (Transamerica Ins. Co.)* (1997) 16 Cal.4th 35 and *Scottsdale Ins. Co. v. MV Transportation* (2005) 36 Cal. 4th 643.

4. Evanston reserves the right to seek reimbursement for any judgment or settlement of non-covered claims paid pursuant to the reservations stated herein as authorized in *Blue Ridge Insurance Company v. Jacobsen*, (2001) 25 Cal.4th 489.

5. All rights and reservations previously asserted are incorporated in full herein, including, but not limited to, the right file an action in the civil courts for reimbursement of defense and indemnity payments.

In summary, Evanston agrees to continue to providing a defense in the above-captioned lawsuit under Policy No. CL 04140001, subject to a reservation

Mr. Todd Muirhead
January 3, 2008
Page 9

---

of rights. The entitlement of Ghillie and you to the defense benefit under the policy is limited to covered attorney fees, expert fees, and other reasonable litigation expenses incurred in connection with the defense of Ghillie and you on or after the date of Evanston's first notice of a lawsuit seeking potentially covered damages.

If you or Ghillie have coverage that exceeds the limits of the Evanston policy, your insurance broker should report the claim. If you or Ghillie have coverage with another company, please provide us with the name of the company, its address, contact person, policy period, and claim number. If you or your broker have notified another carrier, and that carrier has acknowledged or disclaimed coverage, please provide us with any correspondence with that insurer so that we can evaluate its position regarding coverage.

Please note that Evanston's coverage position is based upon the allegations in the lawsuits and the facts and information presented to Evanston to date and should not be be construed as applicable to subsequently amended suits or amendments to this claim. If you disagree in any way with the position taken in this letter, or if you believe there are any facts, legal authorities, documents, witnesses, evidence, policy provisions, or other matter of any kind or nature that would warrant a different conclusion, Evanston would like to consider that additional information at your earliest possible convenience. Further, we request that you provide us with copies of any amended pleadings that may be filed, so that we may continue to review this matter for coverage.

Evanston, by this letter and all prior correspondence, does not waive or invalidate any of the other terms, conditions or exclusions in the policies. Evanston specifically reserves the right to exercise any of the other terms, conditions or exclusions of the policies which now exist or may later become apparent. Evanston also reserves the right to rely upon any facts that are presently known or that may become apparent at any time after this letter. Evanston specifically reserves the right to bring an action to declare the obligations and responsibilities of the parties hereto under the contract of insurance in question, at any time after the date of this letter.

California law requires that we provide the following information to you:

You may have this claim reviewed by the California Department of Insurance to the extent you disagree with any or all of the positions Evanston Insurance Company has expressed. Your inquiry may be directed to the California Department of Insurance, Claims Services

Mr. Todd Muirhead
January 3, 2008
Page 10

Bureau, 11th Floor, 300 South Spring Street, Los Angeles, CA 90013; or you may call 800-927-4357 or 213-897-8921.

\* \* \*

You are not required to contact the California Department of Insurance, and you are welcomed to contact the undersigned should you have any comments or questions about this letter. Thank you.

Sincerely,

Jeffrey S. Bolender
E. Susie Wendorff

JSB:is
Enclosures

Copies to:    Mr. Paul Stephan
SELMAN BREITMAN
33 New Montgomery, 6th Fl.
San Francisco, CA 94105-4537

Mr. Roger DeKraker
EVANSTON INSURANCE COMPANY
8700 East Northsight Blvd., Ste.200
Scottsdale, AZ 85260-3669

EXHIBIT 1

EXHIBIT 1

EXHIBIT 1

EXHIBIT 1

# BOLENDER & ASSOCIATES

A PROFESSIONAL LAW CORPORATION

JEFFREY S. BOLENDER*
PATRICK L. BLAIR*
ANITA V. SHAH
LAUREN M. CHUN

*ADMITTED IN CALIFORNIA AND HAWAII

2601 AIRPORT DRIVE, SUITE 360
TORRANCE, CALIFORNIA 90505

TELEPHONE 310 784 2443
FACSIMILE 310 784 2444

OF COUNSEL
MIKEL A. GLAVINOVICH

April 24, 2007

GHILLIE SUITS.COM, INC.
1743 Rhonda Lane
Stone Mountain, GA 30087

*Sent Via Certified  Mail*

Attn: Todd Muirhead

Re:    ***Ehart, et al.  v. Ghillie Suits.com, Inc., et al.***
    Case No.   : C06-06507
    Claim No.   : 00126843
    Policyholder : Ghillie Suits.com, Inc.
    Policy Nos.  : CL 041400001 (05/19/2004 – 05/19/2005)
             : CL 041400008 (05/19/2005 – 05/19/2007)
    Our File No. : 07-80185

Dear Mr. Muirhead:

Our office has been retained as insurance coverage counsel by Markel Southwest Underwriters, Inc., an affiliated underwriter manager for Evanston Insurance Company ("Evanston"), the general liability carrier for Ghillie Suits.com, Inc. On behalf of Evanston, we hereby acknowledge receipt of a cross-claim filed in the pending lawsuit entitled, <u>Ehart, et al. v. Ghillie Suits.com, Inc., et al.</u>, Case No. C06-06507, filed in the United States District Court, Northern District of California ("the Ehart lawsuit"). We understand that you (Todd Muirhead) are the owner of Ghillie Suits.com, Inc. ("Ghillie"). Please let us know if there is anyone else to whom we should direct this letter.

As you already know, Evanston has already retained Paul Stephan, Esq. of the law firm Selman Breitman, to provide a legal defense to you and Ghillie in the Ehart lawsuit. Mr. Stephan will continue to defend to Ghillie in the Ehart lawsuit. This letter pertains solely to the cross-claim recently filed against you, Ghillie, and others by another defendant, New York Fire-Shield Inc. ("Fire-Shield"). As explained below, the trademark related allegations in the cross-claim are not within the scope of coverage under the Evanston policies. Evanston will provide a legal defense to those allegations in the cross-claim, but its defense of the cross-claim

Mr. Todd Muirhead
April 24, 2007
Page 2

will be under a reservation of rights, including the right to seek reimbursement for attorney fees and litigation expenses incurred solely to defend the allegations in the cross-claim for which no potential coverage exists.

In order to explain the coverage issues, we must discuss the allegations in the complaint and cross-claim. Evanston understands that these allegations are unproven and may be untrue, incomplete, or embellished. In discussing the allegations, Evanston has not and does not conclude that any such allegations are true, and no statement in this letter should be construed otherwise.

As you know, on October 18, 2006, various plaintiffs (Jeremy Ehart, Kristy Ehart, and Steven McClanahan) filed a lawsuit against you, Ghillie, and others (New York Fire-Shield, Inc., Wackenhut Services, Inc., and the Wackenhut Corporation) in the United States District Court for the Northern District of California, case. No. C06-06507. As against you and Ghillie, plaintiffs allege causes of action for strict products liability for the defective design of fire retardant suits and the failure to warn consumers of the defects. Plaintiffs frame their allegations under other theories of liability as well, seeking to recover general damages, medical and incidental expenses, loss of earnings and earning capacity, interest, and costs.

On March 23, 2007, Fire-Shield filed a cross-claim alleging causes of action for trademark infringement; unfair competition; misleading advertising; equitable indemnity; total indemnity; contribution; and declaratory relief. The gist of the cross-claim is a dispute concerning the marketing, advertising, and distribution of fire retardant products under names similar to Fire-Shield's trademark "Inspecta-Shield." Specifically, Fire-Shield alleges that Ghillie infringed on the "Inspecta-Shield" trademark by marketing and distributing fire retardant products under the name "Inspecta-Shield Class A Fire Retardant." The allegedly misleading marketing and advertising caused consumer confusion. Fire-Shield seeks injunctive and declaratory relief, indemnification, and contribution. It also seeks compensatory damages, costs, attorney fees, and punitive damages.

Evanston issued a commercial general liability policy, No. CL 041400001 to Ghillie for the period May 19, 2004 through May 19, 2005. Evanston issued a second insurance policy, No. CL 041400008, effective May 19, 2005 to May 19, 2006. Evanston renewed the second policy as No. CL 041400008RC1, effective May 19, 2006 to May 19, 2007. Each policy's limits of insurance are $1 million per occurrence subject to general aggregate of $2 million. Liability coverage is afforded by Form CG 00 01 (07/98) ("CGL form").

Please refer to the CGL form, specifically the insuring agreement under Section I – Coverages, Coverage A – Bodily Injury and Property Damage Liability, which provides in pertinent part as follows:

Mr. Todd Muirhead
April 24, 2007
Page 3

## SECTION I – COVERAGES

## COVERAGE A.  BODILY INJURY AND PROPERTY DAMAGE LIABILITY

**1.  Insuring Agreement**

    **a.**  We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.  We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. ...

    **b.**  This insurance applies to "bodily injury" and "property damage" only if:

        **(1)**  The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and

        **(2)**  The "bodily injury" or "property damage" occurs during the policy period.

* * *

Please refer to the CGL form, specifically Section V – Definitions, which defines the following policy terms:

## SECTION V - DEFINITIONS

...

**3.**  "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

...

**13.**  "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

...

**17.**  "Property damage" means:

    **a.**  Physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

Mr. Todd Muirhead
April 24, 2007
Page 4

---

**b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

\* \* \*

As you will note, the liability insurance under Coverage A applies only to "bodily injury" and "property damage" sustained during the policy period as a result of an "occurrence." The trademark related allegations in the cross-claim do not constitute an "occurrence," "property damage," or "bodily injury." Therefore, it is the position of Evanston that those allegations are not within the insuring agreement of Coverage A of either Evanston policy.

Please refer to the CGL form, specifically the Insuring Agreement under Section I – Coverages, Coverage B – Personal and Advertising Injury Liability, which provides in pertinent part as follows:

**SECTION I – COVERAGES**

**COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY**

**1. Insuring Agreement**

   **a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. ...

   ...

   **b.** This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

\* \* \*

Please refer to the CGL form, Section V – Definitions, where the following terms are defined:

**SECTION V - DEFINITIONS**

**1.** "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters.

Mr. Todd Muirhead
April 24, 2007
Page 5

...

14.    "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

...

f.    The use of another's advertising idea in your "advertisement"; or

g.    Infringing upon another's copyright, trade dress or slogan in your "advertisement".

\* \* \*

As you will note, the Insuring Agreement for Coverage B applies only to "personal and advertising injury" offenses committed during the policy period. "Personal and advertising injury" is defined to include the "use of another's advertising idea in your 'advertisement'[.]"    Fire-Shield alleges that Ghillie infringed upon its trademark, "Inspecta-Shield," by marketing and advertising its product under the similar product name of "Inspecta-Shield Class A Fire Retardant." Please note, however, that each of the Evanston policies is subject to an Intellectual Property Hazard Exclusion Endorsement, Form IntellProp (09.01), which states in pertinent part:

The following exclusion is added to **SECTION I – COVERAGES, 2. Exclusions under COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILTY** and/or **COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY:**

We have no duty or obligation to indemnify, investigate, settle, or defend any claim, "suit" or administrative proceeding, under any circumstances, against any insured alleging actual or threatened injury or damage of any nature or kind to any persons or property, which arises out of such "intellectual property hazard" either through primary or secondary markets, or through any stage of the stream of commerce.

The following is added to **SECTION V – DEFINITIONS:**

**"Intellectual property hazard"** means any claim, under any circumstance, which in any way relates to or arises out of:

a.    Infringement of patent, trademark, service mark, trade dress, copyright, title or slogan, or copyright joint ownership;

b.    disparagement of a person's or organization's goods, products, services or claims;

c.    unfair competition;

Mr. Todd Muirhead
April 24, 2007
Page 6

 d. trade libel or slander;

 e. violation of the right of privacy or publicity, advertising ideas, style of doing business, intellectual property, trade secrets, market share agreements;

 f. violations of or claims relating to the Lanham Act; and/or

 g. violations of or claims relating to the Computer Fraud Act.

This exclusion is also intended to exclude any agreements or contracts of any kind that the insured may have with third parties requiring defense and/or indemnity. To the extent not excluded, breach of non-disclosure, non-compete or non-solicitation agreements are not covered.

* * *

 The above-quoted provisions exclude coverage for claims arising out of, or in any way are related to the infringement of patent, trademark, service mark, trade dress, copyright, title or slogan, or copyright joint ownership. Fire-Shield's claims arise out of allegations that Ghillie infringed on the trademark, "Inspecta-Shield" by unlawfully marketing, advertising and distributing fire retardant under the similar name, "Inspecta-Shield Class A Fire Retardant." Accordingly, Fire-Shield's allegations in the cross-claim regarding trademark infringement, misleading advertising, and unfair competition fall within the scope of the Intellectual Property Hazard Exclusion Endorsement and are excluded from coverage. Therefore, it is the position of Evanston that these allegations do not fall within the scope of coverage under Coverage B of either Evanston policy.

 Additionally, please note that liability policies, such as the Evanston policies, do not provide coverage for claims seeking injunctive or restitutionary relief. Further, each of Evanston's polices exclude coverage for punitive and exemplary damages, which are sought by Fire-Shield. With respect to policy No. CL 041400001, please refer to Form M/E-001(04/00), which states as follows:

 6. Punitive or Exemplary Damages is not covered under this policy nor are any expenses nor any obligation to share damages with or repay anyone else who must pay damages from same. ...

* * *

With respect to policy Nos. CL 041400008 and CL 041400008RC1, please refer to Form MSU 001 (06/04), which states as follows:

 6. Fines, penalties, and/or punitive or exemplary damages are not covered under this policy nor are any expenses nor is any obligation to share such damages or repay another. ...

Mr. Todd Muirhead
April 24, 2007
Page 7

* * *

As noted above, Evanston is already defending you (Muirhead) and Ghillie in connection with the Ehart lawsuit. Evanston also agrees to defend you and Ghillie with respect to the cross-claim; however, its agreement to furnish a legal defense to the cross-claim is subject to a reservation of rights. This means that, although Evanston will be providing a legal defense, it hereby reserves the right to deny the policy's indemnity benefit as to any liability on the part of you or Ghillie with respect to New York Fire Shield's trademark related allegations. Further, Evanston reserves its right to seek reimbursement pursuant to *Buss v. Superior Court* (1997) 16 Cal.4th 35, 39. Specifically, Evanston reserves its right to seek recovery of attorney fees and litigation expenses to the extent those fees and expenses are incurred in connection with the defense of claims for which no potential coverage exists. Evanston also reserves the right to claim and demand reimbursement from you and Ghillie of such fees and expenses, and to file an action in the civil courts for an order and award of monetary damages in the amount of Evanston's expenditures plus interest.

In summary, Evanston hereby agrees to furnish a defense to the cross-claim, as set forth herein, subject to the reservation. Evanston also reserves its right to seek judicial declarations regarding the respective rights and obligations of all interested parties under the policy. Evanston reserves the right to recover from any insured, and/or any other insurer, or any other parties, any payments made by Evanston, including payments for indemnification, defense costs and expenses, attorney fees and costs of suit, and to seek reimbursement of any payments for indemnification, as well as attorney fees and other litigation costs paid to defend claims for which there is no potential coverage. Evanston reserves the right to withdraw from the defense of Fire-Shield's cross-claim should facts show there is no potential coverage under the insurance afforded by Evanston, or if a court determines there is no duty to defend.

If you are aware of other insurance that applies, or that may apply, please notify the insurers at your earliest convenience. If any other insurer has been notified, but either failed to respond or refused to defend, or if any other insurer has agreed to defend, please forward to my attention any and all policy documents, insurer-related correspondence, etc., so that I may communicate directly with them. If this letter requires clarification in any way, kindly contact me at your earliest convenience so that we can discuss these issues more fully. Rest assured, I will immediately evaluate any such information and provide a detailed written response.

In Evanston's defense, investigation, and handling of this matter, it may describe certain issues and policy provisions that may affect your entitlement to cov-

Mr. Todd Muirhead
April 24, 2007
Page 8

erage. Nothing in this letter, prior correspondence, or any other action by Evanston shall constitute a waiver of any kind as to any legal or contractual rights it may ever have. Evanston reserves the right to rely on any facts, which are now known, or which are later discovered, that may relate to any issue concerning the availability of insurance coverage. Evanston specifically reserves the right to bring an action to declare the obligations and responsibilities of the parties hereto under the contract of insurance in question, at any time after the date of this letter. California law requires that we provide the following information:

You may have this claim reviewed by the California Department of Insurance to the extent you disagree with any or all of the positions Evanston Insurance Company has expressed. Your inquiry may be directed to the California Department of Insurance, Claims Services Bureau, 11th Floor, 300 South Spring Street, Los Angeles, CA 90013; or you may call 800-927-4357 or 213-897-8921.

You are not required to contact the California Department of Insurance, and you are welcomed to contact the undersigned should you have any comments or questions about this letter. Thank you.

Sincerely,

Jeffrey S. Bolender

JSB:is

Copies to:    Mr. Paul Stephan
SELMAN BREITMAN
33 New Montgomery, 6th Fl.
San Francisco, CA 94105-4537

Mr. Roger DeKraker
MARKEL SOUTHWEST UNDERWRITERS, INC.
8700 East Northsight Blvd., Ste.200
Scottsdale, AZ 85260-3669

**EXHIBIT 2**

**EXHIBIT 2**

**EXHIBIT 2**

**EXHIBIT 2**

# BOLENDER & ASSOCIATES
## A PROFESSIONAL LAW CORPORATION

2601 AIRPORT DRIVE, SUITE 360
TORRANCE, CALIFORNIA 90505

JEFFREY S. BOLENDER†
LAUREN M. CHUN
E. SUSIE WENDORFF

— OF COUNSEL —
MIKEL A. GLAVINOVICH
TALI MONROF

TELEPHONE 310 784 2443
FACSIMILE 310 784 2444

†ADMITTED IN CALIFORNIA AND HAWAII

October 11, 2007

**WILLOUGHBY, STUART & BENING**
**A PROFESSIONAL LAW COPROPRATON**
50 West San Fernando, Suite 400
San Jose, CA 95113

*Via Facsimile & U.S. Mail*

Attn: Alexander F. Stuart, Esq.

