\*\*E-filed 3/19/2009\*\*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| EVANSTON INSURANCE COMPANY,<br><br>    Plaintiff and Counter-Defendant,<br><br>v.<br><br>GHILLIE SUITS.COM, INC., TODD MUIRHEAD, JEREMY JAMES EHART, KRISTY EHART, STEVEN RYAN McCLANAHAN, and DOES 1-100,<br><br>    Defendants and Counter-Claimants. | Case Number C 08-2099 JF (HRL)<br><br>ORDER[1] (1) GRANTING COUNTER-CLAIMANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND (2) DENYING EVANSTON'S MOTION FOR PARTIAL SUMMARY JUDGMENT<br><br>[re: docket nos. 31, 57, 60, 65, 66, 72] |

    Jeremy James Ehart, Kristy Ehart and Steven Ryan McClanahan (collectively, "Underlying Plaintiffs") brought an action against Ghillie Suits.com, Inc. and its president and owner, Todd Muirhead (collectively, "GSC") for strict product liability, negligence, breach of implied warranty, and loss of consortium for burn injuries caused by allegedly defective "ghillie" suits.[2] At the time of the alleged failure of the ghillie suits, GSC was insured under a commercial

---

[1] This disposition is not designated for publication in the official reports.

[2] The underlying action is *Ehart, et al. v. Ghillie Suits.Com, Inc., et al.*, CV 06-6507 (N.D. Cal. Oct. 18, 2006).

general liability policy issued by Evanston Insurance Company ("Evanston").  On April 22, 2008, Evanston filed the instant action against GSC and Underlying Plaintiffs, seeking declaratory relief with respect to the application of a per-occurrence coverage limitation contained in the insurance policy.  GSC and Underlying Plaintiffs (collectively, "Counter-Claimants") filed separate but substantially similar counterclaims against Evanston.[3]  Now pending before the Court are the parties' cross-motions for partial summary judgment.[4]  For the reasons set forth below, the Court will grant partial summary judgment in favor of Counter-Claimants.

## I.  BACKGROUND

Without admitting or conceding any issue in the underlying action, the parties have presented the following stipulated facts.  Underlying Plaintiffs Jeremy Ehart and Steven Ryan McClanahan are U.S. Marines who suffered severe burn injuries while participating in a joint military training exercise.  *See* Stipulated Facts ("Stip. Facts") ¶¶ 2, 15(c).  At the time of their injuries, both individuals were wearing ghillie suits manufactured and sold by GSC.  *See id.* ¶ 6(b).  A ghillie suit is a form of camouflage that typically consists of an abundance of shredded material attached to pants and a jacket and is designed to give the wearer a three-dimensional appearance that will blend in with surrounding vegetation.  *See id.* Ex. A.  GSC maintains a website that advertises its ghillie suits along with a fire-retardant spray.  *See id.* ¶ 4.  Application of the spray is recommended if the ghillie suits are to be used near open flame or other sources of ignition.  *Id.*

The joint training exercise was arranged in part by Wackenhut Services Incorporated ("Wackenhut"), a civil contractor retained by the United States Department of Energy ("DOE").

---

[3] Counter-Claimants also allege that Evanston breached its implied contractual duty of good faith and fair dealing by rejecting their earlier settlement offer of $2 million, thus waiving the total aggregate limit set forth in the insurance policy.  That contention is not at issue in the instant motions.

[4] GSC did not file an individual reply to Evanston's opposition to Counter-Claimants' motion for partial summary judgment or opposition to Evanston's motion for partial summary judgment.  However, GSC has moved to join the relevant motion papers filed by Underlying Plaintiffs, and those motions will be granted.

Stip. Facts ¶ 4. DOE requested that Wackenhut acquire and distribute fifteen ghillie suits for the training exercise and recommended that the suits be fireproof. *See id.* An acquisition specialist for Wackenhut then contacted GSC to inquire about its ghillie suits. *Id.* Satisfied with the information provided by GSC, Wackenhut purchased fifteen ghillie suits and an unknown quantity of eight-ounce bottles of "Inspecta-Shield Class 'A' Fire Retardant," which GSC represented to be the "Fire-Proof-It Spray" advertised on its website.[5] *Id.* ¶¶ 4-5. The ghillie suits and fireproofing spray were then distributed to various Marines, who sprayed each ghillie suit in accordance with the instructions on the bottles. *Id*. ¶ 6(a). Ehart and McClanahan did not participate in the fireproofing process. *Id*. ¶ 6(b). Two of the treated ghillie suits were then delivered to Ehart and McClanahan, who believed that the suits had been properly treated to reduce the risk of fire. *Id*.