Re: *Ehart, et al. vs. Ghillie Suits.com, et al.*
   Case No.     : C06-06507
   Claim No.    : 00126843
   Policyholder : GhillieSuits.com, Inc.
   Policy Nos.  : CL 041400001 (05/19/2004 – 05/19/2005)
                : CL 041400008 (05/19/2005 – 05/19/2007)
   Our File No. : 07-80185
   Your File No.: 1160.10643S

Dear Mr. Stuart:

     As you may know, our office has been retained as insurance coverage counsel by Markel Southwest Underwriters, Inc., an affiliated underwriter manager for Evanston Insurance Company ("Evanston"), the general liability carrier for Ghillie Suits.com, Inc.  On behalf of Evanston, we hereby respond to plaintiffs' settlement demand of September 26, 2007 in the above-captioned lawsuit.

     According to your letter of that date, plaintiffs contend that the injuries to each of them constitute separate "occurrences" under the Evanston policy and, therefore, they demand $2 million as the policy limits for settlement of this matter.  As discussed further below, Evanston respectfully disagrees with plaintiffs' interpretation of the policy and applicable case law and renews its tender of the $1 million single occurrence policy limit for full and complete settlement of all claims.  In making this offer, Evanston does not in any way seek to diminish the seriousness of plaintiffs' injuries nor the suffering and loss they have experienced and will continue to experience.  To the contrary, Evanston seeks to provide plaintiffs with the fullest extent of benefits available to them under the policy and the law.

Mr. Alexander F. Stuart, Esq.
October 11, 2007
Page 2

As you are aware, the subject policy specifically defines the term "occurrence" as follows: "[A]n accident, including continuous or repeated exposure to substantially the same general harmful conditions." Where there is a question as to whether a claim constitutes one occurrence or multiple occurrences, California law, recently affirmed in Safeco Ins. Co. of America v. Fireman's Fund Ins. Co. (2007) 148 Cal.App.4th 620, holds that the answer turns on the underlying cause of the injury or claim, not the number or extent of injuries.

In Safeco, the underlying action involved the negligence of one property owner which caused a landslide and resulted in damage to his downhill neighbor. At issue before the Court of Appeal was whether Fireman's Fund was liable for multiple policy limits arising from multiple occurrences, or a single policy limit for only one occurrence. Safeco argued for the former construction, contending that property damage occurred during each of the four Fireman's Fund policy periods. However, the court held that there was only one occurrence, a landslide, in the first policy period. "[T]he definitions of 'occurrence' determined if a particular policy provided coverage, not the amount of coverage. Put another way, in determining which policies provided coverage, the definitions of 'occurrence' meant that property damage claims triggered policies in effect at the time of the damage. . . ." (Citations omitted.) Id. at 633.

The Court then continued its analysis as to the amount of coverage. "Fireman's Fund's liability under the policies is determined on a 'per occurrence' basis. In determining policy limits, 'occurrence has generally been held to mean the underlying cause of the injury, rather than the injury or claim itself; otherwise, the insurer's effort to limit its liability per occurrence would be substantially weakened.'" Id. at 633, quoting Whittaker Corp. v. Allianz Underwriters, Inc. (1992) 11 Cal.App.4th 1236, 1242; EOTT Energy Corp. v. Storebrand Internat. Ins. Co. (1996) 45 Cal.App.4th 565, 575-578. "'When there is a single cause of multiple injuries . . . , courts often look to the cause rather than the injuries in determining the amount of insurance coverage. In such a case, the result is a finding of only one claim; i.e. the court looks to the single cause rather than to the multiple injuries.'" Safeco Ins. Co. of America v. Fireman's Fund Ins. Co., supra, 148 Cal.App.4th at 633, quoting Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Ins. Co. (1993) 5 Cal.4th 854, 863.

The Farmer's Fund policy defined "occurrence" as an "accident, including continuous . . . exposure to the same harmful conditions, . . . ." The Court noted the significance of the term "accident": "[T]his was done in order to clarify the intent with respect to the time of coverage and application of policy limits, particularly in situations involving a related series of events attributable to the same fac-

Mr. Alexander F. Stuart, Esq.
October 11, 2007
Page 3

---

*tors.* Under such circumstances only *one accident or occurrence* is intended as far as the application of *policy limits* is concerned.'" Id. at 635, quoting Montrose Chemical Corp. v. Admiral Ins. Co. (1995) 10 Cal. 4th 645, 672.

In Caldo Oil Co. v. State Water Resources Control Bd., (1996) 44 Cal.App.4th 1821, plaintiff appealed a State Water Resources Control Board decision to treat two claims for tank leaks as one occurrence and thus limit plaintiff's maximum reimbursement. The leaks occurred in two separate tank systems on adjacent parcels of land, the first discovered in April and the second in December. Two separate claims were submitted by plaintiff. The Water Board reasoned that the two events could be considered only one occurrence because "[a]butting parcels were involved. These parcels are owned by the same company which used both parcels in combined business activities. The releases on both parcels involve petroleum products. The releases were discovered within a time frame which permitted a single site investigation." Id. at 1826. Plaintiff argued that the leaks occurred at two separate sites from two different tank systems of two different petroleum fuels, and that the insurance industry definition of "occurrence" should be used. Id. The court agreed with plaintiff and applied the typical commercial general liability policy definition of "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Id. at 1828.

> When all injuries emanate from a common source . . . , there is only a single occurrence *for purposes of policy coverage.* It is irrelevant that there are multiple injuries or injuries of different magnitudes, or that the injuries extend over a period of time. Conversely, when a cause is interrupted, or when there are several autonomous causes, there are multiple "occurrences" for purposes of determining policy limits and assessing deductibles. Id., quoting 3 Cal. Insurance Law & Practice (1995) General Liability Policies, §49.18[3][b], pp. 49:54-55 (emphasis added); see also Safeco Ins. Co. of America v. Fireman's Fund Ins. Co. supra, 148 Cal.App.4th at 633-634.

Thus, in Caldo Oil, the court found two separate conditions or causes for the underground water contamination.

In Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Ins. Co., supra, 5 Cal.4th 854, plaintiff argued that two omissions by its attorney in connection with a collection matter constituted two claims under the attorney's "claims made" policy. In support of this contention, plaintiff relied on several cases concerning "occurrence" policies which inapplicability the court discussed at length. In Michigan Chemical Corp. v. American Home Assur. Co. (W.D.Mich. 1983) 728 F.2d 374, the court held that the mistaken shipment of toxic flame retardant to distributors of livestock feed resulting in the death of thousands of head of livestock and claims

Mr. Alexander F. Stuart, Esq.
October 11, 2007
Page 4

by numerous farmers, constituted a single occurrence. The court reasoned that "[t]he number of occurrences must be determined by explaining the cause of the property damage, i.e. the misshipment or misshipments of the toxin." Id. at 382. "Occurrence" was defined in that policy as "an accident or a happening or event or a continuous or repeated exposure to conditions . . ." Id. at 378. Similarly, in Home Indem. Co. v. City of Mobile (11th Cir. 1984) 749 F.2d 659, more than 200 claims were filed against the city for flood damage incurred during three rain-storms. Plaintiffs alleged that the city had been negligent in its planning, construction, and operation of its water drainage system, and that each claim was an occurrence. The insurer contended that each storm was a separate cause of damage and, thus, a separate occurrence. The court held that the number of causes was determinative and that each discrete act or series of acts causing damage was a separate occurrence under the policy. Thus, each rainstorm constituted an occurrence. In that case, the policy defined "occurrence" as "an accident, including continuous or repeated exposure to conditions, . . . ." Id. at 661. The California Supreme Court noted with agreement the Michigan Chemical court's explanation that use of the term "occurrence" rather than "on a claim basis" indicates that "*such policies were not intended to gauge coverage on the basis of individual accidents giving rise to claims, but rather on the underlying circumstances which resulted in the claims for damages*", quoting Champion International Corp. v. Continental Casualty Co. (2d Cir. 1976) 546 F. 2d 502, 505-506 (emphasis added), Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Ins. Co., supra, 5 Cal.4th at 866. In Champion, plaintiff sold vinyl coated plywood panels installed in houseboats, house trailers, campers, and the like. Fourteen hundred vehicles were damaged when the vinyl peeled off after installation. The court held that there was only one occurrence.

Plaintiffs cite the decision in The Flintkote Co. v. General Accident Assurance Co. (N.D.Cal. 2006) 410 F. Supp.2d 875 for its holding that "occurrence" means "an event that causes and immediately precedes an injury giving rise to liability under the policy." While Evanston would contend that the fire and resulting injuries to plaintiffs meet this definition, the case is otherwise distinguishable from the instant action. At the outset, this case concerns asbestos-related injuries and thus falls within that unique and specific area of law. More specifically, however, the subject policy did not include a definition of "occurrence", unlike the Evanston policy. The court considered a dictionary definition of the term and engaged in a lengthy and detailed analysis of each policy provision using the term, of which there were several, again unlike the Evanston policy. The court concluded that "[a]ll of the preceding passage use 'occurrence' in the sense of 'accident': an unforeseen event that causes injury to one or more persons, or to property. In contrast, both of defendants' proposed constructions for 'occurrence' . . . are better characterized as business decisions or operations facts of plaintiff's business." Id. at 892. The court further noted that, unlike the Evanston policy, there was no pro-

Mr. Alexander F. Stuart, Esq.
October 11, 2007
Page 5

vision defining a condition existing for a prolonged period of time as a single oc-
currence. Id. The court in Maples v. Aetna Casualty & Surety Co. (1978) 83
Cal.App.3d 641, 648-649, cited by the Flintkote court, extensively reviewed cases
from California and a number of other states and held that the "seemingly unbro-
ken line of authority find[s] that the term 'accident' unambiguously refers to the
event causing damage, not the earlier event creating the potential for future injury.
. . ." Finally, the Flintkote court specifically limited its holding to the asbestos
arena: "The court is therefore in substantial agreement with plaintiff and finds
that, *as applied to the context of asbestos-related injuries*, an 'occurrence' is 'ex-
posure to asbestos that causes and immediately precedes an injury giving rise to
liability under the policy.'" The Flintkote Co. v. General Accident Assurance Co.,
supra, 410 F. Supp.2d at 894 (emphasis added).

An earlier decision by the Ninth Circuit Court of Appeals is more helpful in
this instance. In Chemstar, Inc. v. Liberty Mutual Ins. Co., et al. (9th Cir. 1994) 41
F.3d 429, plaintiff manufactured a plaster product which it recommended for exte-
rior use only. Various contractors were unaware of this and used the product for
home interiors, causing pitting in 28 homes the owners of which brought claims
against Chemstar. The Ninth Circuit upheld the Central District Court of Califor-
nia's ruling that the 28 claims constituted only one occurrence stemming from
Chemstar's failure to warn as there was no intervening business decision between
that failure and the pitting.

Similarly, in Mead Reinsurance v. Granite State Insurance Co. (9th Cir.
1988) 873 F.2d 1185, the Ninth Circuit upheld the Northern District Court of Cali-
fornia's ruling that 12 complaints against the city for police misconduct consti-
tuted only two occurrences. The Legislature requires that municipal liability be
based upon a municipal custom or policy. The Court held that the allegations in
eleven of the complaints constituted violation of one particular policy and the
twelfth complaint was directed at violation of another policy. The Mead court
cites to a decision in the Third Circuit, Appalachian Ins. Co. v. Liberty Mutual Ins.
Co. (1982) 767 F.2d 56. In that case, the court held that sex discrimination claims
by various employees at different times constituted one "occurrence". "The gen-
eral rule is that an occurrence is determined by the cause or causes of the resulting
injury. '[T]he majority of jurisdictions employs the 'cause theory'. Using this
analysis, the court asks if [t]here was but one proximate, uninterrupted, and con-
tinuing cause which resulted in all of the injuries and damage.'" (Multiple cita-
tions to various jurisdictions omitted.) Id. at 61. In that case, the cause was Lib-
erty Mutual's discriminatory employment policies.

Mr. Alexander F. Stuart, Esq.
October 11, 2007
Page 6

Plaintiffs also rely on <u>State Farm Fire & Casualty Co. v. Kohl, et al.</u> (1982) 131 Cal.App.3d 1031 and the fireman's rule cases cited in their demand letter to support their contention that their injuries were incurred in two separate occurrences. This reliance is misplaced. <u>Kohl</u> and the cases cited therein address circumstances wherein a defendant in an underlying action has both a homeowner's and an automobile policy and the issue in each case is whether, given the mutually exclusive provisions in the policies, there is potential coverage under one or both policies. There was no dispute as to whether the subject event constituted an "accident" or "occurrence", nor as to whether there was one or more "accidents" or "occurrences" under a given policy.[1] In reaching their decisions, the courts applied general tort principles to determine whether there was a separate and distinct tortious act which would survive the mutual policy exclusions; e.g. in an accident involving a vehicle in some fashion, is there another activity wholly independent of the vehicle which caused or contributed to the plaintiff's injury such that there is a potential for coverage under the homeowner's policy despite such policy's exclusion for injury arising out of the use and operation of a motor vehicle? These decisions are thus distinguishable from, and inapplicable to, the question at hand, namely determination of number of occurrences under a commercial general liability policy.

The fireman's rule cases are likewise clearly distinguishable and inapplicable. This rule, which is an example of the proper application of the doctrine of assumption of risk, a tort principle, operates to bar liability by waiving any otherwise applicable duty of care owed the firefighter. <u>Stapper v. GMI Holdings, Inc.</u> (1999) 73 Cal.App.4th 787. Thus, a firefighter is precluded from suing for injuries arising within the course of his or her employment. However, "[t]he firefighter does not assume every risk of his or her occupation. [Citation omitted.] The rule does not apply to conduct other than that which necessitated the summoning of the firefighter or police officer, and it does not apply to independent acts of misconduct that are committed after the firefighter or police officer arrived on the scene." <u>Id.</u> at 791, quoting <u>Neighbarger v. Irwin Industries, Inc.</u> (1994) 8 Cal.4th 532, 538. The courts in these decisions were faced with determining whether there were any "independent acts of misconduct" which caused or contributed to the plaintiff's injuries separate and apart from the fire or other activity which summoned the plaintiff to the scene. Thus, the failure of a garage door opener which caused a firefighter to become trapped was deemed separate misconduct for which the fire-

---

[1] In their demand letter, plaintiffs include a quote from <u>Kohl</u> regarding the "causation theory." Significantly, the two cases cited in support of this portion of the decision do not apply California law and, moreover, were decided long before the California cases cited herein and reflecting current California law. Further, these cases are also limited to questions concerning coverage for automobile accidents.

Mr. Alexander F. Stuart, Esq.
October 11, 2007
Page 7

fighter could sue (Stapper v. GMI Holdings, Inc., supra, 73 Cal.App.4th 787), the creation of a slip hazard by washing down steps was also a potential cause of injury for a fire inspector independent of his inspection duties (Donohue v. San Francisco Housing Authority (1993) 16 Cal.App.4th 658), and even defective firefighter's safety equipment was not considered a risk inherent in the job and assumed by firefighters (Price v. Tempo, Inc., et al. (1985) 603 F. Supp. 1359). As with Kohl and the cases cited therein, the courts' analysis turns on the question of potential independent torts, not number of "occurrences" under a commercial general liability policy.

Returning to the facts of this case, and based on the foregoing authorities, it remains Evanston's position that the fire was the proximate cause of plaintiffs' injuries and, therefore, plaintiffs' two claims constitute only one occurrence under the policy. As the California Supreme Court has concurred, "occurrence" policies such as that issued by Evanston are not intended to gauge coverage on the basis of individual accidents giving rise to claims, but rather on the underlying circumstances giving rise to the claims for damages. In this case, those unfortunate circumstances, or "factors" as referred to in the Montrose decision, include both men wearing Ghillie Suits at the time of the incident, Mr Ehart's suit catching fire, and Mr. McClanahan attempting to smother the flames in the process of which the fire ignited his suit as well. Moreover, as reflected in the foregoing discussion, determination of an "occurrence" does not include evaluation of potential independent torts. The latter goes to a party's individual claim, which is separate and apart from the occurrence of which his or her claim may only be a part. Thus, your argument that Mr. McClanahan suffered additional injuries due to the fact he was wearing a Ghillie Suit would go to his causes of action and potential recovery of damages but does not constitute a separate occurrence under the law of California and the majority of jurisdictions in this country.

This response reflects Evanston's good faith effort and intent to fully and fairly evaluate plaintiffs' settlement demand in light of the policy and applicable law. If you have any information or legal authorities which you believe would change the above analysis, please let us know.