On October 28, 2004, Ehart and McClanahan were engaged in the training exercise and at one point were stationed approximately forty meters apart on a hillside. Stip. Facts ¶ 7. Ehart was equipped with a blank-fire M60 machine gun and McClanahan with a blank-fire .50 caliber sniper rifle. *Id*. Also in the vicinity was a Wackenhut safety controller, Mac Moad, who was wearing regular civilian clothing and fireproof gloves. *Id.* ¶ 9. As Ehart discharged his automatic weapon, a receiver flash from the gun's ejection port contacted his ghillie suit, causing it to catch on fire. *Id.* ¶ 7. Ehart immediately cried for help. *Id*. McClanahan, who was still forty meters from Ehart, ran to his aid. *Id.* ¶ 8. At the same time, Wackenhut safety controller Moad called out to Ehart and told him to drop and roll, which Ehart did. *Id.* ¶ 9. Both McClanahan and Moad then approached Ehart and attempted to pat out the flames with their hands, but to little effect. *See id.* ¶ 10. Ehart then rose from the ground and began running downhill. *Id*. McClanahan and Moad followed Ehart, set him back on the ground, and attempted once again to extinguish the flames. *Id*.

With fire now completely engulfing Ehart, Moad removed a jacket he was wearing and

---

[5] According to the product's manufacturer, New York Fire Shield, this "fireproof" spray is not appropriate for fireproofing outdoor apparel.

1 used it to smother the flames consuming Ehart's head and upper body. Stip. Facts ¶ 11.
2 McClanahan did likewise, removing the jacket of his ghillie suit and using it to swat at the fire.
3 *Id.* McClanahan's ghillie jacket ignited but he was able to extinguish that fire. *Id*. McClanahan
4 then dropped to his knees, and with Moad's assistance, tried to strip off Ehart's ghillie suit. *Id.*
5 At this point, McClanahan's ghillie pants ignited. *Id.* ¶ 12. McClanahan then ran approximately
6 fifteen feet and rolled on the ground in an attempt to extinguish the spreading flames. *Id.* Moad
7 witnessed McClanahan's plight but concluded that he could not combat two fires at one time and
8 elected to continue helping Ehart. *See id.* Shortly thereafter, other exercise participants arrived
9 and used fire extinguishers to put out both fires. *Id.* ¶ 13. Both of the Marines suffered severe
10 burns. *See id.* ¶¶ 10-12, 15(c). Moad, who was not wearing a ghillie suit, did not catch on fire or
11 suffer any significant injuries. *Id.* ¶ 14.

12  Underlying Plaintiffs then filed suit against GSC, alleging that defects in the ghillie suit
13 caused the Marines' burn injuries. GSC then tendered the lawsuit to Evanston, which agreed to
14 defend and indemnify GSC pursuant to the terms of the insurance policy. The insurance policy
15 provides coverage of up to $1 million per occurrence for bodily injury and/or property damage,
16 subject to a total aggregate limit of $2 million. On September 26, 2007, Underlying Plaintiffs
17 made a demand for the entire $2 million aggregate limit based upon two alleged occurrences, one
18 being the cause of the injuries to Ehart and the other being the event that resulted in
19 McClanahan's injuries. Evanston did not accept the demand, contending that coverage was
20 limited to $1 million because there had been only one occurrence. On April 22, 2008, Evanston
21 filed the instant action for declaratory relief.

## II.  LEGAL STANDARD

23  Summary judgment should be granted only when there are no genuine issues of material
24 fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c);
25 *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party bears the initial
26 burden of informing the court of the basis for the motion and identifying the portions of the
27 pleadings, depositions, or other evidence that demonstrate the absence of a triable issue of
28 material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets this

4

initial burden, the burden shifts to the non-moving party to present specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324. Once the moving party meets this burden, the nonmoving party may not rest upon mere allegations or denials, and instead must present evidence sufficient to demonstrate that there is a genuine issue for trial. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001). A genuine issue for trial exists if the non-moving party presents evidence from which a reasonable jury, viewing the evidence in the light most favorable to that party, could resolve the material issue in his or her favor. *Anderson*, 477 U.S. 242, 248-49.