Sincerely,

Jeffrey S. Bolender
E. Susie Wendorff

JSB/ESW:is

Mr. Alexander F. Stuart, Esq.
October 11, 2007
Page 8

Copies to:      Mr. Paul E. Stephen, Esq.
                SELMAN BREITMAN, LLP
                33 New Montgomery, Sixth Floor
                San Francisco, CA 94105

                Mr. Roger Dekraker
                MARKEL SOUTHWEST UNDERWRITERS, INC.
                8700 E. Northsight Blvd., Suite 200
                Scottsdale, AZ 85258

1  Jeffrey S. Bolender (Bar No. 174423)
2  Bolender & Associates,
   A Professional Law Corporation
3  2601 Airport Drive, Suite 360
   Torrance, CA 90505
4  Telephone: (310) 784-2443
   Facsimile: (310) 784-2444
5
6  Attorney for Plaintiff,
   EVANSTON INSURANCE COMPANY
7

8

9                  **UNITED STATES DISTRICT COURT**

10      **NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION**

11

12  EVANSTON INSURANCE COMPANY,        Case No. C08 02099 JF
    an Illinois corporation,
13                                      **DECLARATION OF TRACEY
                    Plaintiff,          ROVINELLI IN SUPPORT OF
14                                      PLAINTIFF EVANSTON INSURANCE
    vs.                                 COMPANY'S MOTION FOR PARTIAL
15                                      SUMMARY JUDGMENT; EXHIBITS 1
    GHILLIE SUITS.COM, INC., a          – 7**
16  Georgia corporation; TODD
    MUIRHEARD, a Georgia
17  resident; JEREMY JAMES EHART,       Date  : Sept. 19, 2008
    a Kansas resident; KRISTY           Time  : 9:00 a.m.
18  EHART, a Kansas resident; and       Place : Courtroom 3
    STEVEN RYAN McCLANAHAN, a           Judge : Hon. Jeremy Fogel
19  West Virginia Resident, and
    DOES 1 – 100,                       Complaint Filed : 4/22/2008
20                                      Trial Date: None Set
21                  Defendants.
22

23

24

25

26

27

28

BOLENDER & ASSOCIATES
A Professional Law Corporation
2601 Airport Dr., Suite 360
Torrance, CA 90505

U:\Jeffrey\Ghillie Suits\MSJ\Partial.MSJ.Rovinelli.Dec.v1.doc

## DECLARATION OF TRACEY ROVINELLI

I, Tracey Rovinelli, declare:

1.    I submit this declaration in support of Plaintiff Evanston Insurance Company's Motion for Partial Summary Judgment.   The statements in this declaration are based upon my personal knowledge, and if called upon to testify to the truth of said matters, I can and will do so under oath based upon my personal knowledge.

2.    I am and have been employed by Evanston Insurance Company ("Evanston") for approximately eight (8) years.  I hold the position of Senior Underwriter in the Underwriting Department and have been so employed for seven (7) years.  I am familiar with the practices and procedures in the Evanston Underwriting Department.

3.    Evanston issued a commercial general liability insurance policy, No. CL041400001, effective May 19, 2004 to May 19, 2005 ("Evanston Policy"), to the following named insured: Ghillie Suits.Com Inc.  A true and correct copy of the Evanston Policy is attached hereto as Exhibit 1.

4.    For convenience, certain portions of the Evanston Policy are also attached as separate exhibits:

a.    A true and correct copy of the Common Policy Declaration from the Evanston Policy is attached hereto as Exhibit 2.

**DECLARATION OF TRACEY ROVINELLI IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**
**CASE NO. C08 02099 HRL**

U:\Jeffrey\Ghillie Suits\MSJ\Partial.MSJ.Rovinelli.Dec.v1.doc

b.   A true and correct copy of the Commercial General Liability Coverage Part Supplemental Declarations – Limits Of Insurance is attached hereto as Exhibit 3.

c.   A true and correct copy of the Commercial General Liability Coverage Form CG 00 01 07 98 ("CGL form"), included in the Evanston Policy, is attached hereto as Exhibit 4.

d.   A true and correct copy of SECTION I - COVERAGES from the CGL form, pages 1 through 6, is attached hereto as Exhibit 5.

e.   A true and correct copy of SECTION III - LIMITS OF INSURANCE from the CGL form, page 8, is attached hereto as Exhibit 6.

f.   A true and correct copy of SECTION V - DEFINITIONS from the CGL form, pages 10 through 13, is attached hereto as Exhibit 7.


I declare under penalty of perjury under the laws of the State of Arizona, the State of California, and the United States of America that the foregoing is true and correct. Executed on June 5, 2008 in Scottsdale, Arizona.


Tracey Rovinelli, Declarant

DECLARATION OF TRACEY ROVINELLI IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

CASE NO. C08 02099 HRL

3



**EVANSTON INSURANCE COMPANY**

**MARKEL**

## COMMERCIAL GENERAL LIABILITY COVERAGE PART
### SUPPLEMENTAL DECLARATIONS

These Supplemental Declarations form a part of policy number   CL041400001

**LIMITS OF INSURANCE**

General Aggregate Limit (Other Than Products/Completed Operations)          $ 2,000,000

Products-Completed Operations Aggregate Limit                              $ 2,000,000

Personal and Advertising Injury Limit                                      $ 1,000,000

Each Occurrence Limit                                                      $ 1,000,000

Fire Damage Limit                                                         $ 50,000   any one fire

Medical Expense Limit                                                     $ 1,000   any one person

**BUSINESS DESCRIPTION AND LOCATION OF PREMISES COVERED BY THIS POLICY**

Form of Business
[ ] Individual        [ ] Joint Venture        [ ] Partnership        [X] Organization (Other than Partnership or Joint Venture)

Location of All Premises You Own, Rent or Occupy

33116 7TH STREET
UNION CITY, CA 94587

**PREMIUM**

| Description of Hazards/ Insured Classification(s) Premium | Code No | * Premium Basis | Rate | | Advance | |
|---|---|---|---|---|---|---|
| | | | Pr/Co | All Other | Pr/Co | All Other |
| CLOTHING MFG | 51896 | S)300,000 | 3 012 | 5 317 | $ 905 00 | $ 1595 |
| ADDITIONAL INSURED | 11111 | FLAT | INCLD | FLAT | INCLD | INCLD |

GK
JUL 2 0 2004
MSU

TOTAL
ADVANCE
PREMIUM $ 2,500 00

*(a) Area,(c) Total Cost, (m) Admission, (p) Payroll, (s) Gross Sales, (u)Units, (o) Other

**FORMS AND ENDORSEMENT** (other than applicable forms and endorsements shown elsewhere in the policy)

Forms and Endorsements applying to this Coverage Part and made part of this policy at time of issue:
CGAHS LIAB 6/03

THIS SUPPLEMENTAL DECLARATIONS AND THE COMMERCIAL LIABILITY DECLARATIONS, TOGETHER WITH THE COMMON
POLICY CONDITIONS, COVERAGE FORM(S) AND ENDORSEMENTS COMPLETE THE ABOVE NUMBERED POLICY

011-1061 /1 (8-94)



**EVANSTON INSURANCE ·COMPANY.**

MARKEL

ENDORSEMENT #   2

*Entry optional if shown in the Common Policy Declarations. If no entry is shown, the effective date of the endorsement is the same as the effective date of the policy.*

| *ATTACHED TO AND FORMING PART OF POLICY NO | *EFFECTIVE DATE OF ENDORSEMENT | *ISSUED TO |
|---|---|---|
| CL041400001 | 5-19-04 | GHILLESUITS COM INC |

IN CONSIDERATION OF THE PREMIUM CHARGED, IT IS AGREED THAT
THE ATTACHED SIMPLIFIED FORMS LIST MARKED "CORRECTED" REPLACES THE
FORMS LIST ISSUED AT INCEPTION
(The Corrected forms list marks PreEx 5/03 - Pre-Existing Injury, Loss or Damage Exclusion as part of the policy)

B. White
DEC 1 0 2004

PROC'D   **M. Marshall**
CODE CHK'D   DEC 0 9 2004

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions,
agreement or limitations of the above mentioned Policy, other than as above stated

*In Witness Whereof,* the Company has caused this endorsement
to be signed by a duly authorized representative of the Company

CGAMS2(3/00)

Cambridge General Agency 11-12-04LY/cl
COUNTERSIGNATURE



# EVANSTON INSURANCE COMPANY — CORRECTED

**MARKEL**

ENDORSEMENT NO.

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | MO | DAY | ENDORSEMENT EFFECTIVE (STANDARD TIME) YR | 12 01 | NOON | INSURED | AGENCY AND CODE |
|---|---|---|---|---|---|---|---|
| CL041400001 | | | | | | | 0402 |

IN CONSIDERATION OF THE PREMIUM AT WHICH THIS POLICY IS WRITTEN, IT IS HEREBY UNDERSTOOD AND AGREED THAT THE FORMS AND ENDORSEMENTS APPLYING TO AND MADE A PART OF THIS POLICY AT THE TIME OF ISSUE ARE DESIGNATED BY AN "X"

## SIMPLIFIED FORMS—LIABILITY

| FORM | EDITION | DESCRIPTION |
|---|---|---|
| ☒ CG 0001 | 07/98 | COMMERCIAL GENERAL LIABILITY |
| ☒ MSU-100 | 05/00 | JACKET |
| ☒ M/E-001 | 04/00 | COMBINATION GENERAL ENDORSEMENT |
| ☒ M/E-001-A | 07/01 | AMENDMENT TO M/E-001 |
| ☒ M/E-023 | 04/99 | EXCLUSION - ANIMAL |
| ☒ M/E-024 | 09/00 | EXCLUSION- ASSAULT AND BATTERY |
| ☒ M/E-026 | 10/99 | BREACH OF CONTRACT EXCLUSION |
| ☒ M/E-048 | 04/99 | DEDUCTIBLE ENDORSEMENT |
| ☒ M/E-221 | 04/99 | SUBSIDENCE EXCLUSION |
| ☒ M/E-009 | 04/99 | ADDITIONAL INSURED ENDORSEMENT |
| ☐ M/E-009-01 | 04/99 | BLANKET ADDITIONAL ENDORSEMENT |
| ☐ M/E-039 | 04/99 | CONTRACTUAL LIABILITY LIMITATION ENDORSEMENT |
| ☐ M/E-043 | 10/99 | CONTRACTOR LIMITATION ENDORSEMENT |
| ☐ M/E-089 | 04/99 | FIRE LEGAL LIABILITY EXCLUSION |
| ☐ M/E-126 | 04/99 | LIQUOR LIABILITY EXCLUSION AMENDED |
| ☐ M/E-159 | 04/99 | PERSONAL AND ADVERTISING INJURY EXCLUSION |
| ☐ M/E-172 | 04/99 | PRODUCTS /COMPLETED OPERATIONS INCLUDED IN GEN  AGGREGATE |
| ☐ M/E-173 | 04/99 | EXCLUSION-PRODUCTS/COMPLETED OPERATION |
| ☐ M/E-177 | 04/99 | PROFESSIONAL SERVICES, DESIGNATED EXCLUSION |
| ☐ M/E-217 | 11/99 | SPECIFIED/DESIGNATED PREMISES/PROJECT LIMITATION |
| ☐ M/E-091 | 02/01 | HABITATIONAL ENDORSEMENT |
| ☐ M/E-091-1 | 04/99 | HABITATIONAL/COMMERCIAL WATER DAMAGE EXCLUSION |
| ☒ CG 2168 | 01/02 | WAR OR TERRORISM EXCLUSION |
| ☐ CG 2177 | 11/02 | EXCEPTION TO TERRORISM EXCLUSION |
| ☒ PreEx | 05/03 | PRE-EXISTING INJURY, LOSS OR DAMAGE EXCLUSION |
| ☒ INTELLPROP | 09/01 | |
| ☒ M/E219 | 09/93 | |

CGAMS LIAB 6/03

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section II – Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section V – Definitions.

## SECTION I – COVERAGES

### COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1. **Insuring Agreement**

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

      (1) The amount we will pay for damages is limited as described in Section III – Limits Of Insurance; and

      (2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

      No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages A and B.

   b. This insurance applies to "bodily injury" and "property damage" only if:

      (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and

      (2) The "bodily injury" or "property damage" occurs during the policy period.

   c. Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

2. **Exclusions**

   This insurance does not apply to:

   a. **Expected Or Intended Injury**

      "Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

   b. **Contractual Liability**

      "Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

      (1) That the insured would have in the absence of the contract or agreement; or

      (2) Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

         (a) Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

Copyright, Insurance Services Office, Inc., 1997

(b) Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

c. **Liquor Liability**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

(1) Causing or contributing to the intoxication of any person;

(2) The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

(3) Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages.

d. **Workers' Compensation And Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

e. **Employer's Liability**

"Bodily injury" to:

(1) An "employee" of the insured arising out of and in the course of:

(a) Employment by the insured; or

(b) Performing duties related to the conduct of the insured's business; or

(2) The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph (1) above.

This exclusion applies:

(1) Whether the insured may be liable as an employer or in any other capacity; and

(2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

f. **Pollution**

(1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

(a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

(i) "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot from equipment used to heat that building;

(ii) "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

(b) At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

(c) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for any insured or any person or organization for whom you may be legally responsible; or

Copyright, Insurance Services Office, Inc., 1997

CG 00 01 07 98

(d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

(i) "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

(ii) "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

(e) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

(2) Any loss, cost or expense arising out of any:

(a) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

(b) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

**g. Aircraft, Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion does not apply to:

(1) A watercraft while ashore on premises you own or rent;

(2) A watercraft you do not own that is:

(a) Less than 26 feet long; and

(b) Not being used to carry persons or property for a charge;

(3) Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

(4) Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

(5) "Bodily injury" or "property damage" arising out of the operation of any of the equipment listed in Paragraph **f.(2)** or **f.(3)** of the definition of "mobile equipment".

Copyright, Insurance Services Office, Inc., 1997

h. **Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

(1) The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

(2) The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

i. **War**

"Bodily injury" or "property damage" due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion or revolution. This exclusion applies only to liability assumed under a contract or agreement.

j. **Damage To Property**

"Property damage" to:

(1) Property you own, rent, or occupy;

(2) Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

(3) Property loaned to you;

(4) Personal property in the care, custody or control of the insured;

(5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

(6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs (1), (3) and (4) of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of 7 or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section III – Limits Of Insurance.

Paragraph (2) of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs (3), (4), (5) and (6) of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

k. **Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

l. **Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

m. **Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

(1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

(2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

n. **Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

(1) "Your product";

(2) "Your work"; or

(3) "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

o. **Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

Exclusions c. through n. do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section III – Limits Of Insurance.

Copyright, Insurance Services Office, Inc., 1997

CG 00 01 07 98          ☐

## 1. Insuring Agreement

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

(1) The amount we will pay for damages is limited as described in Section III – Limits Of Insurance ; and

(2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages A and B.

b. This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

## 2. Exclusions

This insurance does not apply to:

a. "Personal and advertising injury":

(1) Caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury";

(2) Arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity;

(3) Arising out of oral or written publication of material whose first publication took place before the beginning of the policy period;

(4) Arising out of a criminal act committed by or at the direction of any insured;

(5) For which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement;

(6) Arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement";

(7) Arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement";

(8) Arising out of the wrong description of the price of goods, products or services stated in your "advertisement";

(9) Committed by an insured whose business is advertising, broadcasting, publishing or telecasting. However, this exclusion does not apply to Paragraphs 14.a., b. and c. of "personal and advertising injury" under the Definitions Section; or

(10) Arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

b. Any loss, cost or expense arising out of any:

(1) Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

(2) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

## COVERAGE C MEDICAL PAYMENTS

## 1. Insuring Agreement

a. We will pay medical expenses as described below for "bodily injury" caused by an accident:

(1) On premises you own or rent;

(2) On ways next to premises you own or rent; or

(3) Because of your operations;

provided that:

(1) The accident takes place in the "coverage territory" and during the policy period;

(2) The expenses are incurred and reported to us within one year of the date of the accident; and

(3) The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

Copyright, Insurance Services Office, Inc., 1997

b. We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

  (1) First aid administered at the time of an accident;

  (2) Necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

  (3) Necessary ambulance, hospital, professional nursing and funeral services.

## 2. Exclusions

We will not pay expenses for "bodily injury":

a. To any insured;

b. To a person hired to do work for or on behalf of any insured or a tenant of any insured.

c. To a person injured on that part of premises you own or rent that the person normally occupies.

d. To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

e. To a person injured while taking part in athletics.

f. Included within the "products-completed operations hazard".

g. Excluded under Coverage A.

h. Due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion or revolution.

## SUPPLEMENTARY PAYMENTS – COVERAGES A AND B

1. We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

a. All expenses we incur.

b. Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

c. The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

d. All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

e. All costs taxed against the insured in the "suit".

f. Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

g. All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

2. If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

a. The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

b. This insurance applies to such liability assumed by the insured;

c. The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

d. The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

e. The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

f. The indemnitee:

  (1) Agrees in writing to:

    (a) Cooperate with us in the investigation, settlement or defense of the "suit";

    (b) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

    (c) Notify any other insurer whose coverage is available to the indemnitee; and

    (d) Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

Copyright, Insurance Services Office, Inc., 1997

CG 00 01 07 98

(2) Provides us with written authorization to:

    (a) Obtain records and other information related to the "suit"; and

    (b) Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph 2.b.(2) of Section I – Coverage A – Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when:

a. We have used up the applicable limit of insurance in the payment of judgments or settlements; or

b. The conditions set forth above, or the terms of the agreement described in Paragraph f. above, are no longer met.

## SECTION II – WHO IS AN INSURED

1. If you are designated in the Declarations as:

a. An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

b. A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

c. A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

d. An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

2. Each of the following is also an insured:

a. Your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" is an insured for:

(1) "Bodily injury" or "personal and advertising injury":

    (a) To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), or to a co-"employee" while that co-"employee" is either in the course of his or her employment or performing duties related to the conduct of your business;

    (b) To the spouse, child, parent, brother or sister of that co-"employee" as a consequence of Paragraph (1)(a) above;

    (c) For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraphs (1)(a) or (b) above; or

    (d) Arising out of his or her providing or failing to provide professional health care services.

(2) "Property damage" to property:

    (a) Owned, occupied or used by,

    (b) Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by

you, any of your "employees", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

b. Any person (other than your "employee"), or any organization while acting as your real estate manager.

c. Any person or organization having proper temporary custody of your property if you die, but only:

(1) With respect to liability arising out of the maintenance or use of that property; and

(2) Until your legal representative has been appointed.