"Where the terms and conditions of an insurance policy constitute the entire agreement between the parties, its interpretation is essentially a question of law, particularly well-suited for summary judgment." *State Farm Fire & Cas. Co. v. Yukiyo, Ltd.*, 870 F. Supp. 292, 294 (N.D. Cal. 1994) (citing *St. Paul Fire & Marine Ins. Co. v. Weiner*, 606 F.2d 864, 867 (9th Cir. 1979)). The insured has the initial burden of showing that an event should be covered. *Whittaker Corp. v. Allianz Underwriters, Inc.*, 11 Cal. App. 4th 1236, 1244 (1992). Once an event has been shown to fall within the scope of coverage, the insurer has the burden of showing that an exclusion or limitation applies. *Essex Ins. Co. v. City of Bakersfield*, 154 Cal. App. 4th 696, 705 (2007).[6]

### III. DISCUSSION

The parties agree that the resolution of their respective motions for partial summary judgment turns upon the proper interpretation of "occurrence" as that term is defined in the insurance policy and applied to the facts of the instant case. "Insurance policies are subject to the general rules of contract construction." *Indus. Indem. Co. v. Aetna Cas. & Sur. Co.*, 465 F.2d 934, 936 (9th Cir. 1972). Accordingly, the Court looks first to the express language of the policy. *See Flintkote Co. v. Gen. Accident Assurance Co.*, 410 F. Supp. 2d 875, 881 (N.D. Cal. 2006). *See also Montrose Chem. Corp. v. Admiral Ins. Co.*, 10 Cal. 4th 645, 666 (1995) ("intent

---

[6] Because this case was filed in federal court on the basis of diversity jurisdiction, the Court must apply California substantive law to matters not governed by the United States Constitution or federal statutes. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).

[of parties] is to be inferred, if possible, solely from the written provisions of the contract."). Disputed terms should be "interpreted in their ordinary and popular sense" unless the parties assign a technical meaning to the terms or "unless a special meaning is given to them by usage." *Montrose*, 10 Cal. 4th at 666. Thus, if a layperson would interpret the term in a manner consistent with its plain and ordinary meaning, the Court should adopt that same interpretation. *Flintkote*, 410 F. Supp. 2d at 881 (citing *Montrose*, 10 Cal. 4th at 666-67). Where there is ambiguity with respect to a particular term, "a court must attempt to resolve the ambiguity by adopting the meaning that reflects the objectively reasonable expectations of the insured." *Id*. Extrinsic evidence also may be used by the Court to guide its interpretative analysis of an ambiguous term. *See id.* at 882. Ultimately, any ambiguities should be resolved in favor of the insured. *Montrose*, 10 Cal. 4th at 667. *See also Flintkote*, 410 F. Supp. 2d at 882 ("Courts have also observed, generally, that ambiguities should be resolved in favor of coverage, and that coverage clauses of insurance policies should be interpreted broadly."). Likewise, any provisions that exclude or limit coverage "must be set forth in plain, clear and conspicuous language." *State of Cal. v. Cont'l Ins. Co.*, 88 Cal. Rptr. 3d 288, 305 (Ct. App. 2009) (quoting *Thompson v. Occidental Life Ins. Co.*, 9 Cal. 3d 904, 921 (1973)).

Both Counter-Claimants and Evanston argue that the express language of the insurance policy supports their interpretation of "occurrence." In addition, the parties have presented ample case law to assist the Court in its analysis.

A.  Construction of the Per-Occurrence Limitation

The policy states that Evanston will provide coverage for liability incurred due to "bodily injury" or "property damage." Stip. Facts Ex. B at B010. Bodily injury "means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time." *Id.* at B019. The policy further states that coverage is available for "bodily injury" only if the "'bodily injury'…is caused by an 'occurrence' that takes place in the 'coverage territory'…" *Id*. at B010. Occurrence "means an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Id.* at B020. "Accident" is not defined in the policy. Coverage for each "occurrence" is capped at $1 million. *Id*. at B006.

6

The injuries suffered by Ehart and McClanahan appear to fall under two possible coverage categories, the first being coverage for bodily injury (pursuant to the section entitled "Coverage A") and the second being the coverage category labeled "Products-completed operations hazard." Whether a claim is brought as a Coverage A bodily injury claim or a products-completed operations hazard claim, total damages are subject to a $2 million aggregate limit as well as a $1 million "Each Occurrence Limit," which is the most the insurer will pay for damages or medical expenses "because of all 'bodily injury' and 'property damage' arising out of any one occurrence." Stip. Facts Ex. B at B006, B017. Accordingly, the $1 million per-occurrence limit applies to "all bodily injury" "sustained by a person" "arising out of any one occurrence," *i.e.*, "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."[7]

The parties agree that the ignition of Ehart's ghillie suit was a single occurrence covered by the insurance policy and that coverage for his injuries thus is subject to the $1 million per-occurrence limitation. Evanston articulates two separate theories as to why McClanahan's injuries were part of the same single occurrence. First, it argues that the fire itself was a single occurrence. In the alternative, it contends that a common manufacturing defect, *e.g.*, the application of a defective fireproof spray, was a single occurrence that gave rise to multiple injuries. In response, Counter-Claimants argue that the policy only covers occurrences that happen after the manufacturing process, thereby negating Evanston's common manufacturing defect argument. Counter-Claimants also assert that the circumstances unique to each of the injured Marines, such as the fact that McClanahan was safe until he decided to rescue Ehart, dictate that the events in question were separate "accidents" and thus two separate occurrences under the policy.