Copyright, Insurance Services Office, Inc., 1997

d. Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

3. With respect to "mobile equipment" registered in your name under any motor vehicle registration law, any person is an insured while driving such equipment along a public highway with your permission. Any other person or organization responsible for the conduct of such person is also an insured, but only with respect to liability arising out of the operation of the equipment, and only if no other insurance of any kind is available to that person or organization for this liability. However, no person or organization is an insured with respect to:

a. "Bodily injury" to a co-"employee" of the person driving the equipment; or

b. "Property damage" to property owned by, rented to, in the charge of or occupied by you or the employer of any person who is an insured under this provision.

4. Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

a. Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

b. Coverage A does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

c. Coverage B does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

## SECTION III – LIMITS OF INSURANCE

1. The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

a. Insureds;

b. Claims made or "suits" brought; or

c. Persons or organizations making claims or bringing "suits".

2. The General Aggregate Limit is the most we will pay for the sum of:

a. Medical expenses under Coverage C;

b. Damages under Coverage A, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

c. Damages under Coverage B.

3. The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage A for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

4. Subject to 2. above, the Personal and Advertising Injury Limit is the most we will pay under Coverage B for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

5. Subject to 2. or 3. above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

a. Damages under Coverage A; and

b. Medical expenses under Coverage C

because of all "bodily injury" and "property damage" arising out of any one "occurrence".

6. Subject to 5. above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage A for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, while rented to you or temporarily occupied by you with permission of the owner.

7. Subject to 5. above, the Medical Expense Limit is the most we will pay under Coverage C for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

Copyright, Insurance Services Office, Inc., 1997

CG 00 01 07 98    □

## SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS

**1. Bankruptcy**

Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

**2. Duties In The Event Of Occurrence, Offense, Claim Or Suit**

a. You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

(1) How, when and where the "occurrence" or offense took place;

(2) The names and addresses of any injured persons and witnesses; and

(3) The nature and location of any injury or damage arising out of the "occurrence" or offense.

b. If a claim is made or "suit" is brought against any insured, you must:

(1) Immediately record the specifics of the claim or "suit" and the date received; and

(2) Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

c. You and any other involved insured must:

(1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

(2) Authorize us to obtain records and other information;

(3) Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

(4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

d. No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

**3. Legal Action Against Us**

No person or organization has a right under this Coverage Part:

a. To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

b. To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured obtained after an actual trial; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

**4. Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages A or B of this Coverage Part, our obligations are limited as follows:

a. **Primary Insurance**

This insurance is primary except when b. below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in c. below.

b. **Excess Insurance**

This insurance is excess over:

(1) Any of the other insurance, whether primary, excess, contingent or on any other basis:

(a) That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

(b) That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

(c) That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

(d) If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion g. of Section I – Coverage A – Bodily Injury And Property Damage Liability.

(2) Any other primary insurance available to you covering liability for damages arising out of the premises or operations for which you have been added as an additional insured by attachment of an endorsement.

CG 00 01 07 98

Copyright, Insurance Services Office, Inc., 1997

duty under Coverages A or B to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

(1) The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

(2) The total of all deductible and self-insured amounts under all that other insurance.

We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

c. **Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

5. **Premium Audit**

a. We will compute all premiums for this Coverage Part in accordance with our rules and rates.

b. Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period. Audit premiums are due and payable on notice to the first Named Insured. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

c. The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

6. **Representations**

By accepting this policy, you agree:

a. The statements in the Declarations are accurate and complete;

b. Those statements are based upon representations you made to us; and

c. We have issued this policy in reliance upon your representations.

7. **Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

a. As if each Named Insured were the only Named Insured; and

b. Separately to each insured against whom claim is made or "suit" is brought.

8. **Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

9. **When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**SECTION V – DEFINITIONS**

1. "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters.

2. "Auto" means a land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment. But "auto" does not include "mobile equipment".

3. "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

4. "Coverage territory" means:

a. The United States of America (including its territories and possessions), Puerto Rico and Canada;

Copyright, Insurance Services Office, Inc., 1997

b. International waters or airspace, provided the injury or damage does not occur in the course of travel or transportation to or from any place not included in **a.** above; or

c. All parts of the world if:

(1) The injury or damage arises out of:

(a) Goods or products made or sold by you in the territory described in **a.** above; or

(b) The activities of a person whose home is in the territory described in **a.** above, but is away for a short time on your business; and

(2) The insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in **a.** above or in a settlement we agree to.

5. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

6. "Executive officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

7. "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

8. "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

b. You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by:

a. The repair, replacement, adjustment or removal of "your product" or "your work"; or

b. Your fulfilling the terms of the contract or agreement.

9. "Insured contract" means:

a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

b. A sidetrack agreement;

c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

e. An elevator maintenance agreement;

f. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph **f.** does not include that part of any contract or agreement:

(1) That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

(2) That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

(a) Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

(b) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

(3) Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in (2) above and supervisory, inspection, architectural or engineering activities.

10. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

11. "Loading or unloading" means the handling of property:

a. After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

b. While it is in or on an aircraft, watercraft or "auto"; or

   c. While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

12. "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

   a. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

   b. Vehicles maintained for use solely on or next to premises you own or rent;

   c. Vehicles that travel on crawler treads;

   d. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

     (1) Power cranes, shovels, loaders, diggers or drills; or

     (2) Road construction or resurfacing equipment such as graders, scrapers or rollers;

   e. Vehicles not described in a., b., c. or d. above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

     (1) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

     (2) Cherry pickers and similar devices used to raise or lower workers;

   f. Vehicles not described in a., b., c. or d. above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

     (1) Equipment designed primarily for:

       (a) Snow removal;

       (b) Road maintenance, but not construction or resurfacing; or

       (c) Street cleaning;

     (2) Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

     (3) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

14. "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

   a. False arrest, detention or imprisonment;

   b. Malicious prosecution;

   c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

   d. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

   e. Oral or written publication of material that violates a person's right of privacy;

   f. The use of another's advertising idea in your "advertisement"; or

   g. Infringing upon another's copyright, trade dress or slogan in your "advertisement".

15. "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

16. "Products-completed operations hazard":

   a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

     (1) Products that are still in your physical possession; or

     (2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

       (a) When all of the work called for in your contract has been completed.

       (b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

       (c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

     Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

Copyright, Insurance Services Office, Inc., 1997
CG 00 01 07 98    □

b. Does not include "bodily injury" or "property damage" arising out of:

(1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

(2) The existence of tools, uninstalled equipment or abandoned or unused materials; or

(3) Products or operations for which the classification, listed in the Declarations or in a policy schedule, states that products-completed operations are subject to the General Aggregate Limit.

17. "Property damage" means:

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

18. "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

19. "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

20. "Your product" means:

a. Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

(1) You;

(2) Others trading under your name; or

(3) A person or organization whose business or assets you have acquired; and

b. Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

"Your product" includes:

a. Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

b. The providing of or failure to provide warnings or instructions.

"Your product" does not include vending machines or other property rented to or located for the use of others but not sold.

21. "Your work" means:

a. Work or operations performed by you or on your behalf; and

b. Materials, parts or equipment furnished in connection with such work or operations.

"Your work" includes:

a. Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

b. The providing of or failure to provide warnings or instructions.



# EVANSTON INSURANCE COMPANY

## COMBINATION GENERAL ENDORSEMENT

*Entry optional if shown in the Common Policy Declarations. If no entry is shown, the effective date of the endorsement is the same as the effective date of the policy.*

| *Attached to and Forming Part of Policy No. | *Effective Date of Endorsement | *Issued to |
| --- | --- | --- |

**THIS ENDORSEMENT CHANGES THE POLICY.**

1. Employer's Liability under 2. E. Exclusions, Commercial General Liability Coverage Form, Section I. – Coverage, is replaced by the following and applies and applies throughout this policy:
   This insurance does not apply to any claim, suit, cost or expense arising out of "bodily injury" to
   (1)  any employee of a Named Insured arising out of and in the course of employment or while performing duties related to the conduct of the insured's business; or
   (2)  the spouse, child, parent, brother, sister or relative of that employee as a consequence of (1).
   This exclusion applies whether an Insured may be liable as an employer or in any other capacity, and/or to any obligation to share damages with or repay someone else who must pay damages because of the injury, as well as liability assumed under any "Insured Contract."
   Wherever the word "employee" appears above, it shall also mean any member, associate, leased worker, temporary worker or any person or persons loaned to or volunteering services to you.

2. With respect to any "auto," under 2. Exclusions, g. Aircraft, Auto or Watercraft, Commercial General Liability Coverage Form, Section I. Coverages, the first paragraph is replaced by the following and applies throughout this policy:
   This insurance does not apply to "bodily injury" or "property damage" arising out of, caused by or contributed to by the ownership, non-ownership, maintenance, use or entrustment to others of any "auto." Use includes operation and "loading and unloading."

3. Employment-Related Practices Exclusion is added to Coverages A and B, Section I, Commercial General Liability Coverage Form and to any other coverage under this policy as follows:
   Employment-Related Practices, regardless of allegations, are not covered under this policy nor are any expenses nor any obligation to share damages with or repay anyone else who must pay damages from same, including but not limited to:
   (A)  Refusal to employ or Termination of Employment; or
   (B)  Discrimination, coercion, demotion, evaluation, reassignment, discipline, defamation, harassment in any form, humiliation or other employment-related practices, policies, acts or omissions; or
   (C)  Consequential "Bodily Injury" or "Personal Injury" as a result of (A) and (B).

4. Under 2. Exclusions, f. Pollution, Commercial General Liability Coverage Form, Section I. – Coverages, Pollution/environmental impairment/contamination is not covered under this policy, nor are any expenses nor any obligation to share damages with or repay anyone else who must pay damages from same in conjunction with occurrences arising or alleged to have arisen out of same. All liability and expense arising out of or related to any form of pollution, whether intentional or otherwise and whether or not any resulting injury, damage, devaluation, cost or expense is expected by any Insured or any other person or entity is excluded throughout this policy. All wording is replaced by the following:
   (A)  "Bodily Injury," "Personal Injury," "Property Damage," or Damages for the devaluation of property, or for taking, use or acquisition or interference with the rights of others in or on property or air space, or any other type injury or expense; or
   (B)  Any loss, cost, expense, fines and/or penalties arising out of any (1) request, demand, order, governmental authority or directive or that of any private party or citizen action that any Insured, or others, test for, monitor, clean up, remove, contain, treat, detoxify or neutralize or in any way respond to or assess same the effects of pollutants, environmental impairments, contaminants or (2) any litigation or administrative procedure in which any Insured or others may be involved as a party as a result of actual, alleged or threatened discharge, dispersal, seepage, migration, release, escape or placement of pollutants, environmental impairments, contaminants into or upon land, premises, buildings, the atmosphere, any water course, body of water, aquifer or ground water, whether sudden, accidental or gradual in nature or not, and regardless of when.



# EVANSTON INSURANCE COMPANY

Pollutants mean any solid, liquid, gaseous, fuel, lubricant, thermal, acoustic, electrical, or magnetic irritant or contaminant, including but not limited to smoke, vapor, soot, fumes, fibers, radiation, acid, alkalis, petroleums, chemicals or waste. Waste includes medical waste and all other materials to be disposed of, recycled, stored, reconditioned or reclaimed.

5.   Asbestos, Lead or Silica Dust is not covered under this policy, nor are any expenses nor any obligation to share damages with or repay anyone else who must pay damages from same in conjunction with occurrences arising or alleged to have arisen out of:

(A) "Bodily Injury," "Personal Injury," "Property Damage" or Damages of any type, arising out of the inhalation, ingestion, physical exposure to, absorption of, or toxic substances from asbestos, lead or silica dust in any form, or from any goods, products or structures containing same, or "Property Damage" or devaluation of property arising from any form of same; or

(B) Existence of asbestos, silica dust or lead, in any form, in occupancy or construction, or the manufacture, sale, transportation, handling, storage, disposal, or removal of same, or goods or products containing same; or

(C) Any supervision, instructions, recommendations, requests, warnings or advice given or which should have been given, as well as any costs, including but not limited to abatement, mitigation, removal, contain, treat, detoxify, neutralize, or disposal of same or in any way respond to or assess the effects of same.

6.   Punitive or Exemplary Damages is not covered under this policy nor are any expenses nor any obligation to share damages with or repay anyone else who must pay damages from same. (Exception: This does not apply to Punitive Damages from Wrongful Death brought under Alabama's Wrongful Death Statute.)

7.   Discrimination charges, of any kind, actual and alleged, are not covered under this policy, nor any expenses or obligation to share damages with or repay another whom must pay from same.

8.   If you are a contractor, builder or developer, there is no coverage under this policy for:

(1)   "Bodily injury," "personal injury" or "property damage" caused by acts of independent Contractors/subcontractors contracted by you or on your behalf unless you obtain Certificates of Insurance from them providing evidence of at least like coverage and limits of liability as provided by this policy and naming you as an additional insured.

(2)   "Bodily injury," "personal injury" or "property damage" sustained by any independent contractor/ subcontractor, or any employee, leased worker, temporary or volunteer help of same, unless a Named Insured or employee of a Named Insured is on site, at the time of the injury or damage, and the Named Insured's actions or inactions are the direct cause of the injury or damage, or the injury or damage is directly caused by an employee of the Named Insured.

9.   Professional Liability, Malpractice, Errors, Omission, Acts of any type including rendering or failure to render any type professional service is not covered under this policy nor are any expenses nor any obligation to share damages with or repay anyone else who must pay damages from same, unless such coverage is specifically endorsed onto this policy.

10.   Duty to Defend:  Where there is no coverage under this policy, there is no duty to defend.



# EVANSTON INSURANCE COMPANY
# ASSOCIATED INTERNATIONAL INSURANCE COMPANY

## ENDORSEMENT

\* Entry optional if shown in the Common Policy Declarations. If no entry is shown, the effective date of the endorsement is the same as the effective date of the policy.

| ATTACHED TO AND FORMING PART OF POLICY NO. | EFFECTIVE DATE OF ENDORSEMENT | *ISSUED TO |
|---|---|---|
| | | |

## THIS ENDORSEMENT CHANGES THE POLICY.

### Amendment to M/E-001

It is hereby understood and agreed that Item 5 of either M/E-001 (4/00) or M/E-001 (4/99) is amended to read as follows:

5.  Asbestos, Lead, Silica Dust, Mold, Bio-organic Growth or Mildew are not covered under this policy, nor are any expenses nor are any obligation to share damages with or repay anyone else who must pay damages from same in conjunction with occurrences arising or alleged to have arisen out of:

   (A)   "Bodily Injury", "Personal Injury", "Property Damage", or Damages of any type, arising out of the inhalation, ingestion, physical exposure to, absorption of, or toxic substances from asbestos, lead, silica dust, mold, bio-organic growth or mildew in any form, or from any goods, products or structures containing same; or

   (B)   Existence of asbestos, lead, silica dust, mold, bio-organic growth or mildew, in any form, in occupancy or construction, or the manufacture, sale, transportation, handling, storage, disposal, or removal of same, or goods or products containing same; or

   (C)   Any supervision, instructions, recommendations, requests, or warnings or advice given or which should have been given, as well as any costs, including but not limited to abatement, mitigation, removal, containment, treatment, detoxification, neutralization, or disposal of same or in any way respond to assess the effects of same.

_____
Authorized Representative

_____          _____
Insured's Signature          Date

**M/E-001A (7/01)**



# EVANSTON INSURANCE COMPANY

## ANIMAL EXCLUSION ENDORSEMENT

\* *Entry optional if shown in the Common Policy Declarations. If no entry is shown, the effective date of the endorsement is the same as the effective date of the policy.*

| \*ATTACHED TO AND FORMING PART OF POLICY NO. | \*EFFECTIVE DATE OF ENDORSEMENT | \*ISSUED TO |
|---|---|---|
| | | |

**THIS ENDORSEMENT CHANGES THE POLICY.**

The coverage under this policy does not apply to "bodily injury," "property damage," "personal injury," "advertising injury," or any injury, loss or damage arising out of or caused by an animal, regardless whether owned by you, in your care, or on your premises.

AUTHORIZED REPRESENTATIVE          /
                                                              DATE

M/E-023 (4/99)



# EVANSTON INSURANCE COMPANY
# ASSOCIATED INTERNATIONAL INSURANCE COMPANY

## INTELLECTUAL PROPERTY HAZARD EXCLUSION ENDORSEMENT

*Entry optional if shown in the Common Policy Declarations. If no entry is shown, the effective date of the endorsement is the same as the effective date of the policy.

| ATTACHED TO AND FORMING PART OF POLICY NO. | EFFECTIVE DATE OF ENDORSEMENT | *ISSUED TO |
|---|---|---|
| | | |

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

### COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is added to SECTION I – COVERAGES, 2. Exclusions under COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY and/or COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY:

We have no duty or obligation to indemnify, investigate, settle, or defend any claim, "suit" or administrative proceeding, under any circumstances, against any insured alleging actual or threatened injury or damage of any nature or kind to any persons or property, which arises out of such "intellectual property hazard" either through primary or secondary markets or through any stage of the stream of commerce.

The following is added to SECTION V – DEFINITIONS:

"Intellectual property hazard" means any claim, under any circumstance, which in any way relates to or arises out of:

a. Infringement of a patent, trademark, service mark, trade dress, copyright, title or slogan, or copyright joint ownership;
b. disparagement of a person's or organization's goods, products, services or claims;
c. unfair competition;
d. trade libel or slander;
e. violation of the right of privacy or publicity, advertising ideas, style of doing business, intellectual property, trade secrets, market share agreements;
f. violations of or claims relating to the Lanham Act; and/or
g. violations of or claims relating to the Computer Fraud Act.