---

[7] The fact that there was harm to two different individuals does not, by itself, foreclose the application of the per-occurrence limitation because the limitation applies to "bodily injury" to "a person" "arising out of any one occurrence." Generally, "a" is understood to mean one or more, *see* Williston on Contracts § 30:11 (4th Ed. 2008), and "arising out of" indicates that multiple injuries caused by an initial event may be part of a single occurrence.

### 1. "Coverage Territory"

Counter-Claimants contend that the policy implicitly excludes manufacturing defects because only "occurrences" that take place within the "coverage territory" are covered. *See* Stip. Facts Ex. B at B010. In other words, because occurrence-like events may occur outside of the coverage territory, and manufacturing occurs within the coverage territory, the policy only covers occurrences that occur in the field. However, this argument is inconsistent with language found elsewhere in the policy. For example, "coverage territory" is defined as the United States and "[a]ll parts of the world if…[t]he injury or damages arises out of…[g]oods or products made or sold by you…" *Id*. at B019. Thus, the policy permits coverage for occurrences that arise out of the manufacturing process. The policy also states that a "Products-completed operations hazard" includes bodily injury "occurring away from premises you own and arising out of 'your product' or 'your work'…" *Id*. at B021. "Your product" is defined to include "[a]ny goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by [the insured]…" *Id*. "Your product" also includes "[w]arranties or representations made at any time with respect to the fitness, quality, durability, performance or use of 'your product'" as well as the "providing of or failure to provide warnings or instructions." *Id*. "Your work" is defined as including "[w]ork or operations performed by you or on your behalf; and…[m]aterials, parts or equipment furnished in connection with such work or operations." *Id*. Accordingly, the policy provides coverage for accidents caused by a manufacturing defect.

### 2. "Accident"

Pursuant to the insurance policy, an occurrence "means an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Stip. Facts Ex. B at B020. "An accident" indicates that an occurrence corresponds to a single, unexpected event. That the policy applies only to unexpected events is supported by the fact that "bodily injury…expected or intended from the standpoint of the insured" is excluded from coverage. *See id*. at B010. This interpretation also is consistent with the general understanding of these terms in insurance contracts, pursuant to which "occurrence" typically is interpreted as "[a]ny incident or event, especially one that happens without being designed or expected." Black's Law

Dictionary 1080 (6th Ed.). Similarly, an "accident" is "an event which, under circumstances, is unusual and not expected by the person to whom it happens…and in its common signification the word means an unexpected happening without intention or design." *Id*. at 15.[8] An "accident" also occurs in close proximity to the time of an injury. For example, the policy states that Evanston will reimburse GSC for first aid expenses "administered at the time of an accident." Stip. Facts Ex. B at B014.

In the instant case, it is undisputed that the first occurrence (and accident) was the ignition of Ehart's supposedly fireproof suit. Based on the language of the policy, McClanahan's subsequent injuries were caused by a separate accident and thus arose out of a separate occurrence. Once Ehart's suit ignited and the flames began to spread, McClanahan still was far from the zone of danger and not "continuous[ly]" exposed to "substantially the same" conditions as Ehart. Only after McClanahan made the independent decision to help Ehart was he exposed to a harmful condition, one that was much different from the spark that ignited Ehart's suit, as the initial spark had now turned into a substantial fire. Moreover, McClanahan's suit was supposedly fireproof, and its ignition was as unexpected as the failure of Ehart's. When construed in light of its ordinary meaning, *Montrose*, 10 Cal. 4th at 666, the language of the policy favors a finding that there were two separate accidents on the day of the training exercise.

In addition, it is Evanston's burden to show that the injuries to Ehart and McClanahan are subject to the per-occurrence limitation in the insurance policy. *See Essex Ins. Co.*, 154 Cal. App. 4th at 705. Moreover, if any ambiguity exists with respect to the scope of coverage, such ambiguity must be resolved in Counter-Claimants' favor. *See Indus. Indem. Co.*, 465 F.2d at 936. Accordingly, the Court concludes that there were two separate accidents and thus two separate occurrences for purposes of the per-occurrence limitation in the insurance policy.