This exclusion is also intended to exclude any agreements or contracts of any kind that the insured may have with third parties requiring defense and/or indemnity. To the extent not excluded, breach of non-disclosure, non-compete or non-solicitation agreements are not covered.

_____
Authorized Representative

_____        _____
Insured's Signature                     Date

IntellProp(09.01)

 

# EVANSTON INSURANCE COMPANY

### ASSAULT AND/OR BATTERY EXCLUSION

*Entry optional if shown in the Common Policy Declarations. If no entry is shown, the effective date of the endorsement is the same as the effective date of the policy.

| *ATTACHED TO AND FORMING PART OF POLICY NO. | *EFFECTIVE DATE OF ENDORSEMENT | *ISSUED TO |
|---|---|---|
| | | |

**THIS ENDORSEMENT CHANGES THE POLICY.**

The coverage under this policy does not apply to any claim, suit, cost or expense arising out of assault and/or battery, or out of any act or omission in connection with the prevention or suppression of such acts, whether caused by or at the instigation or direction of any Insured, Insured's employees, patrons or any other person. Nor does this insurance apply with respect to any charges or allegations of negligent hiring, training, placement or supervision. Furthermore, assault and/or battery includes "bodily injury" resulting from the use of reasonable force to protect persons or property. The sentence "This exclusion does not apply to 'bodily injury' resulting from the use of reasonable force to protect persons or property" is deleted from the Commercial General Liability Coverage Form, Section I, Item 2., Exclusions, a.

AUTHORIZED REPRESENTATIVE          DATE

M/E-024 (9/00)

# EVANSTON INSURANCE COMPANY

## BREACH OF CONTRACT EXCLUSION

* *Entry optional if shown in the Common Policy Declarations. If no entry is shown, the effective date of the endorsement is the same as the effective date of the policy.*

| *ATTACHED TO AND FORMING PART OF POLICY NO. | *EFFECTIVE DATE OF ENDORSEMENT | *ISSUED TO |
|---|---|---|
| | | |

**THIS ENDORSEMENT CHANGES THE POLICY.**

This insurance does not apply to claims for breach of contract, whether express or oral, nor claims for breach of an implied in law or implied in fact contract, whether "bodily injury," property damage," "advertising injury," "personal injury" or an "occurrence" or damages of any type is alleged; this exclusion also applies to any additional insureds under this policy.

Furthermore, no obligation to defend will arise or be provided by us for such excluded claims.

AUTHORIZED REPRESENTATIVE          DATE

M/E-020 (10/99)



# EVANSTON INSURANCE COMPANY

## SUBSIDENCE EXCLUSION ENDORSEMENT

*\* Entry optional if shown in the Common Policy Declarations. If no entry is shown, the effective date of the endorsement is the same as the effective date of the policy.*

| \*ATTACHED TO AND FORMING PART OF POLICY NO. | \*EFFECTIVE DATE OF ENDORSEMENT | \*ISSUED TO |
|---|---|---|
| | | |

### THIS ENDORSEMENT CHANGES THE POLICY

This policy does not apply to any liability for "Bodily Injury", "Personal Injury", disease or illness, including death, or "Property Damage" or to loss of, damage to, or loss of property, directly or indirectly arising out of, caused by, resulting from, contributed to or aggravated by the subsidence, settling, sinking, slipping, falling away, caving in, shifting, eroding, mud flow, rising, tilting, bulging, cracking, shrinking or expansion of foundations, walls, roofs, floors, or ceilings, or any other movements of land or earth, regardless of whether the foregoing emanates from, or is attributable to, any operations performed by or on behalf of any insured. The foregoing applies regardless of whether the first manifestation of same occurs during the policy period or prior or subsequent thereto.

It is further agreed that there is no coverage nor defense under this policy for any claims, loss, costs, or expense arising from any allegations against any insured resulting from or contributing to or aggravated by subsidence as described in the first paragraph of this endorsement.

AUTHORIZED REPRESENTATIVE    DATE

M/E-221 (4/99)

 **EVANSTON INSURANCE COMPANY**

## ADDITIONAL INSURED ENDORSEMENT

*Entry optional if shown in the Common Policy Declarations   If no entry is shown, the effective date of the endorsement is the same as the effective date of the policy.*

| *ATTACHED TO AND FORMING PART OF POLICY NO | *EFFECTIVE DATE OF ENDORSEMENT | *ISSUED TO |
|---|---|---|
| CL014100001 | | |

THIS ENDORSEMENT CHANGES THE POLICY.

SECTION II - WHO IS AN INSURED of the Commercial General Liability Form is amended to include

Person or Entity

THE SPORTS AUTHORITY
1050 HAMPDEN AVE
ENGLEWOOD, CA 80110

Interest of the Above

as an additional insured under this policy, but only as respects negligent acts or omissions of the Named Insured and only for occurrences, claims or coverage not otherwise excluded in the policy

It is further agreed that where no coverage shall apply herein for the Named Insured, no coverage nor defense shall be afforded to the above-identified additional insured

Moreover, it is agreed that no coverage shall be afforded to the above-identified additional insured for any "bodily injury," "personal injury," or "property damage" to any employee of the Named Insured or to any obligation of the additional insured to indemnify another because of damages arising out of such injury

Additional Premium $

AUTHORIZED REPRESENTATIVE                    DATE

M/E-009 (4/99)



# EVANSTON INSURANCE COMPANY

## PRE-EXISTING INJURY, LOSS OR DAMAGE EXCLUSION

*\* Entry optional if shown in the Common Policy Declarations. If no entry is shown, the effective date of the endorsement is the same as the effective date of the policy.*

| ATTACHED TO AND FORMING PART OF POLICY NO. | EFFECTIVE DATE OF ENDORSEMENT | *ISSUED TO |
|---|---|---|
|  |  |  |

### THIS ENDORSEMENT CHANGES THE POLICY.

The coverage under this policy does not apply to liability for "bodily injury", "property damage", "personal injury", "advertising injury", or any other injury, loss or damage:

(A)    which first occurred, began to occur, or is alleged to have occurred, prior to the inception date of this policy; or

(B)    which is alleged to be in the process of occurring to any degree as of the inception date of this policy; or

(C)    which is caused by or alleged to have been caused by incremental, continuous or progressive damage arising out of or resulting from an occurrence which first occurred, began to occur or is alleged to have occurred prior to the inception date of this policy.

_____
Authorized Representative

_____
Insured's Signature          Date

PreEx(05.03)

COMMERCIAL GENERAL LIABILITY
CG 21 68 01 02

# THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# WAR OR TERRORISM EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** Exclusion I. under Paragraph **2., Exclusions** of Section I - Coverage A - Bodily Injury And Property Damage Liability is replaced by the following:

2. **Exclusions**

This insurance does not apply to:

I. **War Or Terrorism**

"Bodily injury" or "property damage" arising directly or indirectly, out of:

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents;

(3) Insurrection, rebellion, revolution, usurped power or action taken by governmental authority in hindering or defending against any of these; or

(4) "Terrorism", including any action taken in hindering or defending against an actual or expected incident of "terrorism"

regardless of any other cause or event that contributes concurrently or in any sequence to the injury or damage.

However, with respect to "terrorism", this exclusion only applies if one or more of the following are attributable to an incident of "terrorism":

(1) The total of all damage to all types of property sustained by all persons and entities affected by the "terrorism" (and including business interruption losses sustained by owners or occupants of such damaged property), whether or not insured, exceeds $25,000,000; or

(2) Fifty or more persons sustain death or serious physical injury. For the purposes of this provision, serious physical injury means:

(a) Physical injury that involves a substantial risk of death;

(b) Protracted and obvious physical disfigurement; or

(c) Protracted loss of or impairment of the function of a bodily member or organ; or

(3) The "terrorism" involves the use, release or escape of pathogenic or poisonous biological or chemical materials or of nuclear materials, or directly or indirectly results in nuclear reaction or radiation or radioactive contamination.

For the purposes of determination the total of all damage to all types of property or the total number of deaths or serious physical injuries, multiple incidents of "terrorism" which occur within a seventy-two hour period and appear to be carried out in concert or to have a related purpose or common leadership shall be considered to be one incident of "terrorism".

**B.** The following exclusion is added to Paragraph **2., Exclusions of Section I - Coverage B - Personal And Advertising Injury Liability:**

2. **Exclusions**

This insurance does not apply to:

**WAR OR TERRORISM**

"Personal and advertising injury" arising directly or indirectly, out of:

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents;

(3) Insurrection, rebellion, revolution, usurped power or action taken by governmental authority in hindering or defending against any of these; or

  © ISO Properties, Inc., 2001

**(4)** "Terrorism", including any action taken in hindering or defending against an actual or expected incident of "terrorism"

regardless of any other cause or event that contributes concurrently or in any sequence to the injury.

However, with respect to "terrorism", this exclusion only applies if one or more of the following are attributable to an incident of "terrorism":

**(1)** The total of all damage to all types of property sustained by all persons and entities affected by the "terrorism" (and including business interruption losses sustained by owners or occupants of such damaged property), whether or not insured, exceeds $25,000,000; or

**(2)** Fifty or more persons sustain death or serious physical injury. For the purposes of this provision, serious physical injury means:

**(a)** Physical injury that involves a substantial risk of death;

**(b)** Protracted and obvious physical disfigurement; or

**(c)** Protracted loss of or impairment of the function of a bodily member or organ; or

**(3)** The "terrorism" involves the use, release or escape of pathogenic or poisonous biological or chemical materials or of nuclear materials, or directly or indirectly results in nuclear reaction or radiation or radioactive contamination.

For the purposes of determination the total of all damage to all types of property or the total number of deaths or serious physical injuries, multiple incidents of "terrorism" which occur within a seventy-two hour period and appear to be carried out in concert or to have a related purpose or common leadership shall be considered to be one incident of "terrorism".

**C.** Exclusion h. under Paragraph 2., Exclusions of Section I - Coverage C - Medical Payments does not apply.

**D.** The following definition is added to the Definitions Section:

"Terrorism" means activities against persons, organizations or property of any nature:

**1.** That involve the following or preparation for the following:

**a.** Use or threat of force or violence;

**b.** Commission or threat of a dangerous act; or

**c.** Commission or threat of an act that interferes with or disrupts an electronic, communication, information or mechanical system; and

**2.** When one or both of the following applies:

**a.** The effect is to intimidate or coerce a government or the civilian population or any segment thereof, or to disrupt any segment of the economy; or

**b.** It appears that the intent is to intimidate or coerce a government, or to further political, ideological, religious, social or economic objectives or to express (or express opposition to) a philosophy or ideology.



© ISO Properties, Inc., 2001

CG 21 68 01 02

 

# EVANSTON INSURANCE COMPANY

## DEDUCTIBLE ENDORSEMENT

*Entry optional if shown in the Common Policy Declarations. If no entry is shown, the effective date of the endorsement is the same as the effective date of the policy.

| *ATTACHED TO AND FORMING PART OF POLICY NO | *EFFECTIVE DATE OF ENDORSEMENT | *ISSUED TO |
|---|---|---|
| CL041400001 | | |

**THIS ENDORSEMENT CHANGES THE POLICY.**

## SCHEDULE

| Coverage | Amount and Basis of Deductible |
|---|---|

If provided by this policy
Bodily Injury, Property Damage,
Professional or Personal and
Advertising Injury Liability

$  500 00          Per Claim

Exception

_____          $          Per Claim

☐  If this box is so marked, the basis of deductible is amended to apply 'on a per item per claim' property damage deductible basis

1  Our obligation under Bodily Injury Liability, Property Damage Liability, Professional Liability, Personal and/or Advertising Injury Liability, or any other coverage under this policy, to pay damages on your behalf applies only to the amount of damages in excess of any deductible amounts stated in the Schedule above  The deductible amount stated above shall be applicable to each claim and will include loss payments, adjustment, investigative and legal fees and costs, whether or not loss payment is involved

2  The deductible amount stated above applies under the coverages respectively to all damages sustained by one person, or organization, as the result of any one occurrence

3  The terms of this insurance, including those with respect to
   (a)   Our right and duty to defend any "suits" seeking those damages, and
   (b)   Your duties in the event of an "occurrence," claim, or suit apply irrespective of the application of the deductible amount

4  We may pay any part or all of the deductible amount to effect settlement of any claim or suit and, upon notification of the action taken, you shall promptly reimburse us for such part of the deductible amount as has been paid by us

M/E-048 (4/99)



JUL 2 0 2004

AUTHORIZED REPRESENTATIVE          /
                                    DATE



# EVANSTON INSURANCE COMPANY

**MARKEL**

## ENDORSEMENT

*Entry optional if shown in the Common Policy Declarations. If no entry is shown, the effective date of the endorsement is the same as the effective date of the policy*

| *ATTACHED TO AND FORMING PART OF POLICY NO | *EFFECTIVE DATE OF ENDORSEMENT | *ISSUED TO |
|---|---|---|
| | | |

## THIS ENDORSEMENT CHANGES THE POLICY.

### SPECIFIED PRODUCTS LIABILITY ENDORSEMENT

Insurance afforded by this policy with respect to the handling or use of, the existence of any condition in, or products manufactured, sold, handled or distributed by you shall apply only with respect to the following specified products. In the event of a change of any of the following specified products or in the event coverage is requested for additional products during the period of this policy, you agree to submit a description of such change in its formulation and a description of any such additional products, and a list of the ingredients of such reformulated or new products. Coverage for such reformulated or new products shall be afforded only by endorsement attached to this policy. We do not cover claims, loss, costs or expense arising from any product(s) other than as specified

### LIST OF SPECIFIED PRODUCTS

**BRAND OR TRADE NAME**

**DESCRIPTION**

PLEASE SEE GHILLIE SUITS PRODUCTS LIST

_____/
AUTHORIZED REPRESENTATIVE    DATE

M/E-219 (9/93)

# Cambridge
## General Agency

### NOTICE

1. THE INSURANCE POLICY THAT YOU HAVE PURCHASED IS BEING ISSUED BY AN INSURER THAT IS NOT LICENSED BY THE STATE OF CALIFORNIA. THESE COMPANIES ARE CALLED "NON-ADMITTED" OR "SURPLUS LINE" INSURERS.

2. THE INSURER IS NOT SUBJECT TO THE FINANCIAL SOLVENCY REGULATION AND ENFORCEMENT WHICH APPLIES TO CALIFORNIA LICENSED INSURERS.

3. THE INSURER DOES NOT PARTICIPATE IN ANY OF THE INSURANCE GUARANTEE FUNDS CREATED BY CALIFORNIA LAW. THEREFORE, THESE FUNDS WILL NOT PAY YOUR CLAIMS OR PROTECT YOUR ASSETS IF THE INSURER BECOMES INSOLVENT AND IS UNABLE TO MAKE PAYMENTS AS PROMISED.

4. CALIFORNIA MAINTAINS A LIST OF ELIGIBLE SURPLUS LINE INSURERS APPROVED BY THE INSURANCE COMMISSIONER. ASK YOUR AGENT OR BROKER IF THE INSURER IS ON THAT LIST.

5. FOR ADDITIONAL INFORMATION ABOUT THE INSURER YOU SHOULD ASK QUESTIONS OF YOUR INSURANCE AGENT, BROKER, OR "SURPLUS LINE" BROKER OR CONTACT THE CALIFORNIA DEPARTMENT OF INSURANCE AT THE FOLLOWING TOLL-FREE TELEPHONE NUMBER: 1-800-927-4357.

GK

JUL 2 0 2004

MSU

D-2 FOR (1/1999)

100 Pine Street, Suite 250, San Francisco, CA 94111 (415)955-8555 FAX: (415)394-6305



**ENDORSEMENT #  1**

\* Entry optional if shown in the Common Policy Declarations. If no entry is shown, the effective date of the endorsement is the same as the effective date of the policy

| *ATTACHED TO AND FORMING PART OF POLICY NO | *EFFECTIVE DATE OF ENDORSEMENT | *ISSUED TO |
|---|---|---|
| CL041400001 | 5-19-04 | GHILLE SUITS COM, INC |

IN CONSIDERATION OF THE PREMIUM CHARGED, IT IS AGREED THAT THE
FOLLOWING FORMS ARE MADE A PART OF THE POLICY

-M/E-007(4/99)
-M/E-030(4/99)
-M/E-045(4/99)


**B. White**
**NOV 1 0 2004**


PROC'D    **M. Marshall**

CODE CHK'D NOV 0 9 2004


Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions,
agreement or limitations of the above mentioned Policy, other than as above stated


In Witness Whereof, the Company has caused this endorsement
to be signed by a duly authorized representative of the Company

CGAMS2(3/00)

Cambridge General Agency 10-20-04
LY/cl
COUNTERSIGNATURE



# EVANSTON INSURANCE COMPANY

## ABSORPTION / INHALATION /DISEASE EXCLUSION

*Entry optional if shown in the Common Policy Declarations. If no entry is shown, the effective date of the endorsement is the same as the effective date of the policy

| *ATTACHED TO AND FORMING PART OF POLICY NO | *EFFECTIVE DATE OF ENDORSEMENT | *ISSUED TO |
|---|---|---|
| CL041400001 | | |

### THIS ENDORSEMENT CHANGES THE POLICY.

This insurance does not apply to "bodily injury", "property damage", "personal injury", "advertising injury", disease or illness including death resulting from such disease or illness, alleged disease or illness, property damage, or any other damages, for past, present, or future claims arising in whole or in part, directly or indirectly out of

1. Any form of inhalation or absorption, or
2. Acquired Immunodeficiency Syndrome or Human Immunodeficiency Virus, or exposure to another having same, or to substances or materials contaminated with same, or
3. Fear of contracting Acquired Immunodeficiency Syndrome or Human Immunodeficiency Virus, or
4. Any sexually transmitted disease, or
5. Any form of communicable disease

This applies whether damages result from an insured's act or failure to act, as well as allegations of an insured's act or failure to act in

1. Hiring, training or supervising any person or controlling, monitoring or supervising the care of any person in the custody of any insured, or
2. Testing, screening, segregating or obtaining medical treatment for any person in the custody of any insured, or
3. Disposing of contaminated substances or materials

AUTHORIZED REPRESENTATIVE          DATE

M/E-007 (4/99)



# EVANSTON INSURANCE COMPANY

## CLASSIFICATION LIMITATION ENDORSEMENT

*Entry optional if shown in the Common Policy Declarations. If no entry is shown, the effective date of the endorsement is the same as the effective date of the policy.*

| *ATTACHED TO AND FORMING PART OF POLICY NO | *EFFECTIVE DATE OF ENDORSEMENT | *ISSUED TO |
|---|---|---|
| CL041400001 | | |

**THIS ENDORSEMENT CHANGES THE POLICY.**

The coverage provided by this policy applies only to those operations specified in the application for insurance on file with the company and described under the "description" or "classification" on the declarations of the policy.