---

[8] Similarly, Merriam-Webster's Online Dictionary defines "accident" as "an unforeseen and unplanned event or circumstance…an unexpected happening causing loss or injury which is not due to any fault or misconduct on the part of the person injured but for which legal relief may be sought." *See* http://www.merriam-webster.com/dictionary/accident.

B.  Judicial Interpretations of "Occurrence"

In the majority of jurisdictions, the number of "occurrences" is determined by the number of proximate causes rather than the number of individual injuries. *See* Couch on Insurance § 172:12 (3d Ed. 2008). "Such courts consequently hold that where one proximate, uninterrupted, and continuing cause results in injuries to more than one person or damage to more than one item of property, there is a single accident or occurrence." *Id*. California adheres to the majority rule. *See, e.g., Safeco Ins. Co. of Am. v. Fireman's Fund Ins. Co.*, 148 Cal. App. 4th 620, 633 (2007) ("When there is a single cause of multiple injuries (or a number of causes that result in a greater number of injuries), courts often look to the cause rather than the injuries in determining the amount of insurance coverage. In such a case, the result is a finding of only one claim, *i.e.*, the court looks to the single cause rather than to the multiple injuries.") (quoting *Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co.*, 5 Cal. 4th 854, 863 (1993)). *See also United Servs. Auto. Assn. v. Baggett*, 209 Cal. App. 3d 1387, 1393 (1989) ("[T]he prevailing interpretation of the terms 'accident' and 'occurrence' in insurance policy provisions limiting liability…[is] a reference to the proximate cause of unexpected damage.").[9]  As discussed previously, Evanston argues for at least two possible proximate causes of the Marines' injuries: (1) the fire and (2) a common manufacturing defect in the two ghillie suits.

### 1. The Fire

Evanston cites several cases to support the proposition that the fire that injured Ehart was a single occurrence that happened to injure more than one individual. Essentially, this argument posits that McClanahan's injuries were a natural consequence of the initial accident. In *Baggett*, an insured driver struck another vehicle, and immediately after the incident the insured and the other driver drove a short distance and parked to discuss the accident. 209 Cal. App. 3d at 1390. Subsequently, a third car collided with the insured's car, causing it to strike and kill the other

---

[9] Certain jurisdictions use an "events" test, according to which "it is the number of events, not the number of causative negligent acts, which is dispositive." *Hodgson v. Bremen Farmers' Mut. Ins. Co.*, 3 P.3d 1281, 1284 (Kan. Ct. App. 1999). However, the events test is inconsistent with the law applicable to the instant case.

Case No. C 08-2099 JF (HRL)
ORDER GRANTING COUNTER-CLAIMANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ETC.
(JFLC1)

driver. *Id*. The court concluded that there had been only one occurrence because the insured's initial negligent act led to additional and foreseeable events that were directly attributable to the initial accident. *See id*. at 1394-96. Likewise, in *Patoc v. Lexington Ins. Co.*, No. 08-01893, 2008 WL 3244079 (N.D. Cal. Aug. 5, 2008), the insured sought indemnification for a $1 million judgment under a policy with a limit of $500,000 per occurrence. *Id*. at *1. There, an employee of the insured failed to properly restrain a passenger in a van and as a result the passenger was injured. *Id*. However, instead of bringing the passenger to the hospital for treatment, the employee drove the passenger back to her house. *Id*. at *2. The insured attempted to characterize these events as two separate occurrences, *i.e.*, the employee first was negligent in failing to properly secure the passenger and then was negligent again when he failed to drive her straight to the hospital. *See id*. at *3. However, the court found that there had only been one occurrence because "[i]f each negligent act or omission were regarded as a separate accident, there arguably would be numerous accidents based on heirs' characterization of insured's negligence." *Id*. at *3 (quoting *Baggett*, 209 Cal. App. 3d at 1394).

More recently, in *State of California v. Continental Insurance Co.*, the State sought indemnification for costs related to the remediation of an industrial waste site. 88 Cal. Rptr. 3d at 293. The State argued that there had been several occurrences because there had been multiple acts of negligence, including the escape of contaminants into an underground stream, the use of inferior construction materials in a dam, and a failure to monitor the dam properly. *Id*. at 314. The court rejected this argument, concluding that the only occurrence was the initial deposit of waste material, which then led to several related events that exacerbated the contamination. *See id*. at 316. ("there can be multiple contributing conditions, yet only a single occurrence.").