<u>AUTHORIZED REPRESENTATIVE</u>   <u>DATE</u>

M/E-030 (4/99)



# EVANSTON INSURANCE COMPANY

MSU
10·27·04

## CROSS SUITS/LIABILITY ENDORSEMENT

*\* Entry optional if shown in the Common Policy Declarations. If no entry is shown, the effective date of the endorsement is the same as the effective date of the policy.*

| \*ATTACHED TO AND FORMING PART OF POLICY NO | \*EFFECTIVE DATE OF ENDORSEMENT | \*ISSUED TO |
|---|---|---|
| CL041400001 | | |

**THIS ENDORSEMENT CHANGES THE POLICY.**

The coverage under this policy does not apply to "bodily injury," "property damage," "personal injury," "advertising injury," or any injury, loss or damage arising out of actions, allegations, expense initiated or caused to be brought about by any insured covered by this policy against any other insured covered by this policy

AUTHORIZED REPRESENTATIVE        DATE

M/E-045 (4/99)

b. Does not include "bodily injury" or "property damage" arising out of:

(1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

(2) The existence of tools, uninstalled equipment or abandoned or unused materials; or

(3) Products or operations for which the classification, listed in the Declarations or in a policy schedule, states that products-completed operations are subject to the General Aggregate Limit.

17. "Property damage" means:

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

18. "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

19. "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

20. "Your product" means:

a. Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

(1) You;

(2) Others trading under your name; or

(3) A person or organization whose business or assets you have acquired; and

b. Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

"Your product" includes:

a. Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product", and

b. The providing of or failure to provide warnings or instructions.

"Your product" does not include vending machines or other property rented to or located for the use of others but not sold.

21. "Your work" means:

a. Work or operations performed by you or on your behalf; and

b. Materials, parts or equipment furnished in connection with such work or operations.

"Your work" includes:

a. Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

b. The providing of or failure to provide warnings or instructions.

U:\Jeffrey\Ghillie Suits\MSJ\Partial.MSJ.Bolender.Dec.Final.doc

1  Jeffrey S. Bolender (Bar No. 174423)
   Bolender & Associates,
2  A Professional Law Corporation
3  2601 Airport Drive, Suite 360
   Torrance, CA 90505
4  Telephone: (310) 784-2443
   Facsimile: (310) 784-2444
5
6  Attorney for Plaintiff,
   EVANSTON INSURANCE COMPANY
7
8
                 UNITED STATES DISTRICT COURT
9
10     NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION
11
   EVANSTON INSURANCE COMPANY,        Case No. C08 02099 JF
12 an Illinois corporation,
                                      DECLARATION OF JEFFREY S.
13                Plaintiff,          BOLENDER IN SUPPORT OF
                                      PLAINTIFF EVANSTON INSURANCE
14 vs.                                COMPANY'S MOTION FOR PARTIAL
                                      SUMMARY JUDGMENT; EXHIBIT 1
15 GHILLIE SUITS.COM, INC., a
16 Georgia corporation; TODD         Date  : Sept. 19, 2008
   MUIRHEARD, a Georgia              Time  : 9:00 a.m.
17 resident; JEREMY JAMES EHART,      Place : Courtroom 3
   a Kansas resident; KRISTY         Judge : Hon. Jeremy Fogel
18 EHART, a Kansas resident; and
19 STEVEN RYAN McCLANAHAN, a          Complaint Filed: 4/22/2008
   West Virginia Resident, and       Trial Date: None Set
20 DOES 1 – 100,
21                Defendants.
22
23
24
25
26
27
28

BOLENDER & ASSOCIATES
A Professional Law Corporation
2601 Airport Dr., Suite 360
Torrance, CA 90505

U:\Jeffrey\Ghillie Suits\MSJ\Partial.MSJ.Bolender.Dec.Final.doc

## DECLARATION OF JEFFREY S. BOLENDER

I, Jeffrey S. Bolender, declare:

1.    I am an attorney, duly licensed to practice in the Northern District of California, and am shareholder in the law firm Bolender and Associates, attorneys of record for Plaintiff Evanston Insurance Company ("Evanston"). I am submitting this declaration in support of Evanston's Motion for Summary Judgment. I have personal knowledge of the following facts, and if called to testify under oath, I could and would competently testify to those facts from my own personal knowledge.

2.    A true and correct copy of the Complaint in *Jeremy James Ehart, et al. v. Ghillie Suits.Com.Inc., et al.*; United States District Court, Northern District of California, San Jose Division, Case No. C06 06507, is attached hereto as Exhibit 1 (hereinafter referred to as the "Underlying Action").

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.   Executed on June 9, 2008 in Torrance, California.

_____
Jeffrey S. Bolender

2

DECLARATION OF JEFFREY S. BOLENDER IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT
CASE NO. C08 02099 HRL

Case 5:08-cv-02099-JF    Document 31-4    Filed 08/13/2008    Page 3 of 26

Case 5:06-cv-06507-JW RS    Document 64    Filed 03/23/2007    Page 14 of 36
Case 5:06-cv-06507-RS    Document 1    Filed 10/18/2006    Page 1 of 25

10/18/06

1   CRAIG NEEDHAM (SBN 52010)
    KIRSTEN FISH (SB #217940)
2   NEEDHAM, DAVIS, KEPNER, & YOUNG, LLP
    1960 The Alameda, Suite 210
3   San Jose, CA 95126
    Tel:    (408) 244-2166
4   Fax:    (408) 244-7815

5   TINSMAN & SCIANO, INC.
    DANIEL J.T. SCIANO (Pending Admission *Pro Hac Vice*)
6   10107 McAllister Freeway
    San Antonio, Texas 78216
7   Telephone: (210) 225-3121
    Fax:  (210) 225-6235
8
    *Attorneys for Plaintiffs, JEREMY JAMES*
9   *EHART, KRISTY EHART, and STEVEN*
    *RYAN McCLANAHAN*
10

FILED

2006 OCT 18  P 2:10

RICHARD W. WIEKING
CLERK
U.S. DISTRICT COURT
NO. DIST. OF CA. S.J.

#3
Fees Pd
SI

11

12                  IN THE UNITED STATES DISTRICT COURT

13                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

                                SAN JOSE DIVISION
14
                                C 06    06507    RS
15   JEREMY JAMES EHART, KRISTY
     EHART, and STEVEN RYAN
16   McCLANAHAN,
                                         COMPLAINT FOR DAMAGES
17              Plaintiffs,
                                         DEMAND FOR JURY TRIAL
18      vs.

19   GHILLIE SUITS.COM INC.; TODD
     MUIRHEAD; NEW YORK FIRE-SHIELD
20   INCORPORATED; WACKENHUT
     SERVICES, INCORPORATED; THE
21   WACKENHUT CORPORATION; and
     DOES 1 – 50, inclusive,
22
                Defendants.
23

24       Plaintiffs, JEREMY JAMES EHART, KRISTY EHART, and STEVEN RYAN

25   McCLANAHAN (referred to collectively as "Plaintiffs") complain of Defendants, GHILLIE

26   SUITS.COM INC., D/B/A AND A/K/A GHILLIE SUITS.COM (referred to as "Ghillie

27   Suits.com"), TODD MUIRHEAD (referred to as "Muirhead"), NEW YORK FIRE-SHIELD

EXHIBIT 1

Case 5:08-cv-02099-JF    Document 31-4    Filed 08/13/2008    Page 4 of 26

Case 5:06-cv-06507-JW    Document 64    Filed 03/23/2007    Page 15 of 36
Case 5:06-cv-06507-RS    Document 1    Filed 10/18/2006    Page 2 of 23

1   INCORPORATED, D/B/A AND A/K/A N.Y. FIRE-SHIELD, INC. and D/B/A AND A/K/A NEW

2   YORK FIRE-SHIELD, INC. (referred to as "New York Fire-Shield"), WACKENHUT SERVICES,

3   INCORPORATED AND/OR THE WACKENHUT CORPORATION (referred to as "Wackenhut"),

4   and DOES 1 – 50, (collectively referred to as "Defendants") as follows:

5                              **GENERAL ALLEGATIONS**

6        1.      At all times mentioned herein, Plaintiff JEREMY JAMES EHART is an individual

7   citizen and resident of the County of Reno, State of Kansas.

8        2.      At all times mentioned herein, Plaintiff KRISTY EHART is an individual citizen and

9   resident of the County of Reno, State of Kansas.

10       3.      At all times mentioned herein, Plaintiff STEVEN RYAN McCLANAHAN is an

11  individual citizen and resident of the County of Summers, State of West Virginia.

12       4.      At all times mentioned herein, Defendant GHILLIE SUITS.COM INC., D/B/A AND

13  A/K/A GHILLIE SUITS.COM is a corporation duly organized and existing under the laws of the

14  State of Georgia, with its principle place of business in the State of Georgia.  At all times mentioned

15  herein, Defendant GHILLIE SUITS.COM INC., D/B/A AND A/K/A GHILLIE SUITS.COM

16  engaged in substantial, continuous and systematic activities in the State of California.  By

17  advertising for sale and selling its products in the State of California via its interactive commercial

18  website, said defendant entered into repeated sales contracts with the residents of the State of

19  California knowing that it would receive commercial gain and therefore purposefully availed itself

20  of the privilege of conducting activities in the State of California.  Said defendant has taken

21  deliberate actions within the State of California and has created obligations to residents in the State

22  of California through sales of its products on its website.  Plaintiffs' claims arose out of or resulted

23  from said defendant's conduct of selling its products in the State of California.

24       5.      At all times mentioned herein, Defendant TODD MUIRHEAD is an individual

25  citizen and resident of the State of Georgia.  At all times mentioned herein, Defendant TODD

26  MUIRHEAD is the registered patent owner of the ghillie suit product at issue.  By advertising for

27  sale and selling said products in the State of California via his interactive commercial website, said

{H:\WDOCS\6183\71353\pleading\00026038.DOC}
COMPLAINT FOR DAMAGES                                                    -2-

1    defendant entered into repeated sales contracts with the residents of the State of California knowing

2    that he would receive commercial gain and therefore purposefully availed himself of the privilege of

3    conducting activities in the State of California. Said defendant has taken deliberate actions within

4    the State of California and has created obligations to residents in the State of California through

5    sales of its products on its website. Plaintiffs' claims arose out of or resulted from said defendant's

6    conduct of selling its products in the State of California.

7        6.    At all times mentioned herein, Defendant NEW YORK FIRE-SHIELD

8    INCORPORATED, D/B/A AND A/K/A N.Y. FIRE-SHIELD, INC. and D/B/A AND A/K/A NEW

9    YORK FIRE-SHIELD, INC. is a corporation duly organized and existing under the laws of the State

10   of New York, with its principal place of business in the State of New York. At all times mentioned

11   herein, Defendant NEW YORK FIRE-SHIELD INCORPORATED, D/B/A AND A/K/A N.Y.

12   FIRE-SHIELD, INC. and D/B/A AND A/K/A NEW YORK FIRE-SHIELD, INC. engaged in

13   substantial, continuous and systematic activities in the State of California. By advertising for sale

14   and selling its products in the State of California via its interactive commercial website, said

15   defendant entered into repeated sales contracts with the residents of the State of California knowing

16   that it would receive commercial gain and therefore purposefully availed itself of the privilege of

17   conducting activities in the State of California. Said defendant has taken deliberate actions within

18   the State of California and has created obligations to residents in the State of California through

19   sales of its products on its website. Plaintiffs' claims arose out of or resulted from said defendant's

20   conduct of selling its products in the State of California.

21       7.    At all times mentioned herein, Defendant WACKENHUT SERVICES,

22   INCORPORATED AND/OR THE WACKENHUT CORPORATION is a corporation duly

23   organized and existing under the laws of the State of Florida, with its principal place of business in

24   the State of Florida. At all times mentioned herein, Defendant WACKENHUT SERVICES,

25   INCORPORATED AND/OR THE WACKENHUT CORPORATION engaged in substantial,

26   continuous and systematic activities in the State of California. By advertising for sale and selling its

27   products and services in the State of California via its interactive commercial website, said

Case 5:08-cv-02099-JF    Document 31-4    Filed 08/13/2008    Page 6 of 26

Case 5:06-cv-06507-JW    Document 64    Filed 03/23/2007    Page 17 of 36
Case 5:06-cv-06507-RS    Document 1    Filed 10/18/2006    Page 4 of 23

1 | defendant entered into sales and service contracts with the residents of the State of California

2 | knowing that it would receive commercial gain and therefore purposefully availed itself of the

3 | privilege of conducting activities in the State of California. Said defendant has taken deliberate

4 | actions within the State of California and has created obligations to residents in the State of

5 | California through sales of its products on its website. Plaintiffs' claims arose out of or resulted

6 | from said defendant's conduct of selling its products or services in the State of California.

7 |       8.    The true names and/or capacities, whether individual, partnership, corporate,

8 | associate, or otherwise of Defendants, DOES 1 through 50, inclusive, are unknown to Plaintiffs,

9 | who therefore sue said Defendants by such fictitious names and will ask leave to amend this

10 | complaint to show their true names and capacities when the same have been ascertained. Plaintiffs

11 | are informed and believe and on such information and belief allege that each of the Defendants

12 | designated herein as DOE is responsible in some manner for the events and happenings herein

13 | referred to, and that there is now due, owing and unpaid from said Defendants, and each of them, to

14 | Plaintiffs, the sums which are hereinafter alleged.

15 |       9.    At all relevant times, each of the Defendants was the agent, principal, servant,

16 | master, employee, employer, partner, joint venturer, alter ego, aider and abettor, co-conspirator,

17 | enterprise, franchisee and/or franchisor of each of the other Defendants. At all relevant times, and

18 | with regard to all relevant tortuous conduct herein alleged, each of said Defendants was acting

19 | within the course and scope and in furtherance of the object of said agency, service, employment,

20 | partnership, joint venture, conspiracy, enterprise, and/or franchise. At all times herein mentioned,

21 | each of the Defendants was the agent, servant, employee, partner, joint venturer, and/or franchisee

22 | of each of the remaining Defendants herein, and were at all times acting within the purpose and

23 | scope of said agency, service, employment, partnership, joint venture, and/or franchise.

24 | **JURISDICTION**

25 |       10.    Plaintiffs refer to paragraphs 1-9 as set forth above and by this reference incorporate

26 | the same herein as though set forth in full.

27 |       11.    This Court has jurisdiction of the subject matter of this action pursuant to 28 U.S.C.

1    §1332 based on the diversity of the parties' citizenship and the amount in controversy, which

2    exceeds $75,000, exclusive of interest and costs.

3                                    **VENUE**

4        12.     Venue is proper in this District pursuant to 28 U.S.C. §1391 in that the claim arose in

5    this District.

6                       **INTRADISTRICT ASSIGNMENT**

7        13.     Pursuant to Local Rule 3-2(e), this case is properly assigned to the San Jose Division

8    in that the claim arose in the County of Monterey, State of California.

9                         **FACTUAL ALLEGATIONS**

10        14.     Plaintiffs refer to paragraphs 1-13 as set forth above and by this reference incorporate

11    the same herein as though set forth in full.

12        15.     Severe burn injuries occurred to Plaintiff Jeremy Ehart, a Lance Corporal in the

13    United States Marine Corps, and to Plaintiff Steven McClanahan, a Corporal in the United States

14    Marine Corps, on October 28, 2004 while participating in a military exercise at Fort Hunter Liggett,

15    located in the City of Jolon, County of Monterey, State of California. Approximately twenty five

16    Marines were assigned to participate in Exercise Pacific Patriot at Fort Hunter Liggett, sponsored by

17    the Department of Energy ("DOE"), from October 5, 2004 to November 5, 2004. The DOE

18    provided all gear, equipment and weapons for the exercise. This included 15 commercial ghillie

19    suits, consisting of a blouse and pair of trousers, purchased from Defendants Muirhead and Ghillie

20    Suits.com. Said ghillie suits were Desert Storm era desert utilities with jute fabric sewn onto them.

21        16.     In addition to providing the ghillie suits to Plaintiffs Jeremy Ehart and Steven

22    McClanahan, the DOE provided the weapons to use in the exercise. All training with weapons was

23    blank fire. Defendant Wackenhut developed and implemented the porting procedure used to modify

24    the weapon used by Plaintiff Jeremy Ehart at the time of the incident.

25        17.     Muirhead and Ghillie Suits.com offered for sale and sold with said ghillie suits "Fire-

26    Proof-It Spray," which is an 8-ounce finger spray bottle of "Inspecta-Shield" fire retardant that is

27    applied to the ghillie suit.

18.    The "Inspecta-Shield" fire retardant is manufactured by Defendant New York Fire-Shield. The smallest bottle of fire retardant that New York Fire-Shield manufactures is a 32-ounce bottle.