These cases illustrate the general rule that where a series of related acts of negligence results in an injury, those acts are considered a single "occurrence" for the purpose of determining coverage limits under an insurance policy. *See*, *e.g.*, *Flemming ex rel. Estate of Flemming v. Air Sunshine, Inc.*, 311 F.3d 282, 295 (3d Cir. 2002) (a series of "allegedly negligent acts constitute a single occurrence under the terms of the insurance policy."). Counter-Claimants do not contest this general rule, and both parties agree that Ehart's injuries arose out of

a single occurrence—the ignition of his ghillie suit. However, the question before the Court is whether McClanahan's injuries are traceable to the same proximate cause. *See Baggett*, 209 Cal. App. 3d at 1390. In the instant case, the facts favor Counter-Claimants. In *Baggett*, *Patoc*, and similar cases, the additional injuries would not have occurred without the initial and primary act of negligence. In the instant case, the proximate cause of Ehart's injuries was the unexpected ignition of his ghillie suit by the receiver flash from his weapon. This ignition event clearly was not the proximate cause of McClanahan's burns. McClanahan was forty meters away and would not have been injured if he had stayed away from the fire. Moreover, the failure of his ghillie suit was likewise unexpected and not a natural consequence arising out of the spark that set Ehart's suit on fire. As the parties have stipulated, "[i]f McClanahan had not attempted a rescue of Ehart while wearing his ghillie suit, he would not have caught on fire." Stip. Facts ¶ 15(a). This is a classic recitation of but-for causation that reveals that there was a separate proximate cause of McClanahan's injuries.

### 2. Attempted Rescue as Separate and Independent Cause

Counter-Claimants also argue—under what is essentially an intervening cause theory—that the attempt by McClanahan to help Ehart constituted an independent event and thus was a separate occurrence under the policy. When an "original cause is interrupted or replaced by another cause, then there is more than one 'accident' or 'occurrence.'" *Baggett*, 209 Cal. App. 3d at 1393. In support of their argument that McClanahan's efforts created a separate occurrence, Counter-Claimants cite *State Farm Fire & Cas. Co. v. Kohl*, 131 Cal. App. 3d 1031 (1982), in which an insured automobile driver injured a motorcyclist and then proceeded to injure the motorcyclist further when he dragged her to safety. *Id*. at 1034. The court found that the insured could be indemnified under both his automobile insurance policy and his homeowner's insurance policy, despite an exclusionary clause in the homeowner policy with respect to injuries arising out of the operation of an automobile, because the rescue was an activity separate from the operation of the car. *See id.* at 1036-37. However, *Kohl* analyzed the initial accident and the subsequent rescue to determine whether an exclusionary clause applied, not whether the initial accident was the proximate cause of injuries caused by the rescue. *See Baggett*, 209 Cal. App. 3d

at 1395 ("*Kohl*, and similar cases involving potential applicability of several insurance policies do not identify each negligent act of the insured as a separate 'accident' or 'occurrence.' Instead, they find applicable two or more types of liability insurance when damage results from two or more separate negligent acts or omissions by the insured."). The court in *Kohl* stated as much when it noted that "it is clear that under general tort principles, the additional injury suffered by [the motorcyclist] as a result of the conduct of [the driver] in negligently 'dragging' her would be covered by the automobile policy, since that subsequent negligence would be a foreseeable consequence of the original accident." 131 Cal. App. 3d at 1035.

Counter-Claimants also cite a recent decision by the Illinois Supreme Court, *Addison Ins. Co. v. Fay*, No. 105752, 2009 WL 153859 (Ill. Jan. 23, 2009), which overturned a lower court's finding that a fatality caused by an attempted rescue was part of the same occurrence that resulted in the first fatality. *Id.* at *9. In *Addison*, two boys entered a property that contained a sandpit partially filled with water, which created a quicksand-like condition. *See id.* at *1. The boys became trapped and succumbed to hypothermia. *Id*. Investigators concluded that one boy became trapped and then the second boy likely became trapped while attempting a rescue, but the investigators could not determine whether the attempted rescue happened immediately after the initial occurrence or if the second boy was even present when the first became trapped. *Id*. Applying the causation test and also what is referred to as the "time and space" test, the court found that the insurer had not met its burden of showing that there had been only one occurrence because it was unclear whether the boys had become trapped at almost the same time or if the second boy came along some time later, which would be a separate occurrence under the time and space test. *See id.* at *9. The court did limit its holding by not endorsing a general rule that would define a rescue as a separate and intervening act under all circumstances. *See id.*

The *Addison* court distinguished its decision from that in another often-cited rescue case, *Doria v. Insurance Co. of North America*, 509 A.2d 220 (N.J. Super. Ct. 1986), in which the New Jersey court applied the proximate cause test to conclude that an initial accident and failed rescue attempt were part of the same occurrence. *See id.* at 223 ("the term 'occurrence' clearly focuses on the underlying circumstances of the event which gave rise to the claim of injuries