19.    Muirhead and Ghillie Suits.com provided 8-ounce bottles of "Inspecta-Shield" Class "A" fire retardant with the 15 ghillie suits, which again consisted of one blouse and one pair of trousers, which designated marines applied to the ghillie suits prior to the training exercise.

20.    No specific on-product directions were provided from Muirhead and Ghillie Suits.com on how to properly apply the fire retardant. Further, no separate written instructions were supplied by Muirhead and Ghillie Suits.com on how to properly apply the fire retardant.

21.    Three marines applied the fire retardant to all of the ghillie suits prior to any training being conducted. There were no on-product instructions provided by Defendants Muirhead and Ghillie Suits.com on how frequently to reapply the fire retardant or under what conditions the fire retardant would be degraded. Further, no separate written instructions were supplied by Muirhead and Ghillie Suits.com on how frequently to reapply the fire retardant or under what conditions the fire retardant would be degraded.

22.    On the morning of October 28, 2004, Plaintiffs Jeremy Ehart and Steven McClanahan arrived at their fighting positions. There was approximately 40-meters distance between Plaintiff Steven McClanahan's fighting position and Plaintiff Jeremy Ehart's fighting position. Both Plaintiffs Jeremy Ehart and Steven McClanahan were wearing ghillie suits that were purchased from Muirhead and Ghillie Suits.com.

23.    At approximately 11:05 on October 28, 2004, Plaintiff Jeremy Ehart engaged DOE agents in a convoy from their fighting positions. Plaintiff Jeremy Ehart was using an M60 machine gun at the time of the incident. At approximately 11:06 on October 28, 2004, Plaintiff Jeremy Ehart's ghillie suit caught on fire. Plaintiff Jeremy Ehart rose from his fighting position and ran towards Plaintiff Steven McClanahan while calling for help. Plaintiff Steven McClanahan, after removing the blouse portion of his ghillie suit, attempted to put out the flames on Plaintiff Jeremy Ehart by smothering the flames and attempting to get Plaintiff Jeremy Ehart to roll on the ground.

Case 5:08-cv-02099-JF     Document 31-4     Filed 08/13/2008     Page 9 of 26

Case 5:06-cv-06507-JW     Document 64     Filed 03/23/2007     Page 19 of 36
Case 5:06-cv-06507-RS     Document 1     Filed 10/18/2006     Page 7 of 23

1    24.    In the process of attempting to rescue Plaintiff Jeremy Ehart, Plaintiff Steven

2    McClanahan's ghillie suit also caught on fire.  A paramedic arrived within two to three minutes of

3    the mayday call and used a fire extinguisher to put out the flames burning Plaintiff Ehart.  An

4    unidentified individual used a fire extinguisher to put out the flames burning Plaintiff McClanahan.

5    25.    In addition to airway swelling and lung injury, Plaintiff Jeremy Ehart sustained 50-

6    60% total body surface area burns, including both full thickness and partial thickness burns.  His

7    legs, from the groin to the area above the top of this boots, sustained full thickness burns.  His right

8    arm from the shoulder down and his left arm from the mid-bicep down sustained a mix of full and

9    partial thickness burns.  His face sustained full thickness burns.  Plaintiff Jeremy Ehart was not able

10   to return to full active duty as a result of the catastrophic injuries sustained.  On the 28th day of

11   April, 2006, Plaintiff Jeremy Ehart was medically discharged from the United States Marine Corps

12   due to the physical conditions sustained in the occurrence made the basis of this lawsuit.

13   26.    Plaintiff McClanahan sustained 20-30% total body surface area burns on his legs and

14   back.  The burns varied from second degree partial thickness burns to third degree full thickness

15   burns.

16   27.    As a result of said injuries, Plaintiffs have received, and will in the future continue to

17   receive, medical and hospital care and treatment provided by and through the United States of

18   America.  The Plaintiffs, for the sole use and benefit of the United States of America, under the

19   provisions of 42 U.S.C. §§ 2651-2653 et seq. and 10 U.S.C. §1095, and with its express consent,

20   assert a claim for the cost of said medical and hospital care and treatment and the value of future

21   care..

22                                    **COUNT ONE**

23   (Strict Liability – Design Defect – Against Muirhead, Ghillie Suits.com and Does 1 through 5)

24        AS AND FOR A FIRST COUNT TO THIS COMPLAINT, Plaintiffs Jeremy Ehart and

25   Steven McClanahan allege against Defendants Muirhead, Ghillie Suits.com and Does 1 through 5 as

26   follows:

27        28.    Plaintiffs hereby reallege and incorporate paragraphs 1 through 27 as if fully set forth

1  herein.

2      29.    Plaintiffs are informed and believe and thereon allege that said Defendants, at all

3  times herein mentioned, were in the business of manufacturing, researching, designing, assembling,

4  testing, producing, constructing, assembling, inspecting, distributing, marketing, and advertising for

5  sale and selling to and for the use of the general public ghillie suits, or components of it,

6  manufactured by said Defendants, which is the subject matter of this Complaint. Said Defendants

7  are responsible in some manner for placing said product or causing it to be placed into the stream of

8  commerce, such that Plaintiffs' injuries as hereinafter alleged were legally caused by the acts of said

9  Defendants, and each of them.

10     30.    At the time said Plaintiffs used said ghillie suits, the suits were substantially the same

11  as when they left the possession of said Defendants. Any changes made to the suits after they left

12  said Defendants' possession, such as the application of fire retardant spray to said suits, were

13  reasonably foreseeable to said Defendants.

14     31.    Said ghillie suits did not perform as safely as an ordinary consumer would have

15  expected at the time of use, in that the suits were highly flammable despite the fire retardant sprayed

16  on them. The suits were used in a way that was reasonably foreseeable to said Defendants.

17     32.    Said Defendants, by way of advertisement and through their website, made certain

18  representations and misrepresentations concerning the character or quality of the ghillie suits and

19  fire retardant sold by said Defendants. The purchaser of the ghillie suits relied upon the

20  misrepresentation made by said Defendants and passed on the ghillie suits and fire retardant, which

21  gave rise to the physical injuries to Plaintiffs as set out above and below.

22     33.    While utilizing said ghillie suits in the manner intended, said Plaintiffs were injured

23  in their health, strength, and activity, and sustained injury to their body and shock and injury to their

24  nervous system and persons, all of which have caused and continue to cause them great mental,

25  physical, and nervous pain and suffering. These injuries will result in some permanent disability to

26  said Plaintiffs, all to their general damage. The flammability of said ghillie suits and failure to

27  perform safely was a substantial factor in causing Plaintiffs' harm.

34.   As a further legal result of the conduct of said Defendants, and each of them, said Plaintiffs were required to and did employ physicians, surgeons and nurses for examination, treatment and care, and incurred and will continue to incur additional medical and incidental expenses, the exact amount of which is unknown to said Plaintiffs at this time.

35.   As a further legal result of the conduct of said Defendants and because of Plaintiffs' injuries, said Plaintiffs have been, and will continue to be, prevented from working in their occupations. The amount of earnings which will be lost to said Plaintiffs is unknown at this time. Plaintiffs are informed and believe that their inability to work and/or reduction in their earning capacity will continue in the future, thereby causing a further loss of earnings and/or earning capacity, the exact amount of which is unknown to said Plaintiffs at this time.

36.   As a further legal result of the conduct of said Defendants, said Plaintiffs have incurred damages in an ascertainable economic value, as hereinbefore alleged, and thus Plaintiffs are entitled to pre-judgment interest on said damages pursuant to Civil Code §3287 and/or §3288.

## COUNT TWO

### (Strict Liability – Design Defect – Against New York Fire-Shield and Does 6 through 10)

AS AND FOR A SECOND COUNT TO THIS COMPLAINT, Plaintiffs Jeremy Ehart and Steven McClanahan allege against Defendants New York Fire-Shield and Does 6 through 10 as follows:

37.   Plaintiffs hereby re-allege and incorporate paragraphs 1 through 36 as if fully set forth herein.

38.   Plaintiffs are informed and believe and thereon allege that said Defendants, at all times herein mentioned, were in the business of manufacturing, researching, designing, assembling, testing, producing, constructing, assembling, inspecting, distributing, marketing, and advertising for sale and selling to and for the use of the general public Inspecta-Shield fire retardant, or components of it manufactured by said Defendants, which is the subject matter of this Complaint. Said Defendants are responsible in some manner for placing said product or causing it to be placed into the stream of commerce, such that Plaintiffs' injuries as hereinafter alleged were legally caused by

1   the acts of said Defendants, and each of them.

2       39.    At the time Plaintiffs used said fire retardant, the product was substantially the same

3   as when they left the possession of said Defendants.

4       40.    Said fire retardant did not perform as safely as an ordinary consumer would have

5   expected at the time of use, in that the ghillie suits worn by Plaintiffs Jeremy Ebart and Steven

6   McClanahan as described above were highly flammable despite the fire retardant being sprayed on

7   them. The fire retardant was used in a way that was reasonably foreseeable to said Defendants.

8       41.    Said Defendants, by way of advertisement and/or through their website, made certain

9   representations and misrepresentations concerning the character or quality of the fire retardant sold

10  by and supplied to Ghillie Suits.com. Ghillie Suits.com relied upon the misrepresentation made by

11  Defendant New York Fire-Shield and Does 6 through 10 and passed on the fire retardant, which

12  gave rise to the physical injuries to said Plaintiffs as set out above and below.

13      42.    While utilizing said fire retardant in the manner intended, said Plaintiffs were injured

14  in their health, strength, and activity, and sustained injury to their body and shock and injury to their

15  nervous system and persons, all of which have caused and continue to cause them great mental,

16  physical, and nervous pain and suffering. These injuries will result in some permanent disability to

17  said Plaintiffs, all to their general damage. The flammability of said ghillie suits despite the use of

18  fire retardant spray and the failure of said spray to perform safely was a substantial factor in causing

19  Plaintiffs' harm.

20      43.    As a further legal result of the conduct of said Defendants, said Plaintiffs were

21  required to and did employ physicians, surgeons and nurses for examination, treatment and care, and

22  incurred and will continue to incur additional medical and incidental expenses, the exact amount of

23  which is unknown to said Plaintiffs at this time.

24      44.    As a further legal result of the conduct of said Defendants and because of Plaintiffs'

25  injuries, said Plaintiffs have been, and will continue to be, prevented from working in their

26  occupations. The amount of earnings which will be lost to said Plaintiffs is unknown at this time.

27  Plaintiffs are informed and believes that their inability to work and/or reduction in his earning

1    capacity will continue in the future, thereby causing a further loss of earnings and/or earning

2    capacity, the exact amount of which is unknown to said Plaintiffs at this time.

3        45.    As a further legal result of the conduct of said Defendants, said Plaintiffs have

4    incurred damages in an ascertainable economic value, as hereinbefore alleged, and thus Plaintiffs

5    are entitled to pre-judgment interest on said damages pursuant to Civil Code §3287 and/or §3288.

6    **COUNT THREE**

7    **(Strict Liability – Design Defect – Against Wackenhut and Does 11 through 15)**

8        AS AND FOR A THIRD COUNT TO THIS COMPLAINT, Plaintiffs Jeremy Ehart and

9    Steven McClanahan allege against Defendants Wackenhut and Does 11 through 15 as follows:

10        46.    Plaintiffs hereby re-allege and incorporate paragraphs 1 through 45 as if fully set

11    forth herein.

12        47.    Plaintiffs are informed and believe and thereon allege that said Defendants, at all

13    times herein mentioned, were in the business of manufacturing, researching, designing, assembling,

14    modifying, testing, producing, constructing, assembling, inspecting, distributing, marketing, and

15    advertising for sale and selling machine guns or components of machine guns manufactured by said

16    Defendants, which is the subject matter of this Complaint. Said Defendants are responsible in some

17    manner for placing said product or causing it to be placed into the stream of commerce, such that

18    Plaintiffs' injuries as hereinafter alleged were legally caused by the acts of said Defendants, and

19    each of them.

20        48.    At the time Plaintiff Jeremy Ehart used said machine gun, the product was

21    substantially the same as when they left the possession of said Defendants.

22        49.    Said machine gun did not perform as safely as an ordinary consumer would have

23    expected at the time of use, in that the amount of muzzle flash and receiver signature on said gun

24    was not normal. The machine gun was used in a way that was reasonably foreseeable to said

25    Defendants.

26        50.    While utilizing said machine gun in the manner intended, said Plaintiffs were injured

27    in their health, strength, and activity, and sustained injury to their body and shock and injury to their

1  nervous system and persons, all of which have caused and continue to cause them great mental,

2  physical, and nervous pain and suffering.  These injuries will result in some permanent disability to

3  said Plaintiffs, all to their general damage.  The abnormal amount of muzzle flash and receiver

4  signature on the gun was a substantial factor in causing Plaintiffs' harm.

5      51.    As a further legal result of the conduct of said Defendants, said Plaintiffs were

6  required to and did employ physicians, surgeons and nurses for examination, treatment and care, and

7  incurred and will continue to incur additional medical and incidental expenses, the exact amount of

8  which is unknown to said Plaintiffs at this time.

9      52.    As a further legal result of the conduct of said Defendants, and because of Plaintiffs'

10  injuries, said Plaintiffs have been, and will continue to be, prevented from working in their

11  occupations.  The amount of earnings which will be lost to said Plaintiffs is unknown at this time.

12  Plaintiffs are informed and believes that their inability to work and/or reduction in his earning

13  capacity will continue in the future, thereby causing a further loss of earnings and/or earning

14  capacity, the exact amount of which is unknown to said Plaintiffs at this time.

15      53.    As a further legal result of the conduct of said Defendants, said Plaintiffs have

16  incurred damages in an ascertainable economic value, as hereinbefore alleged, and thus Plaintiffs

17  are entitled to pre-judgment interest on said damages pursuant to Civil Code §3287 and/or §3288.

18                                    COUNT FOUR

19          (Strict Liability – Failure to Warn – Against Muirhead, Ghillie Suits.com and

20                              Does 1 through 5)

21      AS AND FOR A FOURTH COUNT TO THIS COMPLAINT, Plaintiffs Jeremy Ehart and

22  Steven McClanahan allege against Defendants Muirhead, Ghillie Suits.com and Does 1 through 5 as

23  follows:

24      54.    Plaintiffs hereby reallege and incorporate paragraphs 1 through 53 as if fully set forth

25  herein.

26      55.    The ghillie suits that were involved in the subject incident had been distributed,

27  marketed and sold by said Defendants without adequate warnings and/or instructions.

Case 5:08-cv-02099-JF    Document 31-4    Filed 08/13/2008    Page 15 of 26

Case 5:06-cv-06507-JW-RS   Document 64    Filed 03/23/2007   Page 25 of 36
Case 5:06-cv-06507-JW-RS   Document 1    Filed 10/13/2006   Page 13 of 23

56.     Said ghillie suits had potential risks that were known or knowable by the use of scientific knowledge at the time of manufacture, distribution and/or sale, in that said suits were highly flammable despite the fire retardant sprayed on them.

57.     The potential risks of said ghillie suits presented a substantial danger to users of the product. Ordinary consumers would not have recognized the potential risks described above.

58.     Said Defendants failed to adequately warn and/or instruct of the potential risks as described above. Said Defendants also did not provide proper instructions on how to apply the "Inspecta-Shield" fire retardant, nor did they provide an adequate quantity of fire retardant after repackaging it in smaller quantities than sold by the manufacturer. The instructions provided by said Defendants with the 8-ounce bottles of fire retardant were minimal, and therefore, the amount of retardant applied to the suits was inadequate to prevent an instantaneous and catastrophic fire. The fire-resistant treatment recommended by said Defendants was not sufficient to adequately alter the flammability and fire performance characteristics of the ghillie suit.

59.     Said ghillie suits were used in a way that was reasonably foreseeable to said Defendants.

60.     While utilizing said ghillie suits in the manner intended by said Defendants, said Plaintiffs were injured as set forth above. The lack of sufficient instructions and/or warnings was a substantial factor in causing Plaintiffs' harm.

## COUNT FIVE

**(Strict Liability – Failure to Warn – Against New York Fire-Shield and Does 6 through 10)**

AS AND FOR A FIFTH COUNT TO THIS COMPLAINT, Plaintiffs Jeremy Ehart and Steven McClanahan allege against Defendants New York Fire-Shield and Does 6 through 10 as follows:

61.     Plaintiffs hereby reallege and incorporate paragraphs 1 through 60 as if fully set forth herein.

62.     The Inspecta-Shield fire retardant that was involved in the subject incident had been distributed, marketed and sold by said Defendants without adequate warnings and/or instructions.

Case 5:08-cv-02099-JF    Document 31-4    Filed 08/13/2008    Page 16 of 26

Case 5:06-cv-06507-JW-RS   Document 64   Filed 08/29/2007   Page 26 of 36
Case 5:06-cv-06507-JW-RS   Document 1   Filed 10/16/2006   Page 14 of 36

63. Said fire retardant had potential risks that were known or knowable by the use of scientific knowledge at the time of manufacture, distribution and/or sale, in that said fire retardant, if not applied properly, resulted in material that was highly flammable despite the fire retardant being sprayed on the material.

64. The potential risks of said fire retardant presented a substantial danger to users of the fire retardant product. Ordinary consumers would not have recognized the potential risks described above.

65. Said Defendants failed to adequately warn and/or instruct of the potential risks as described above. Said Defendants also did not provide proper instructions on how to apply the "Inspecta-Shield" fire retardant or instructions regarding how much fire retardant was needed to adequately alter the flammability and fire performance characteristics of the material on which it was being applied. Said fire retardant was used in a way that was reasonably foreseeable to said Defendants.