13

1  rather than on the injury itself…for the purpose of counting the number of occurrences, the term
2  must be construed from the point of view of the cause or causes of the accident rather than its
3  effect."). In *Doria*, three boys encountered an uncovered pool. *Id*. at 221. After one boy fell in
4  to the pool, the second attempted a rescue but also fell in. *Id*. The two boys drowned before the
5  third boy could summon help. *Id*. The court concluded both deaths arose from a single
6  occurrence because of the close "temporal and spatial connection" between the initial fall and
7  attempted rescue. *Id*. at 224. Moreover, the cause of the boys' respective injuries—an
8  uncovered pool—occurred at the same time for both individuals and the danger remained
9  throughout the entire episode. *Id*.

10  The circumstances of the instant case more closely resemble the events in *Addison* than
11  those in *Doria*. The decision by McClanahan to aid Ehart was an independent event that severed
12  the chain of causation. Moreover, and as discussed previously, the conditions faced by
13  McClanahan were markedly different from the receiver flash that ignited Ehart's suit. The two
14  accidents did not occur simultaneously and under the same precise conditions. Nor can it be said
15  that McClanahan's injuries were so closely linked temporally and spatially so as to be part of the
16  same occurrence that caused Ehart's burns. *See Flemming*, 311 F.3d at 296 (a cause and its
17  result are a single event only if they are "so closely linked in time and space as to be considered
18  by the average person as one event.") (quoting *Welter v. Singer*, 376 N.W.2d 84 (Wis. Ct. App.
19  1985)).

### 3. Two Defective Ghillie Suits as Separate Occurrences

21  A manufacturing defect or failure to warn that results in harm to multiple persons may
22  nonetheless constitute a single occurrence because the injuries "arise" from a single common
23  cause. *See*, *e.g.*, *Chemstar, Inc. v. Liberty Mut. Ins. Co.*, 41 F.3d 429, 432 (9th Cir. 1994)
24  (manufacturer's failure to warn that resulted in property damage to twenty-eight users was a
25  single occurrence); *Champion Intern. Corp. v. Cont'l Cas. Co.*, 546 F.2d 502, 505 (2d Cir. 1976)
26  (multiple product failures due to a common defect were a single occurrence because "the policy
27  was not intended to gauge coverage on the basis of individual accidents giving rise to claims, but
28  rather on the underlying circumstances which resulted in the claim for damages."). *See also*

Couch § 172:19 (citing several cases where multiple product failures were deemed to constitute a single occurrence).  In the instant case, it is undisputed that "each of the ghillie suits was in substantially the same condition as when it left the possession of [GSC], subject to reasonably foreseeable changes caused by the application of the recommended 'fireproof' spray."  Stip. Facts ¶ 18(b).

Counter-Claimants cite two asbestos litigation cases, *Flintkote* and *London Market Insurers v. Superior Court*, 146 Cal. App. 4th 648 (2007), in support of the proposition that multiple defective products nonetheless may constitute multiple occurrences.  In *Flintkote*, the court first engaged in an extensive interpretation of the language of the insurance policy, and construed that policy's applicable language to define occurrence as "an event that causes and immediately precedes an injury giving rise to liability under the policy."  410 F. Supp. 2d at 892.  In other words, there should be a close temporal relationship between the occurrence and the injury.  *Id*. at 892-93.  Because a number of years had elapsed since the manufacture of the harmful products, and it was the exposure to asbestos rather than the existence of asbestos-containing products that caused the injury, the court concluded that each injury was a separate occurrence.  *See id.* at 894.  A similar rationale was utilized by the court in *London Market*, in which it was noted that asbestos injury occurs at different times and in different locations, and thus the occurrence causing the injury was the release of asbestos fibers from the insured's products.  *See* 146 Cal. App. 4th at 662-663.

Evanston argues that the holdings of both *Flintkote* and *London Market* are limited to the context of asbestos litigation.  It is true that both courts noted that their respective interpretations of "occurrence" depended at least in part on the particular characteristics of the products at issue.  *See Flintkote*, 410 F. Supp. 2d at 893 ("as applied to the context of asbestos-related injuries, an 'occurrence' is 'exposure to asbestos that causes and immediately precedes an injury giving rise to liability under the policy.'"); *London Market*, 146 Cal. App. 4th at 668 ("as used in the present CGL policies, 'occurrence' means asbestos exposure that results in bodily injury, not [the insured's] manufacture and distribution of asbestos products.").  However, both decisions also are directly relevant to the present analysis because they determine whether an occurrence must