66. While utilizing said fire retardant in the manner intended by said Defendants, said Plaintiffs were injured as set forth above. The lack of sufficient instructions and/or warnings was a substantial factor in causing Plaintiffs' harm.

## COUNT SIX

(Strict Liability – Failure to Warn – Against Wackenhut and Does 11 through 15)

AS AND FOR A SIXTH COUNT TO THIS COMPLAINT, Plaintiffs Jeremy Ehart and Steven McClanahan allege against Defendants Wackenhut and Does 11 through 15 as follows:

67. Plaintiffs hereby reallege and incorporate paragraphs 1 through 66 as if fully set forth herein.

68. The machine gun that was involved in the subject incident had been distributed, modified, marketed and/or sold by said Defendants without adequate warnings and/or instructions.

69. Said machine gun had potential risks that were known or knowable by the use of scientific knowledge at the time of manufacture, distribution and/or sale, in that the amount of muzzle flash and receiver signature on said gun was not normal.

70.   The potential risks of said machine gun presented a substantial danger to users of the product. Ordinary consumers would not have recognized the potential risks described above.

71.   Said Defendants failed to adequately warn and/or instruct of the potential risks as described above.

72.   Said machine gun was used in a way that was reasonably foreseeable to said Defendants.

73.   While utilizing said machine gun in the manner intended by said Defendants, said Plaintiffs were injured as set forth above. The lack of sufficient instructions and/or warnings was a substantial factor in causing said Plaintiffs' harm.

## COUNT SEVEN

### (Negligence – Against Muirhead, Ghillie-Suits.com and Does 1 through 5)

AS AND FOR A SEVENTH COUNT TO THIS COMPLAINT, Plaintiffs Jeremy Ehart and Steven McClanahan allege against Defendants Muirhead, Ghillie-Suits.com and Does 1 through 5 as follows:

74.   Plaintiffs hereby reallege and incorporate paragraphs 1 through 73 as if fully set forth herein.

75.   Said Defendants were negligent in designing, manufacturing, supplying, and inspecting the ghillie suits worn by Plaintiffs Jeremy Ehart and Steven McClanahan. Said Defendants were also negligent in failing to use reasonable care to warn or instruct about the product's dangerous condition or about facts that made the product likely to be dangerous. Said Defendants were also negligent in failing to test the products they sold. Said Defendants knew or reasonably should have known that the ghillie suits were dangerous or were likely to be dangerous when used in a reasonably foreseeable manner.

76.   Said Defendants knew or reasonably should have known that users would not realize the dangers of said ghillie suits.

77.   Said Defendants failed to adequately warn of the danger or instruct on the safe use of said product. Said Defendants did not provide proper instructions on how to apply the "Inspecta-

1  Shield" fire retardant, nor did they provide an adequate quantity of fire retardant after repackaging it

2  in smaller quantities than sold by the manufacturer. The instructions provided by said Defendants

3  were minimal, and therefore, the amount of retardant applied to the suits was inadequate to prevent

4  an instantaneous and catastrophic fire. The fire-resistant treatment recommended by said

5  Defendants was not sufficient to adequately alter the flammability and fire performance

6  characteristics of the ghillie suit.

7      78.    A reasonable manufacturer, distributor or seller under same or similar circumstances

8  would have warned of said foreseeable dangers or instructed on the safe use of the product.

9      79.    While utilizing said ghillie suits in the manner intended by said Defendants, said

10  Plaintiffs were injured as set forth above. Said Defendants' failure to warn or instruct was a

11  substantial factor in causing Plaintiffs' harm.

12                          **COUNT EIGHT**

13          (Negligence – Against New York Fire-Shield and Does 6 through 10)

14      AS AND FOR A EIGHTH COUNT TO THIS COMPLAINT, Plaintiffs Jeremy Ehart and

15  Steven McClanahan allege against Defendants New York Fire-Shield and Does 6 through 10 as

16  follows:

17      80.    Plaintiffs hereby reallege and incorporate paragraphs 1 through 79 as if fully set forth

18  herein.

19      81.    Said Defendants were negligent in designing, manufacturing, supplying, and

20  inspecting the Inspecta-Shield fire retardant used by Plaintiffs Jeremy Ehart and Steven

21  McClanahan. Said Defendants were also negligent in failing to use reasonable care to warn or

22  instruct about the product's dangerous condition or about facts that made the product likely to be

23  dangerous. Said Defendants knew, or reasonably should have known, that the fire retardant was

24  dangerous or was likely to be dangerous when used in a reasonably foreseeable manner.

25      82.    Said Defendants knew or reasonably should have known that users would not realize

26  the dangers of said Inspecta-Shield fire retardant.

27      83.    Said Defendants failed to adequately warn of the danger or instruct on the safe use of

1  said product. Said Defendants did not provide adequate warnings and instructions for use on how to

2  apply the "Inspecta-Shield" fire retardant, nor did they provide an adequate quantity of fire retardant

3  to distributors or monitor how said fire retardant was being repackaged once it was sold by the

4  manufacturer to distributors.

5      84.    A reasonable manufacturer, distributor or seller, under the same or similar

6  circumstances, would have warned of said foreseeable dangers and provided adequate instructions

7  for the safe use of the product.

8      85.    While utilizing said fire retardant spray in the manner intended by said Defendants,

9  said Plaintiffs were injured as set forth above. Said Defendants' failure to warn or instruct was a

10  substantial factor in causing Plaintiffs' harm.

11          **COUNT NINE**

12      (Negligence -- Against Wackenhut and Does 11 through 15)

13      AS AND FOR A NINTH COUNT TO THIS COMPLAINT, Plaintiffs Jeremy Ebart and

14  Steven McClanahan allege against Defendants Wackenhut and Does 11 through 15 as follows:

15      86.    Plaintiffs hereby reallege and incorporate paragraphs 1 through 85 as if fully set forth

16  herein.

17      87.    Said Defendants were negligent in designing, manufacturing, modifying, supplying,

18  and inspecting the machine gun used by Plaintiff Jeremy Ebart at the time and place described

19  above. Said Defendants were also negligent in failing to use reasonable care to warn or instruct

20  about the product's dangerous condition or about facts that made the product likely to be dangerous.

21  Said Defendants were also negligent in failing to test the machine gun at issue. Said Defendants

22  knew or reasonably should have known that the machine gun at issue was dangerous or were likely

23  to be dangerous when used in a reasonably foreseeable manner.

24      88.    Said Defendants knew or reasonably should have known that users would not realize

25  the dangers of said machine gun.

26      89.    Said Defendants failed to adequately warn of the danger or instruct on the safe use of

27  said machine gun.

1    90.    A reasonable manufacturer, modifier, distributor or seller under same or similar

2    circumstances would have warned of said foreseeable dangers or instructed on the safe use of the

3    product.

4    91.    While utilizing said machine gun in the manner intended by said Defendants, said

5    Plaintiffs Jeremy Ehart and Steven McLanahan were injured as set forth above.  Said Defendants'

6    failure to warn or instruct was a substantial factor in causing Plaintiffs' harm.

7                                   **COUNT TEN**

8    **(Breach of Implied Warranty of Fitness for a Particular Purpose – Against Muirhead, Ghillie**

9                          **Suits.com and Does 1 through 5)**

10    AS AND FOR AN TENTH COUNT TO THIS COMPLAINT, Plaintiffs Jeremy Ehart and

11    Steven McClanahan allege against Defendants Muirhead, Ghillie Suits.com and Does 1 through 5 as

12    follows:

13    92.    Plaintiffs hereby reallege and incorporate paragraphs 1 through 91 as if fully set forth

14    herein.

15    93.    Said ghillie suit was purchased for a particular purpose, i.e., safe camouflage.

16    94.    At the time of the sale, said Defendants knew or had reason to know the particular

17    purpose for which each of the Plaintiffs would use the ghillie suits.

18    95.    Said Defendants knew or had reason to know that each of the Plaintiffs relied upon

19    the skill and judgment of said Defendants to create, market, test, and sell a suitable and safe product.

20    96.    Said Defendants, through their agents, employees, subsidiaries, representatives and

21    affiliates, warranted that said ghillie suits were suitable for the particular purpose for which it was

22    utilized by each of the Plaintiffs.

23    97.    At the time it was manufactured and at all subsequent times, said ghillie suits were

24    not as warranted, but were unfit for the particular purpose for which they were intended in that they

25    were defective, causing each of Plaintiffs to suffer damages and consequential damages in an

26    amount in excess of the minimum jurisdictional limits of the Court that are more fully set forth

27    herein.

{H:\WDOCS\6183\71353\pleading\00086038.DOC}
COMPLAINT FOR DAMAGES                                                          -18-

Case 5:08-cv-02099-JF    Document 31-4    Filed 08/13/2008    Page 21 of 26

Case 5:06-cv-06507-JW    Document 64    Filed 03/23/2007    Page 31 of 36
Case 5:06-cv-06507-RS    Document 1    Filed 10/18/2006    Page 19 of 23

98.    As a direct and proximate cause of each of the Defendants' breach of the implied warranty of fitness for a particular purpose and the resulting dangers associated with the use of said ghillie suits, each of the Plaintiffs sustained medical expenses from hospitals, physicians, surgeons, at-home care, and incidental expenses, and each Plaintiff will necessarily incur additional such expenses for an indefinite period of time in the future. Each Plaintiff also sustained physical pain and suffering and mental anguish damages in the past and future, as well as a loss of earnings, past, present, and future, and a loss of earning capacity.

## COUNT ELEVEN

**(Breach of Implied Warranty of Fitness for a Particular Purpose — Against New York Fire-Shield and Does 6 through 10)**

AS AND FOR AN ELEVENTH COUNT TO THIS COMPLAINT, Plaintiffs Jeremy Ehart and Steven McClanahan allege against Defendants New York Fire-Shield and Does 6 through 10 as follows:

99.    Plaintiffs hereby reallege and incorporate paragraphs 1 through 98 as if fully set forth herein.

100.    Said Inspecta-Shield fire retardant was purchased for a particular purpose, i.e., to make materials fire retardant.

101.    At the time of the sale, said Defendants knew or had reason to know the particular purpose for which each of the Plaintiffs would use the Inspecta-Shield fire retardant.

102.    Said Defendants knew or had reason to know that each of the Plaintiffs relied upon the skill and judgment of said Defendants to create, market, test, and sell a suitable and safe product.

103.    Said Defendants, through their agents, employees, subsidiaries, representatives and affiliates, warranted that said Inspecta-Shield fire retardant was suitable for the particular purpose for which it was utilized by each of the Plaintiffs,

104.    At the time it was manufactured and at all subsequent times, said Inspecta-Shield fire retardant was not as warranted, but were unfit for the particular purpose for which it was intended in that it was defective, causing each of Plaintiffs to suffer damages and consequential damages in an

1    amount in excess of the minimum jurisdictional limits of the Court that are more fully set forth

2    herein.

3    105.    As a direct and proximate cause of each of the Defendants' breach of the implied

4    warranty of fitness for a particular purpose and the resulting dangers associated with the use of said

5    Inspecta-Shield fire retardant, each of the Plaintiffs sustained medical expenses from hospitals,

6    physicians, surgeons, at-home care, and incidental expenses, and each Plaintiff will necessarily incur

7    additional such expenses for an indefinite period of time in the future. Each Plaintiff also sustained

8    physical pain and suffering and mental anguish damages in the past and future, as well as a loss of

9    earnings, past, present, and future, and a loss of earning capacity.

10                              COUNT TWELVE

11    (Breach of Implied Warranty of Fitness for a Particular Purpose – Against Wackenhut and

12                            Does 11 through 15)

13        AS AND FOR AN TWELFTH COUNT TO THIS COMPLAINT, Plaintiffs Jeremy Ebart

14    and Steven McClanahan allege against Defendants Wackenhut and Does 11 through 15 as follows:

15        106.    Plaintiffs hereby reallege and incorporate paragraphs 1 through 105 as if fully set

16    forth herein.

17        107.    Said gun was purchased for a particular purpose, i.e., for safe use in military

18    exercises.

19        108.    At the time of the sale, said Defendants knew or had reason to know the particular

20    purpose for which each of the Plaintiffs would use said gun.

21        109.    Said Defendants knew or had reason to know that each of the Plaintiffs relied upon

22    the skill and judgment of said Defendants to create, market, test, modify and sell a suitable and safe

23    product.

24        110.    Said Defendants, through their agents, employees, subsidiaries, representatives and

25    affiliates, warranted that said gun was suitable for the particular purpose for which it was utilized by

26    each of the Plaintiffs.

27        111.    At the time it was manufactured and at all subsequent times, said gun was not as

1   warranted, but were unfit for the particular purpose for which it was intended in that it was

2   defective, causing each of Plaintiffs to suffer damages and consequential damages in an amount in

3   excess of the minimum jurisdictional limits of the Court that are more fully set forth herein.

4       112.   As a direct and proximate cause of each of the Defendants' breach of the implied

5   warranty of fitness for a particular purpose and the resulting dangers associated with the use of said

6   Inspecta-Shield fire retardant, each of the Plaintiffs sustained medical expenses from hospitals,

7   physicians, surgeons, at-home care, and incidental expenses, and each Plaintiff will necessarily incur

8   additional such expenses for an indefinite period of time in the future. Each Plaintiff also sustained

9   physical pain and suffering and mental anguish damages in the past and future, as well as a loss of

10  earnings, past, present, and future, and a loss of earning capacity.

11  **COUNT THIRTEEN**

12  (Loss of Consortium – Against All Defendants)

13      AS AND FOR A THIRTEENTH COUNT TO THIS COMPLAINT, Plaintiff Kristy Ehart

14  alleges against Defendants, and each of them, as follows:

15      113.   Plaintiff hereby realleges and incorporates paragraphs 1 through 112 as if fully set

16  forth herein.

17      114.   At all times herein mentioned, Plaintiff Kristy Ehart and Plaintiff Jeremy Ehart were

18  husband and wife, respectively. By reason of the injuries to Plaintiff Jeremy Ehart as described

19  herein, Plaintiff Kristy Ehart has been deprived of the consortium of Plaintiff Jeremy Ehart.

20  **DEMAND FOR JURY TRIAL**

21      Plaintiffs hereby demand a jury for all claims which a jury is permitted.

22  **PRAYER**

23      WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as

24  follows:

25      1.    For general damages according to proof;

26      2.    For medical and incidental expenses according to proof;

27      3.    For loss of earnings and earning capacity according to proof;

4.   For prejudgment interest on all general and special damages according to law;

5.   For costs of suit herein; and,

6.   For such other and further relief as the court deems just and proper.

Dated:  10/17/06

NEEDHAM, DAVIS, KEPNER & YOUNG, LLP

By:

CRAIG NEEDHAM
*Attorneys for Plaintiffs*

{H:\WDOCS\6183\71353\pleading\00086048.DOC}
COMPLAINT FOR DAMAGES

1

2  <u>CERTIFICATION OF INTERESTED ENTITIES OR PERSONS</u>

3  Pursuant to Civil L.R. 3-16, the undersigned certifies that as of this date, other than the

named parties, there is no such interest to report.

4  Dated: 10/16/06

5                                    NEEDHAM, DAVIS, KEPNER & YOUNG, LLP

6

7  By: _____

8      CRAIG NEEDHAM
       *Attorneys for Plaintiffs*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

-23-

IH\WDOCS\61831\71353\pleading\00086038.DOC]
COMPLAINT FOR DAMAGES

## PROOF OF SERVICE

**Name of Action:** Ehart v. Ghillie Suits.Com, Inc., et al.
**Court and Action No:** United States District Court, Northern District, San Jose Division
Action No. C 06 06507 RS

I, Karen D. Tallman, declare that I am over the age of eighteen years and not a party to this action or proceeding. My business address is 2033 North Main Street, Suite 800, PO Box 8035, Walnut Creek, California 94596-3728. On March 23, 2007, I caused the following document(s) to be served:

NEW YORK FIRE SHIELD, INC.'S CROSS-CLAIM FOR TRADEMARK INFRINGEMENT, UNFAIR COMPETITION, MISLEADING ADVERTISING , EQUITABLE INDEMNITY, TOTAL INDEMNITY, CONTRIBUTION, AND DEMAND FOR JURY TRIAL

I electronically served the above referenced document(s) through e-File. E-service in this action was completed on all parties listed on the service list with the United States District Court e-File website.

☒

Craig Needham, Esq.
Kirsten Fish, Esq.
Needham, Davis, Kepner & Young
1960 The Alameda, Suite 210
San Jose, CA 95126
Phone: 408.244.2166
Fax: 408.244.7815
*Attorneys for Plaintiffs Jeremy James*
*Ehart, Kristie Ehart, and Steven Ryan*
*McClanahan*

Daniel J.T. Sciano, Esq.
Tinsman &Sciano, Inc.
10107 McAllister Freeway
San Antonio, TX 78216
Phone: 210.225.3121
Fax: 210.225.6235
*Attorneys for Plaintiffs Jeremy James*
*Ehart, Kristie Ehart, and Steven Ryan*
*McClanahan*

Michael L. Smith, Esq.
Manning & Marder, Kass, Ellrod,
Ramirez
One California Street, Suite 1100
San Francisco, CA 94111
Phone: 415.217.6990
Fax: 415.217.6999
*Attorneys for Wackenhut Services,*
*Inc.; The Wackenhut Corporation*

Gregg A. Thornton, Esq.
Danielle K. Lewis, Esq.
Selman Breitman
33 Montgomery, Sixth Floor
San Francisco, CA 94105
Phone: 415.979.0400
Fax: 415.979.2099
*Attorneys for Ghillie Suits.Com, Inc.*
*and Todd Muirhead*

I declare under penalty of perjury that the foregoing is true and correct. Executed on March 23, 2007, at Walnut Creek, California.

*Karen Tallman*

Karen D. Tallman

PROOF OF SERVICE