15

be linked to a proximate cause or if a CGL policy may provide coverage for multiple injuries caused by a remote cause. *See Flintkote*, 410 F.Supp.2d at 892 ("The common thread running through the California cases is that an 'occurrence' or 'accident' is associated with the time of injury. This leads to the conclusion that the 'cause' of injury which determines the number of occurrences undoubtedly refers to the immediate rather than the remote cause of injury") (quoting *In re Prudential Lines. Inc.*, 158 F.3d 65, 82 (2d Cir.1998)); *London Market*, 146 Cal. App. 4th at 665 ("Real parties urge that…California law defines 'occurrence' as the underlying or remote cause of an alleged injury, not the immediate cause. Thus, they suggest, because Kaiser's manufacturing and distribution is 'the single underlying cause of [asbestos bodily injury claims],' it necessarily is the relevant 'occurrence.' We do not agree.").

The Court concludes that the proximate cause of Ehart's injuries was the ignition of his ghillie suit. McClanahan's suit ignited after he decided to rescue Ehart and came into contact with a substantial fire. To conclude otherwise would allow an insurer to select any number of preceding events as a possible common cause. *See Flintkote*, 410 F. Supp. 2d at 894 ("many events preceding an injury are casually connected to the injury."). In the instant case, a non-exclusive list of remote causes could include a failure to warn, the decision by GSC to bundle its ghillie suits with a defective fireproof spray, or misapplication of the spray to the suits. Once the analysis looks behind the immediate and proximate cause of an injury, any number of preceding events could be said to be the underlying cause of a person's injuries. Such an interpretation is inconsistent with the terms of the policy and established rules of contract interpretation. Allowing the insurer to limit the number of occurrences to a particular remote cause would effectively eviscerate the purpose of having a per-occurrence limitation as opposed to an aggregate limit. The mere decision by GSC to sell ghillie suits could cover any number of injuries to different people at different times, and limit Evanston's coverage to only $1 million. Clearly such a result was not contemplated by GSC when it entered into the policy. *See London Market*, 146 Cal. App. 4th at 662 (interpretations that render provisions superfluous are disfavored). Moreover, if Evanston had desired to designate a manufacturing defect as a common occurrence under all circumstances, it could have included such provisions in the

policy. *See* Stip. Facts Ex. B at B023 (specific asbestos exclusion included in the policy); *id.* at B035 (specific products liability rider for ghillie suits was included but without language supporting Evanston's current position). Accordingly, the Court finds that the presence of a common defect does not defeat Counter-Claimants' request for coverage for two separate occurrences because such a defect was not the proximate cause of the injuries to the Marines.[10]

### IV.  ORDER

Good cause therefor appearing, IT IS HEREBY ORDERED that Counter-Claimants' motion for partial summary judgment is GRANTED and Evanston's motion for partial summary judgment is DENIED.[11]

DATED: March 18, 2009

_____
JEREMY FOGEL
United States District Judge

---

[10] The cases cited by Evanston do not support a remote cause theory. In *Chemstar*, the failure of the products was inevitable. *See* 41 F.3d at 432 ("there was no intervening, proximate cause after [manufacturer's] failure to warn."). In contrast, the Marines' injuries were not an inevitable result of a defect in the ghillie suits. If the suits had been treated with a chemical that caused burns upon skin contact, such a scenario would favor application of the per-occurrence limitation in spite of multiple injuries. Moreover, such injuries would have arisen out of "continuous or repeated exposure to substantially the same general harmful conditions."

[11] Evanston also objects to certain portions of a declaration submitted by McClanahan on the ground that such portions are duplicative of evidence presented in the Stipulated Facts and/or unfairly prejudicial. The Court agrees, and the objectionable portions are excluded pursuant to Fed. R. Evid. 403.

1  Notice has been electronically mailed to:

2  Alexander Friedland Stuart   afs@wsblaw.net, csc@wsblaw.net, dal@wsblaw.net

3  Craig Evan Needham   cneedham@ndkylaw.com

4  Daniel JT Sciano   dsciano@tsslawyers.com, mbrien@tsslawyers.com, sshaw@tsslawyers.com

5  Gerald A. Emanuel   jemanuel@hinklelaw.com, pstokes@hinklelaw.com

6  Jacquetta May Lannan   jlannan@hinklelaw.com

7  Jeffrey S. Bolender   jbolender@bolender-firm.com

8  Kirsten M. Fish   kfish@ndkylaw.com, pbrown@ndkylaw.com

9  Thomas Henry Schelly   tschelly@bolender-firm.com

Case No. C 08-2099 JF (HRL)
ORDER GRANTING COUNTER-CLAIMANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ETC.
(JFLC1)